

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
Filed

MAY 1 7 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| FEBRIONA VIERA ESCOBEDO | § | |
| INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE ESTATE | § | |
| OF JOSE ANGEL ESCOBEDO | § | |
| RODRIGUEZ, DECEASED;  AND | § | CIVIL ACTION |
| LUIS ALBERTO ESCOBEDO VIERA | § | |
| AND JOSE VIERA ESCOBEDO | § | |
| | § | NO. B-03-135 |
| | § | |
| VS. | § | |
| | § | |
| FORD MOTOR COMPANY, | § | |
| MICHELIN NORTH AMERICA, INC. | § | |
| AND WALMART STORES, INC. DBA | § | |
| SAM'S WHOLESALE CLUB | § | |

## PLAINTIFF'S INITIAL DESIGNATION OF EXPERTS

NOW COMES, Febriona Viera Escobedo, Individually and as Representative of

the Estate of Jose Angel Escobedo Rodriguez, Deceased, and Luis Alberto Escobedo

Viera and Jose Enrique Viera Escobedo and Jose Angel Escobedo, Plaintiffs, as shown

on the attached Exhibit "A", subject to the following:

### I.

Plaintiffs reserve the right to supplement this designation with additional

designations of experts within the time limits imposed by the court or any alterations of

same by subsequent Court Order or agreement of the parties, or pursuant to the Federal

Rules of Civil Procedure and/or the Federal Rules of Civil Evidence.

### II.

Plaintiffs reserve the right to elicit, by way of cross-examination, opinion

testimony from experts designated and called by other parties to the suit. Plaintiffs

express their intention to possibly call, as witnesses associated with adverse parties, any of Defendants' experts.

### III.

Plaintiffs reserve the right to call undesignated rebuttal expert witnesses whose testimony cannot reasonably be foreseen until the presentation of the evidence against Plaintiffs.

### III.

Plaintiffs reserve the right to withdraw the designation of any expert and to aver positively that any such previously designated expert will not be called as a witness at trial, and to re-designate same as a consulting expert, who cannot be called by opposing counsel.

### IV.

Plaintiffs reserve the right to elicit any expert opinion or lay opinion testimony at the time of trial which would be truthful, which would be of benefit to the jury to determine material issues of fact, and which would not be violative of any existing Court Order or the Texas Rules of Civil Procedure.

### V.

Plaintiffs hereby designate, as adverse parties, potentially adverse parties, and/or as witnesses associated with adverse parties, all parties to this suit and all experts designated by any party to this suit, even if the designating party is not a party to the suit at the time of trial. In the event a present or future party designates an expert but then is dismissed for any reason from the suit or fails to call any designated expert, Plaintiffs reserve the right to designate and/or call any such party or such experts previously designated by any party.

## VI.

### DESIGNATION OF MEDICAL DOCTORS & NURSES

In addition to the above designations, Plaintiffs refer you to the medical records and nurses' notes, from which the identities of medical doctors and nurses may be determined. Plaintiffs hereby designate such doctors, nurses and caregivers as experts who may be called to testify as expert witnesses at the time of trial to prove up the reasonableness and medical necessity of Plaintiffs' expenses. See attached Exhibit "B."

## VII.

Plaintiffs reserve whatever additional rights they might have with regard to experts, pursuant to Texas Rules of Civil Procedure, the Texas Rules of Civil Evidence, the case law construing same, and the rulings of the trial court.

Respectfully submitted this the /1 day of May, 2004.

WATTS LAW FIRM, L.L.P.
1926 East Elizabeth Street
Brownsville, Texas 78520
Telephone Number: (956) 544-0500
Facsimile Number: (956) 541-0255


Ray R. Marchan
Attorney for Plaintiffs
State Bar No.12969050
Federal I.D. No. 9522

## CERTIFICATE OF SERVICE

On this the _17_ day of May, 2004, a true and correct copy of the foregoing

instrument was forwarded to all counsel via facsimile, by hand-delivery, or by certified

mail, return receipt requested.

Jaime A. Drabek
The Law Firm of Rabek & Associates
1720 E. Harrison, Ste. B
Harlingen, Texas  78550

Thomas M. Bullion, III
Brown, McCarrol, L.L.P.
111 Congress Avenue, Suite 1400
Austin, Texas  78701

Jaime A. Saenz
Rodriguez, Colvin & Chaney
P.O.  Box 2155
Brownsville, Texas  78522

_____
Ray R. Marchan

EXHIBIT "A"

EXPERT WITNESS LIST

PLAINTIFFS retained experts are:

1.    Andy Irwin

2.    Dr. Joseph Burton

3.    John Stilson

4.    Dr. David Feltoon

5.    Stephen M. Horner, Ph.D.

The descriptions provided below each retained experts name are not intended to be an exhaustive list of the areas to be addressed by the expert. Likewise, the listing of documents or materials reviewed by any expert are not necessarily a complete listing of the materials contained within the expert's file. Rather, this information is being furnished to provide opposing counsel with an indication of the general areas that the expert will address and to provide guidance on the types of information or materials that the expert has or will review in connection with his/her work in this case. All of the materials provided to, reviewed by, or prepared by or for each expert are available immediately for inspection and copying upon request. Further, these materials will be made available at each expert's deposition.

Dr. Joseph Burton

Burton & Associates

1378414 Highway 9

Alpharetta, GA '30004

(770) 777-0437

Dr. Burton has been a licensed medical doctor for many years and the Medical Examiner for several counties surrounding metropolitan Atlanta. Dr, Burton will

provide testimony on crash injuries, injury causation, occupant kinematics, injury tolerance levels, mechanisms of Plaintiffs' injury, and other causation issues presented in this matter. Dr. Burton may testify about hiseducational background and work experience to the extent it is relevant to his testimony and opinions in this case. Dr. Burton has reviewed discovery exchanged between the parties, photographs of the scene and vehicles, medical records, radiology films, and depositions. He has also inspected the Ford F-150 and reviewed relevant technical literature. Dr. Burton's opinions and the basis for his opinions are described in his report. Dr. Burton's C.V. and report are being produced by Plaintiffs and are incorporated herein by reference. See the report for additional materials Dr. Burton has reviewed.


Dr. Burton will be provided for deposition upon reasonable request and his deposition and deposition exhibits are incorporated herein by reference, when taken. Please contact the undersigned to schedule Dr. Burton's deposition.


Andy/Steve Irwin

The Irwin Company

5746 Richmond Avenue

Dallas, IX 7S206

(214) 320-8686

Mr. Irwin is an expert in accident reconstruction and has knowledge regarding his reconstruction of the incident made the basis of this lawsuit, about the speed of the vehicles involved, the forces present at time of impact and during rollover, and the changes in velocity experienced by the vehicles involved in the incident. Mr. Irwin may testify about his educational background and work experience to the extent it is relevant to his testimony and opinions in this case. Mr. Irwin may also testify about traffic safety and related liability issues. Mr. Irwin has reviewed discovery exchanged between the parties and depositions taken in this cause. He has inspected the vehicle and the scene. He has reviewed photographs and technical literature relevant to his areas of expertise. Mr. Irwin's opinions and the basis of his opinions are described in his report. Mr. Irwin's C.V. is attached hereto and are incorporated herein by reference. See his report for additional materials he has reviewed.


Mr. Irwin will be provided for deposition upon reasonable request and his deposition and deposition exhibits are incorporated herein by reference, when taken. Please contact the undersigned to schedule Dr. Irwin's deposition.

John Stilson

Stilson Consulting

18544 Old Gages Lake Road

Wildwood, IL 60030

(847) 223-3101

Mr. Stilson is an engineer who may testify as to liability issues in this case, the cause of the accident, negligence, gross negligence and malice. Mr. Stilson will testify about liability issues concerning door latches, safer alternative design, other similar incidents, the applicability of the NHTSA inquiry and related liability issues, including those discussed in his report. Mr. Stilson's opinions and the basis of his opinions are described in his report. Mr. Stilson's CV is attached hereto and the report is being preapred. See his report for additional materials he has reviewed.

Mr. Stilson will be provided for deposition upon reasonable request and his deposition and deposition exhibits are incorporated herein by reference, when taken. Please contact the undersigned to schedule Mr. Stilson's deposition.

H. David Feltoon, Ph.D.
Clinical & Neuropsychology
8025 Chalk Knoll
Austin, Texas 78735
(512) 750-7164

Dr. H. David Feltoon is a clinical psychologist. He also holds a Ph.D. in Clinical and Neuropsychological. In general, Dr. Feltoon will testify regarding his evaluations of Plaintiffs. He will testify regarding his opinions of the present and future psychological effect and damages that accident has had on Plaintiffs. See CV and report attached hereto.

Stephen M. Horner, Ph.D.

Economic, Business & Statistical Consulting

P. O. Box 2685

Corpus Christi, Texas 78403

(361) 883-1686

Dr. Horner is an economist who will be testifying regarding the economical damages of the plaintiffs. See CV attached hereto.

1)    All medical and/or dental care providers above will testify regarding matters contained in their records and depositions. Their observations, diagnosis, opinions, prognosis, facts, physical and clinical examinations, and tests do reviewed or relied upon are incorporated herein by reference. This includes opinions regarding Plaintiffs pain, mental anguish, medical care, medical expenses, limitations, disfigurement, physical impairment, wage earning capacity, surgery, or any other medical issue in this case. The medical care providers may also testify regarding the reasonableness and necessity of the medical charges and treatment and they may authenticate the medical charges. The medical care providers will testify that they injuries for which they treated Plaintiffs were caused by the subject automobile accident.   All retained and non-retained medical providers are not subject to the control of the Plaintiffs, although Plaintiffs will be requesting that they testify by deposition or live at trial. These retained and non-retained medical providers will testify about any healthcare or medical issues within his/her area of expertise. Records and/or medical reports from these retained and non-retained medical providers have been previously produced to the Defendants.

All retained and non-retained medical providers are expected to testify regarding their education, experience, and credential as a physician or healthcare provider. These retained and non-retained medical providers have reviewed all of the medical records and medical bills of the Plaintiffs which pertain to injuries suffered in the incident made the basis of this lawsuit. These retained and non-retained medical providers have examined the Plaintiffs and reviewed x-rays, MRls, CTScansA or other studies. These retained and non-retained medical providers will testify concerning their diagnosis(ses), treatment, recommendations, and prognosis (ses) for the Plaintiffs. These retained and non-retained medical providers will testify about the nature and severity of the Plaintiffs injuries and the associated limitations. These retained and non-retained medical providers are familiar with the reasonable and customary charges for medical treatment of the type that Plaintiffs has received for the injuries Plaintiffs sustained in the incident made the basis of this lawsuit. These retained and non-retained medical providers are of the opinion that the Plaintiffs injuries were proximately caused by the incident made the basis of this lawsuit. These retained and non-retained medical providers are of the opinion that the medical bills and expenses incurred by the Plaintiffs [and previously furnished to Defendant in response to other discovery requests] were reasonable and necessary. These retained and non-retained medical providers are of the opinion that Plaintiffs will require additional and future medical treatment which will be necessary because of the injuries Plaintiffs sustained in the incident made the basis of this lawsuit. These retained and non-retained medical providers will give opinion testimony concerning the reasonable charges for future medical treatment that is necessary because of the injuries Plaintiffs suffered in the incident made the basis of this lawsuit.

**EXHIBIT B**
LIST OF EXPERTS AND PERSONS WITH KNOWLEDGE OF RELEVANT FACTS

Dr. Jaime Jaramillo Gonzalez
Gobierno del Estado de Tamaulipas
Procuria Duria General de Justicia
Depto. Medico Legal
Hospital Civil Luis G. Falcon
5 de Febrero, Juarez y Morelos
Valle Hermoso, Tamaulipas
842-02-03
Knowledge of facts and circumstances surrounding the medical examination and treatment of Plaintiff for injuries sustained as a result of the accident made the basis of this lawsuit. All medical providers are expected to testify fully as to history, examination, treatment, diagnosis, prognosis and causation as related to Plaintiff's injuries that form the basis of this suit. Additionally, Plaintiff may introduce all the health care provider's medical records through a qualified custodian of records.

Custodian of records for
Dr. Jaime Jaramillo Gonzalez
Gobierno del Estado de Tamaulipas
Procuria Duria General de Justicia
Depto. Medico Legal
Hospital Civil Luis G. Falcon
5 de Febrero, Juarez y Morelos
Valle Hermoso, Tamaulipas
Knowledge of facts and circumstances surrounding the medical and financial records pertaining to Plaintiff for injuries sustained as a result of the accident made the basis of this lawsuit. It is reasonably anticipated that the custodian of records will testify that the medical and financial records pertaining to Plaintiff are under the supervision, custody and control of the custodian of records, that such records were kept in the regular course of business, and that the medical expenses incurred are reasonable and necessary.

Francisco Trujillo-driver of ambulance
Cristina Ureno Casas-Directora del D.I.F. Municipal
C. Claudia Nava-Encargada de las ambulancias
Desarrol Integral De La Familia
Valle Hermoso, Tamps.
Knowledge of facts and circumstances surrounding the ambulatory service which transported Plaintiff.

Custodian of Records for
Francisco Trujillo-driver of ambulance
Cristina Ureno Casas-Directora del D.I.F. Municipal

C. Claudia Nava-Encargada de las ambulancias
Desarrol Integral De La Familia
Valle Hermoso, Tamps.
Knowledge of facts and circumstances surrounding the ambulatory service which transported Plaintiff to hospital. It is reasonably anticipated that the custodian of records will testify that the financial records pertaining to Plaintiff are under the supervision, custody and control of the custodian of records, that such records were kept in the regular course of business, and that the medical expenses incurred are reasonable and necessary.

C.P. Raul Garza Galvan-Owner
Jardina de la Paz Funeral Home
(FunerariaJardina de la Paz)
Calle Rio Bravo #310 Esquina con 21 de Marza Zona Cnetro
Cd. Valle Hermoso, Tamps.
8.842.0038
Knowledge of facts and circumstances surrounding the funeral records and expenses incurred as a result of the incident made the basis of this lawsuit.

C.P. Raul Garza Galvan-Owner
Jardina de la Paz Funeral Home
(FunerariaJardina de la Paz)
Calle Rio Bravo #310 Esquina con 21 de Marza Zona Cnetro
Cd. Valle Hermoso, Tamps.
8.842.0038
Knowledge of facts and circumstances surrounding the funeral records and expenses incurred as a result of the incident made the basis of this lawsuit. It is reasonably anticipated that the custodian of records will testify that the financial records pertaining to decedent are under the supervision, custody and control of the custodian of records, that such records were kept in the regular course of business, and that the funeral expenses incurred are reasonable and necessary.

Lic. Jaime Benjamin Tijerina Solorzano
Lic. Jesus Ramonez Ballesteros Garza
Direccion General de Seguridad Publica
Agency of Public Investigations
Valle Hermoso, Tamp.
Knowledge of facts and circumstances surrounding the investigation of the accident made the basis of this lawsuit.

Custodian of Records for
Lic. Jaime Benjamin Tijerina Solorzano
Lic. Jesus Ramonez Ballesteros Garza
Direccion General de Seguridad Publica
Agency of Public Investigations
Valle Hermoso, Tamp.
Knowledge of facts and circumstances surrounding the investigation of the accident made the basis of this lawsuit. It is reasonably anticipated that the custodian of records will testify that the investigation reports pertaining to Plaintiff are under the

supervision, custody and control of the custodian of records and that such records were kept in the regular course of business.

Carlos Leonel Lozano Gutierrez
Agent of Public Investigative office
Knowledge of facts and circumstances surrounding the investigation of the accident made the basis of this lawsuit.

Custodian of Records for
Carlos Leonel Lozano Gutierrez
Agent of Public Investigative office
Knowledge of facts and circumstances surrounding the investigation of the accident made the basis of this lawsuit. It is reasonably anticipated that the custodian of records will testify that the investigation reports pertaining to Plaintiff are under the supervision, custody and control of the custodian of records and that such records were kept in the regular course of business.

Custodian of Records for
Ministry Police of the State (Policia Minesterial Del Estado)
Address Unknown
Knowledge of facts and circumstances surrounding the investigation of the accident made the basis of this lawsuit. It is reasonably anticipated that the custodian of records will testify that the investigation reports pertaining to Plaintiff are under the supervision, custody and control of the custodian of records and that such records were kept in the regular course of business.

Gerardo Blanco Davila
Notary Public Number 93 (Notaria Publica)
Calle J. Garcia Cardenas No. 345
Cd. Valle Hermoso, Tamps.
Knowledge of facts and circumstances surrounding the investigation of the accident made the basis of this lawsuit.

Custodian of Records for
Gerardo Blanco Davila
Notary Public Number 93 (Notaria Publica)
Calle J. Garcia Cardenas No. 345
Cd. Valle Hermoso, Tamps.
Knowledge of facts and circumstances surrounding the investigation of the accident made the basis of this lawsuit. It is reasonably anticipated that the custodian of records will testify that the investigation reports pertaining to Plaintiff are under the supervision, custody and control of the custodian of records and that such records were kept in the regular course of business.

Carlos Leonel Lozano
Corina Fabiola Arguelles
Ana Maria Torres Espinoza
Dr. Jaime Jaramillo Gonzalez
Benjamin Tijerina

Jesus Ballesteros
Procuraduria General De Justicia Del Estado
Departamento De Medicina Forense
Knowledge of facts and circumstances surrounding the investigation of the accident
made the basis of this lawsuit.

Custodian of Records for
Carlos Leonel Lozano
Corina Fabiola Arguelles
Ana Maria Torres Espinoza
Dr. Jaime Jaramillo Gonzalez
Benjamin Tijerina
Jesus Ballesteros
Procuraduria General De Justicia Del Estado
Departamento De Medicina Forense
Knowledge of facts and circumstances surrounding the investigation of the accident
made the basis of this lawsuit. It is reasonably anticipated that the custodian of records
will testify that the investigation reports pertaining to Plaintiff are under the
supervision, custody and control of the custodian of records and that such records were
kept in the regular course of business.

Custodian of Records for
Prevention Police (Policia Preventiva)
Valle Hermoso
Knowledge of facts and circumstances surrounding the investigation of the accident
made the basis of this lawsuit. It is reasonably anticipated that the custodian of records
will testify that the investigation reports pertaining to Plaintiff are under the
supervision, custody and control of the custodian of records and that such records were
kept in the regular course of business.

Isaias Diaz Perez
Direccion General De Seguridad Publica
Valle Hermoso, Tamps.
Knowledge of facts and circumstances surrounding the investigation of the accident
made the basis of this lawsuit.

Custodian of Records for
Isaias Diaz Perez
Direccion General De Seguridad Publica
Valle Hermoso, Tamps.
Knowledge of facts and circumstances surrounding the investigation of the accident
made the basis of this lawsuit. It is reasonably anticipated that the custodian of records
will testify that the investigation reports pertaining to Plaintiff are under the
supervision, custody and control of the custodian of records and that such records were
kept in the regular course of business.

Dr. Jaime Jaramillo
Dr. Eduardo Hernandez E.
Dr. Quintero

Dr. Daniel Moreno Chapa-sub director medico
Secretaria De Salud Hospital Civil Luis G. Falcon
Calles Juarez y Morelos
Cd. Valle Hermoso, Tamps.
8.842.0203
Knowledge of facts and circumstances surrounding the medical examination and
treatment of Plaintiff for injuries sustained as a result of the accident made the basis of
this lawsuit. All medical providers are expected to testify fully as to history,
examination, treatment, diagnosis, prognosis and causation as related to Plaintiff's
injuries that form the basis of this suit. Additionally, Plaintiff may introduce all the
health care provider's medical records through a qualified custodian of records.

Custodian of Records for
Dr. Jaime Jaramillo
Dr. Eduardo Hernandez E.
Dr. Quintero
Dr. Daniel Moreno Chapa-sub director medico
Secretaria De Salud Hospital Civil Luis G. Falcon
Calles Juarez y Morelos
Cd. Valle Hermoso, Tamps.
8.842.0203
Knowledge of facts and circumstances surrounding the medical and financial records
pertaining to Plaintiff for injuries sustained as a result of the accident made the basis of
this lawsuit. It is reasonably anticipated that the custodian of records will testify that
the medical and financial records pertaining to Plaintiff are under the supervision,
custody and control of the custodian of records, that such records were kept in the
regular course of business, and that the medical expenses incurred are reasonable and
necessary.

Custodian of Records for
Social Security Hosptial
(Hospital del Seguro Social)
Address Unknown
Knowledge of facts and circumstances surrounding the medical and financial records
pertaining to Plaintiff for injuries sustained as a result of the accident made the basis of
this lawsuit. It is reasonably anticipated that the custodian of records will testify that
the medical and financial records pertaining to Plaintiff are under the supervision,
custody and control of the custodian of records, that such records were kept in the
regular course of business, and that the medical expenses incurred are reasonable and
necessary.

David Elizalde  Olguin
El Bravo Newspaper Clipping
Matamoros, Texas
Knowledge of facts and circumstances surrounding the investigation of the accident
made the basis of this lawsuit.

Custodian of Records for
David Elizalde Olguin
El Bravo Newspaper Clipping
Matamoros, Texas
Knowledge of facts and circumstances surrounding the investigation of the accident
made the basis of this lawsuit. It is reasonably anticipated that the custodian of records
will testify that the investigation reports pertaining to Plaintiff are under the
supervision, custody and control of the custodian of records and that such records were
kept in the regular course of business.

Desarrollo Integral De La Familia
Valle Hermoso, Tamps.
Jose Escobedo, Deceased
Dr. Quintero, M.D.
Javier Aguilar, Paramedic
Dr. Quintero, Physician who received body
Francisco Trujillo, Driver of ambulance
Cristina Ureno Casas, Municipal Director
C. Claudia Nava, In charge of ambulances

El Bravo Newspaper
Valle Hermoso
David Elizalde Olguin, Reporter
Cardenas, Photographer
Juan Rangel Espinoza, Driver
Carlos Leonel Lozano, Investigator

Hospital Civil Luis G. Falcon
Valle Hermoso, Tamps.
Jose Angel Escobedo Rodriguez, Deceased
Eduardo Hernandez E., M.D.

Capillas Jardines de la Paz
Valle Hermoso, Tamps.
Luis Alberto Escobedo, Son
Agustin Escobedo, Father
Andrea Rodriguez, Mother
Febriona Viera Macareno, Wife

Secretaria de Salud
Servicios de Salud de Tamualipas
Hospital Civil Luis G. Falcon
5 de Febrero y Morelos(8)842-02-03
Valle Hermoso, Tamps.
Dr. Jaime Jaramillo G.

Gobierno del Estado de Tamualipas
Procuraduria General de Justicia
C. Lic. Carlos Leonel Lozano Gutierrez

## ACCIDENT INVESTIGATION REPORT

## ESCOBEDO vs FORD

## I. Introduction

I was requested by the Watts Law Firm to conduct an independent accident investigation into a single vehicle rollover that resulted in fatal injury to the passenger, Mr. Escobedo Rodriguez.

## II. Background

Based upon the accident report and information received, on July 10, 2002, Mr. Juan Rangal Espinoza was driving a 1994 Ford Ranger pick up truck northbound on El Empalme 122 when the vehicle experienced a left rear tire failure and the driver lost control of the vehicle and it rolled over into the off road coming to rest inverted on the vehicle roof. The belted right front passenger, Mr. Escobedo was seriously injured in the course of the rollover and subsequently died of his injuries.

According to the translated medical report of the autopsy, Folio No. 9343, Mr. Jose Escobedo had the following descriptive injuries:

1. Bruises on left eyelid, right shoulder and right side back.

2. Complete fracture of the 2nd and 3rd rib.

3. Dislocation of the 2nd vertebra with injury to the cerebral stem.

4. Scalp bruise of 10 cm on the right side.

5. Shock caused by explosion of the liver.

I inspected the subject vehicle at the Watts warehouse in Corpus Christi, Texas on April 14, 2004 with the following observations and findings:

1. 1994 Ford Ranger XLT (4 x 2).

2. Wheelbase 108 inches.

3. GVWR 4200 pounds.

4. Rear Step Bumper.

5. Coffin rails on box.

6. Snap on box cover.

7. Left side mid-ship fuel tank.

8. High back bucket seats.

9. Manual seat tracks and seat back recliner.

10. Front Type II B-Pillar mounted active D-ring seat belts with side release buckle.

11. Rear sliding backlite.

12. Remote mirrors.

13. Mixed tire sizes and brands.

14. Twin I-beam front suspension.

15. Left front fender top forward damage (some).

16. Possible body repair holes in front and lower fender area.

17. Driver door upper frame crushed.

18. Driver A-Pillar crushed downward, rearward, and inward.

19.  Driver roof rail crushed downward.

20.  Driver door side glass broken out.

21.  Driver B-Pillar crushed at top (slightly).

22.  Pick up box buckled above filler door.

23.  Rear taillight broken out.

24.  Lower door sill crushed below B-Pillar.

25.  Rear tailgate sprung, but in place.

26.  Right rear taillight broken out.

27.  Sliding rear cab backlite unbroken.

28.  Right box coffin rail bent downward.

29.  Right box side panel buckled at rear and central area.

30.  Right C-Pillar crushed at top.

31.  Right passenger door buckled at lower character line.

32.  Right door mirror broken off.

33.  Right front wheel/suspension damage.

34.  Right front passenger door sprung in opening.

35.  Right front fender (some damage).

36.  Right front roof rail some crush.

37.  Hood sprung to body opening.

38. Roof front header and panel crushed down on left center to top of steering wheel rim (classic 'V' down pattern from left side roof impact).

39. Windshield broken out or separated.

40. No front grille damage.

41. Driver's seat in forward position (lower S/W rim at about C/L of seat cushion).

42. Driver seat back about upright position.

43. Driver seat belt slacked.

44. Plastic sheath of driver buckle is torn.

45. Roof crushed down above driver seat position.

46. RF passenger seat back about 10-20 degrees recline.

47. RF passenger door trim panel separated at front.

48. Glove box door open position.

49. Center console loose and top up.

50. Metal chrome plated B-Pillar D-ring.

51. RF passenger D-ring bolt cover dislodged (loose).

52. RF seat belt cut above floor anchor and webbing retracted.

Based upon the inspection findings, the subject vehicle physical condition shows it experienced a rollover. The roof damage on the drivers side is excessive, with the roof panel and header headliner crushed below the drivers upper steering wheel rim and crush extending rightward to the right front passenger area.

III.    My fee schedule is attached as Exhibit I.

IV.    My four year testimony is attached as Exhibit II.

V.    My curriculum vitae and qualifications are attached as Exhibit III.

VI.    Opinions and Conclusions

The following opinions and conclusions are preliminary and subject to supplement and amendment due to a lack of available case specific discovery information. In particular, I have not received the accident reconstruction and medical reports at the time of this report. The opinions and conclusions are based upon the available information, research, analysis, testing, my experience, training, and education.

I also reserve additional supporting basis for my opinions due to the lack of available discovery materials provided in this case. I have previously received discovery materials from Ford Motor Company in other substantially similar rollover cases that are either subject to a protective order or have not been provided to me in this case. Among others, the captions for these cases are Soria vs Ford, Ferm vs Ford, Romo vs Ford, Alaniz vs Ford, Grimes vs Ford, Odell vs Ford, and Castro vs Ford.

A.    The subject 1994 Ford Ranger pick up truck is defective and unreasonably dangerous due to defects associated with the roof system and occupant restraint system design.

B.    The defective and unreasonably dangerous is a proximate cause of the excessive roof crush and occupant excursion level within the vehicle, and existed at the time the subject vehicle left the control of Ford Motor Company.

C.    The following preliminary defective conditions existed on the subject vehicle:

1.    Lack of adequate roof crush resistance.

2.    Lack of a proper occupant restraint system.

3.  Lack of a proper FMEA.

4.  Lack of proper design validation.

D.  Ford Motor Company (FMC) was aware of the risk of rollover prior to the production of the subject vehicle.

E.  FMC was aware of the risk of roof crush into the occupant survival space prior to the production of the subject vehicle.

F.  FMC was aware of the risk of excessive occupant interior excursion in a rollover prior to the production of the subject vehicle.

G.  FMC was aware of the risk of a seat belted occupant partial ejection prior to the production of the subject vehicle.

H.  FMC violated their internal safety policies in the design of the subject vehicle roof system and occupant restraint system.

I.  FMC violated the industrial Safety Standard of Hazard Prevention.

J.  FMC was aware of the provision of FMVSS 208 to prevent occupant partial ejection from the confines of the vehicle under the rollover requirements.

K.  FMC had the capability, knowledge, and technology to have integrated readily available, economically feasible design alternatives into the subject vehicle. These design alternatives include, but not limited to, the following:

1.  Integrated roll bars into the vehicle structure.

2.  Reinforcements for the structural roof Pillars and cross structuring of the roof panel.

3.  Double roof panel.

4.  Locking latch plate.

-6-

5. Integrated seat belts.

6. End release seat belt buckle.

7. Laminated side glass.

L.    I reserve my opinions on door retention pending receipt of further information.

## VIII.  Discussion

Based upon the information provided, in this specific rollover accident the right front passenger was wearing his seat belt and was potentially fatally injured due to defects in the roof structure, occupant seat belt system, and fracture sensitive tempered side glass. Specifically, the roof strength is designed to the minimum Federal Motor Vehicle Safety Standards (FMVSS 216) and FMC internal guidelines (SM1) that utilize a static test procedure and therefore lack adequate roof and support structure crush resistance in a dynamic rollover situation frequently encountered on public highways. Safety research from the early 1960 period to the present has shown that vehicle roofs designed to the static roof test procedure will deform excessively into the occupant survival space. When this happens, the belted occupants are exposed to the roof structure crushing downward and inward onto them. Another serious consequence of roof crush is the B-Pillar being deformed so the mounted shoulder harness D-ring introduces slack in the harness webbing and combined with a by pass latch plate exposes the belted occupant to harmful interior excursion levels in a rollover. Also, the harness webbing retractor can spool out and introduce additional slack into the harness webbing. And finally, roof crush can fracture the tempered side glass creating a large portal for partial ejection of the belted occupant from the vehicle. All of these defective conditions are known to expose the occupants to the hazards of roof crush and partial ejection.

The hazards of roof collapse and partial ejection were identified by Ford Motor Co. as early as 1969 in inter company reports that addressed the subject of occupant protection in rollovers.  The infamous Brilmeyer report cited that it was unfortunate that a belted occupant was penalized by being held up in a position that exposed them to injury when the roof collapsed.

Even before 1969, a Ford Motor Company report in 1967 titled "1965-1966 Roof Collapse Evaluation", stated that dynamic roof tests using the SAE drop test resulted in excessive roof crush. The actual testing verified the statements that at anticipated vehicle drop heights, Ford vehicles could not meet the SAE J996 dynamic test procedure. One obvious omission from the SAE test procedure is a requirement for failure criteria if the roof deforms in the drop test. Addressed in the report were Ford Motor Company studies into rollover accidents that determined that rollover accident injuries were occurring without rollover protection. In addition, independent safety researchers published technical papers that identified the hazard of roof crush and ejection from the vehicle.

There have been several dynamic test procedures developed and published to evaluate roof crush resistance. These dynamic test procedures, although used by some automotive manufacturers and written by automotive engineering representatives were never accepted as being valid by Ford Motor Company. Instead, Ford Motor Company has adopted the "divers injury" theory and only uses the static test procedure requirement in FMVSS 216 to design their vehicle overhead system for rollover protection. FMVSS 216 only applied to passenger cars until around 1992 when it was proposed by the NHTSA to apply to light trucks and MPV's. From the information I have reviewed, Ford Motor Company voluntarily applied FMVSS 216 to their light truck vehicles, and up to the 1990 time frame conducted dynamic rollover testing on production and prototype vehicles as a developmental tool.

The technical literature published by safety researchers has identified roof collapse as a safety hazard to occupants in rollover accidents. Accident statistics have reported rollover accidents account for a large percentage of the more serious injury and deaths on public highways, and the risk of serious injury is well known to the automotive industry and safety researchers. One primary element of injury mechanism is the collapse of the overhead structure into the occupant survival space sometimes called the "safety zone" necessary to keep the interior surfaces from contacting the occupant during the rollover. This is especially hazardous to the seat belted occupant who is held in a vulnerable position. The safety implication to occupants involved in a rollover accident demand the following vehicle design considerations:

1. The occupants head and neck be restrained from contacting the roof and the roof be of sufficient strength to keep it from contacting the occupants head and neck.

2. The vehicle overhead structure and restraint system be designed to prevent partial/full ejection from the confines of the occupant compartment,

These safety principles are valid, established, and accepted by experts who practice in my field. In addition, they have been tested, published in peer reviewed articles, and their relative error measured against reliable standards, and are of a type reasonably relied upon by experts who practice in my field.

A.    Hazard Prevention Discussion

Occupant protection is the proposition of providing a vehicle that is crash worthy under all accident modes. The premise of crashworthiness is that accidents are known to occur in the "real world", and vehicles must provide a level of protection to prevent serious injury and death from occurring when an accident happens. Studies into crashworthiness in relationship to rollover protection have shown that the best methods of protection is to contain the occupants within the vehicle. Containment prevents ejection and this reduces the risk of injury to the passengers. There is no known safety benefit to an occupant in a rollover accident when the structure of a vehicle collapses onto them or they are partially /fully ejected from the occupant compartment. Under the occupant containment safety principle, the term "roof collapse" is used to describe intrusion of the overheard structure. When a vehicle is designed to provide a certain level of headroom for a passenger it is important to maintain adequate head clearance to the upper roof when the roof is designed to crush and absorb energy during a rollover.

In 1973, Ford Motor Co. participated in the Experimental Safety Vehicle (ESV) project with the US. D.O.T. and conducted drop testing to prevent roof crush within defined objectives of 3-inches of maximum roof crush. The basic concepts set forth in the Ford ESV program were not incorporated into the 1994 Ranger model design despite Ford's knowledge of the identified hazards.

In 1975, a safety concern for SUV's became the subject of an investigation by the Consumer Protection Safety Agency in response to petitions and customer

complaints for the rollover propensity of sport utility vehicles. The safety concern arose due to the vehicle parameters that caused rollover, such as, high center of gravity, narrow track, short wheel base and suspension components. The investigation focused on certain utility vehicles that had higher incidents of rollover than others. The overall data determined that all classes of utility vehicles had rollover problems, but the higher fatal/serious injury accident statistics for certain vehicles became the primary focus. Studies continued after 1975, and several vehicles have been the subject of having safety concerns and were designated as unsafe by independent safety organizations. The investigations by the CPSC revealed that SUV models have a greater propensity to rollover on public highways and established that "real world" rollover accidents occurred for a variety of reasons, including the vehicle design parameters. The investigations and studies also revealed that pick up trucks have a greater propensity for rollover than other vehicles and were drawn into the arena of debate over handling and rollover stability through testing conducted by the automotive manufacturers and independent safety organizations. The testing showed that lift off occurred during several established dynamic limit testing procedures. In the course of the controversy, several complaints were issued due to an identified increase in real world rollover accidents that resulted in serious injuries. The compliment of documents in my research library reveal that Ford Motor Company began conducting several dynamic J-Turn limit rollover tests on their production vehicles. With the knowledge that pick up trucks have a higher propensity for rollover, it becomes important for an automotive manufacture, such as Ford Motor Company, who markets a pick up truck to provide crashworthiness within occupant containment and roof crush resistance design objectives emphasizing vehicle dynamic rollover protection.

Hazards are defined as a condition of a product that exposes the person to a risk of injury when used for its intended purpose, foreseeable purpose, and reasonably foreseeable misuse. The hazards in this case are the crushing of the overhead structure that subjects the occupant to impact/crushing and partial ejection out the side door windows opening and proper restraint of the occupant when the overhead compartment remains uncollapsed. In the strictest sense, it is the fundamental purpose of safety to prevent hazards in products from injuring users. This safety philosophy generated safety principles that were codified into a publish safety practice known as the industrial Safety Standard of Hazard Prevention. In 1993, this safety standard was published in ASME and ASSE



publications. The standard expresses the principles of safety that obligates a manufacturer of products as follows:

1.    To identify all hazards.

2.    To eliminate the hazards where practical.

3.    To guard or otherwise protect the user from the hazard.

4.    At a minimum to warn and instruct the user to protect themselves from the hazard.

The safety standard applies to any product including vehicles and is voluntary rather than mandated by the government. One of the advantages of this safety standard is that it can be compared to the safety objectives selected by a manufacturer to design its vehicles for occupant safety (crashworthiness).

I have been provided with the generic safety objectives selected by Ford Motor Company in the design of their vehicles through discovery from several investigations concerning rollover accidents. Basically, the safety policy set-forth by Ford Motor Company is as follows:

1.    Meet or exceed FMVSS.

2.    Comply with internal guidelines.

3.    Conduct cost/benefit analysis on product improvements.

In this specific case, Ford tested the subject vehicle to the static requirements of FMVSS 216 and their internal design guidelines and the data reports a low energy absorption roof crush resistance. FMVSS 216 is a static test conducted on a vehicle secured to a platform without a chassis/suspension and a metal rectangular platen is oriented at 25 degrees lateral roll and 5 degrees frontal pitch to the front A-Pillar. The platen is loaded with two hydraulic cylinders and under FMVSS 216 requirements must not allow 5 inches of ram travel at 1.5 times the maximum vehicle unloaded weight. The requirements set-forth a performance standard as opposed to a design standard which allows the manufacture to design the roof

-11-

structure to whatever construction criteria they choose.

Under the provisions of Title 49, part 571 of the Code of Federal regulations and the 1966 Safety Act the FMVSS are minimum safety standards intended to provide a certain level of safety, and are intended to be exceeded to achieve the stated purpose of minimizing the risk of serious injury to the occupants in the event of an accident.

The Ford Motor Company safety policy is generic, since it applies to all vehicle models designed for sale in the United States. Specific safety language concerning Ford Motor Company's safety policy is found in their internal documents e.g. (WPAS, CPAS, GPAS, Practice 5, Practice 6, Policy A7 and A8) and are described in the Product Program Direction publications for each specific model. Once the Product Program Direction is issued specifying the safety and design objectives for each vehicle general and sub-systems, Ford engineering departments proceed to follow the design and safety objectives. The procedure used to meet the design and safety objectives is called the design process. Design process establishes the step-by-step procedures to achieve what is called "vehicle sign-off." I used this design process procedure during my tenure as a design/development engineer at Ford Motor Company for several vehicle models and vehicle component systems. The significant steps that apply to the issues in this case relative to the design process used for the 1994 Ranger model are as follows:

1. Issue product specifications;

2. Issue Design Verification and Prove Out Plans;

3. Conduct FMEA's on systems;

4. Product Design Validation (Testing);

5. Issue assembly specifications;

6. Monitor warranty and customer acceptance field performance.

Since the design process is subject to the internal safety policy selected by Ford

-12-

management, the level of product performance is established by the decision of upper management to issue safety objectives for the vehicle design, development, and assembly applied to that model. Upon completion of the design process requirements for any model, Ford engineers and safety departments issue a sign-off letter stating the vehicle complies with the internal safety objectives. In this case, I compared the Ford Motor Company internal safety policy, design process and safety objectives to the Hazard Prevention Safety Standard to evaluate the performance of the 1994 Ranger pick up truck to provide reasonable protection in this rollover accident.

In order to make this evaluation it was necessary to conduct a hazard prevention analysis and failure mode analysis. This methodology is accepted as valid, reliable, and established practice by the safety community in evaluating the safety of a vehicle involved in an accident. It is impractical to simply measure the performance of a vehicle to meet the internal safety objectives and design specifications set forth by the manufacture as the standard for providing reasonable safety for the user. The accepted method of evaluating the crashworthiness of a vehicle incorporates the application of established safety principles in making the assessment.

In particular, the hazards associated with a rollover accident were identified in the 1960's by Ford Motor Company Safety Research engineers, in the 1970's through the Experimental Safety Vehicle (ESV) program, in the 1980'S through the Research Safety Vehicle (RSV) program, and the related testing of vehicles and components.

In terms of the safety objectives selected by Ford Motor Company, there are no dynamic test requirements to evaluate the roof rollover performance. The static application of the FMVSS 216 test procedure does not address the dynamic characteristics of rollover accidents. After the notice of rule making by the NHTSA to provide rollover protection, Ford safety research engineers acknowledged that SAE J374 was not a test to evaluate real world dynamic rollovers, but to measure the relative strength of roof designs on new vehicle models. The crashworthiness of a vehicle designed to FMVSS 216 type static testing has been shown to have inadequate roof crush resistance in real world rollovers. The lack of a dynamic rollover test procedure application to the roof design for the 1994 Ranger creates a situation where Ford Motor Company does

-13-

not know the performance level of the roof and restraint system in real world accidents until they happen. This safety policy results in users being exposed to a risk of injury associated with the lack of knowledge of how the roof will perform in readily foreseeable rollover accidents.

Adoption of the static test requirements of FMVSS 216 ignores the safety concern for inadequate roof structure and occupant protection. Ford Motor Company has responded to this safety concern in several comments to the NHTSA attempts to upgrade FMVSS 216 to a dynamic test procedure with a safety position that there is no casual relationship between roof collapse and injury. Neglecting the issue of fully ejection of an occupant from the vehicle, Ford's safety position applies to belted and unbelted passengers contained within the vehicle. The result is a no win position for an occupant involved in a rollover when the roof designed to FMVSS 216 collapses into the survival space.

Another consideration of the FMVSS 216 static test procedure is that it allows 5 inches of roof intrusion at one particular vehicle orientation and does not test for other roof impact force applications. The manufacturer orients the design towards resistance to intrusion at this single orientation of the vehicle. This approach does not account for "real world" rollovers with a design that is independent of vehicle orientation at impact to offer appropriate roof crush resistance.

My analysis of the failure mode of the subject vehicle roof system revealed that the design of the roof crush resistance is inadequate to prevent excessive roof collapse. The roof construction is based upon design concepts that are known to result in roof collapse during the dynamic load inputs imparted to the roof through contact with the ground. Implementation of design objectives using the static FMVSS 216 test procedure results in structural analysis and testing to meet or exceed the enforced safety policy. These roof design deficiencies derive from weak roof support pillars and roof panels that lack sufficient construction to prevent bending and buckling under relatively low loading conditions. My review of FMVSS 216 testing on a compliment of 1990 Ford models reveals the roof is capable of around 30,000 inch- pounds of energy absorption. This seems like a large number until it is understood that FMC uses the value of inch-pounds which increases the magnitude of the value. If the value is converted to the more common use of foot-pounds it is 2500 foot-pounds. Simple use of physics determines that the energy absorption capability of the Ford pick up roofs is in the range of one-

-14-

half foot vertical drop height during a rollover (5000 pound vehicle dropped from 1-foot= 5000 foot-pounds). When the interior decorative trim is removed from the cab, what is revealed is the design of a "halo" roof where the inner weld flanges of the headers, side rails, and cross bow are "glued" to the single panel roof. This type of overhead construction does not provide a proper unitized body construction to act as a system to distribute the loading. For example, the primary purpose of the lateral roof bow is to prevent undesirable noise due to the thin gage single piece roof panel flapping as a flag in the breeze during vehicle highway operation. Engineering principles of roof collapse at critical areas of the support pillars is a known deficiency where the defectively designed structures lack strength to resist crush loading.

There were several dynamic test procedures readily available to Ford Motor Company to evaluate the rollover performance of the 1988 Ford Bronco II including the following:

1. SAE J996 Drop Test;

2. SAE J875 Ramp Rollover Test;

3. FMVSS 208 Dolly rollover Test.

Ford Motor Company has performed all of these test procedures on experimental, production, and prototype models since the 1960's, but never adopted them as a design requirement.  Ford argues that none of these dynamic test procedures are reliable and repeatable in evaluating vehicle rollover protection and that the static FMVSS 216 is a sufficient test. I take exception to this safety position based upon my experience in body structural design, investigation of hundreds of rollover accidents, investigation of a large compliment of Ford vehicle models, drop testing of similar vehicles, review of hundreds of rollover tests and test reports, review of the design process for the subject vehicle, accident statistics reported in the FARS and NCSS data compiled by the NHTSA concerning the risk of serious injury in rollover accidents, and numerous safety organization publications on the subject of roof collapse and belted occupant excursion in rollovers. All of this information is contained in my extensive research library.

-15-

## B. Roof Construction and Survival Space Discussion

As stated previously, roof collapse is a term used to describe excessive intrusion of the overhead structure into the occupant compartment. When a vehicle is designed to provide a certain level of headroom for a passenger it is important to maintain adequate head clearance to the upper roof when the roof crushes to absorb energy during a rollover. The amount of headroom is referred to as survival space and is determined by the packaging of the occupant into the occupant compartment. The packaging of the occupant in this case involves the interior dimensions set forth for the 1994 Ranger to create a cage around the occupant. Although I have not received the design specifications and drawings from FMC in this case, prior work on substantially similar FMC models and my inspection off the subject vehicle establish the identical defective conditions exist. Basically, the subject vehicle roof system is designed with a steel stamped front and rear header assembly, side roof rails, two support pillars (A & B) on the left and right side, lateral roof bow, and a single panel roof. The relatively large opening between the vertical pillars is supported by the door/s and glass. The cab steel assembly members are spot welded together into a unitized occupant compartment and then reinforcements are spot welded to some members to form the occupant compartment. There are also openings (holes) made in the stamped pillars for weight reduction and assembly of interior parts which also deteriorates the overall part strength. In general, the construction of the roof involves meeting engineering design directives and specifications that consider styling of the body for rake and tumble home aimed at achieving what is called a "green house" effect. These design parameters result in a structure primarily designed for vehicle durability rather than occupant protection under the established safety objectives. In particular, the large openings for the cab glass components and doors along with "narrowing" of the upper pillars in comparison to the lower pillars, sometimes referred to as the "coke bottle" effect which reduces the overall crush resistance of the overhead structure. The transition between the lower and upper pillars and the attachment to the upper roof rails and header assemblies become the critical areas of stress in providing roof crush resistance. In addition, the single piece roof panel strength must resist lateral and vertical buckling and crushing over the large span between the structural members. A single thickness roof panel without adequate cross structuring creates a weak construction. A further reduction in strength occurs due to the assembly of the pillars with internal openings intended for structural rigidity, but without adequate bending strength result in wasted "space."

-16-

All of these roof components must act as an assembly to resist crushing loads during roof impact by distributing the loading. If one member is overloaded and deforms extensively, the load is transferred to the next member in a domino type effect that seeks the weakest links resulting in excessive roof deformation. These areas of stress are called plastic hinges, because they yield and deform beyond elastic strength levels. Since the A-Pillar is known to be the weakest structural member of the roof system due to its narrowing, rake, and tumble home, it must be designed with bending strength and reinforced at its critical loading section/s. It is also important for the door and glass to provide a percentage of structural support to assist the roof and pillars in sustaining the loads.

In 1986, the Ford Motor Company Policy and Strategy Committee approved a new design strategy targeted at NAAO Trucks and MPV's called Safety Design Guidelines. The purpose was to recommend priorities for potential new or revised safety design guidelines based on a study of the available facts, external factors, customer expectations, a NHTSA report on light truck safety, and to follow the philosophy of Policy 105 (A7, later revised to 7) for advancing the state-of-the-art of safety wherever practicable. The executive summary in the proposed guidelines stated, "Fatalities in rollover accidents, which may or may not be accompanied by roof crush or occupant ejections, are more prevalent in light trucks than cars." It included Roof Crush as an area of study and stated that for all types of trucks, rollover is more frequent than for passenger cars. It also reported based on the analysis of accident statistics that, "A rollover accident is more likely to produce serious to fatal injury to an unbelted occupant, even if not ejected, because of the increased risk of multiple "secondary" impacts inside the vehicle. Although a belted occupant is still at risk, he is much less likely to experience severe injury." The statement basically supports the diver injury theory which according to FMC has no "known" engineering resolution beyond allowing it to continue. This is confirmed in the discussion area of the Design Guideline on resistance to roof crush, and states the following:

1.    The fact remains that in many accidents situations a rollover is inevitable.

2.    In the case of belted occupants the focus shifts to the roof structure to minimize the risk of restrained occupant injury.

3.   Most light truck roofs meet or exceed the "dynamic" requirements of FMVSS 216.

4.   Designing a roof to literally prevent crush is not practicable.

5.   The challenge is to reduce the probability of roof crush by establishing a guideline that exhibits criteria proportionately better than the 216 requirements, particularly for ductile roof materials.

6.   In the absence of a validated dynamic test procedure, development of this guideline would be based on the static FMVSS roof crush criteria and test procedure.

Essentially, the guideline presents the safety objectives of Ford Motor Company as maintaining the static test procedure for roof strength using several "old" arguments as their rational and justification. The self serving statement that there are no validated dynamic test procedures ignores the SAE J996 drop test, SAE J875 ramp rollover, and FMVSS 208 dolly rollover established over several years of testing and development. The Design Safety Guideline for roof crush resistance was eventually approved at a 25% design factor over the FMVSS 216.

Essentially, the roof construction of the 1994 Ranger using a "halo roof" with the inner structural member glued to the roof, along with lateral roof bows glued to the single roof panel does not create a crush resistant unitized roof construction design that distributes the loading paths throughout the entire structure.

Part of the design process includes the design requirement of using a procedure called Failure Mode Effects Analysis (FMEA). The objective of the published FMEA procedure is for an engineer to conceive of any possible hazardous failure mode and to evaluate the risk of serious injury to the occupant. This procedure serves as a reasonable opportunity for Ford Motor Company to have applied the method to the design of the 1994 Ranger roof design without the restriction of the imposed safety objectives, which explains one reason for the failure of the Ford FMEA for roof design under the imposed constraint by the Ford Motor Company upper management to design the roof to FMVSS 216 and their internal design guideline for roof crush resistance. Imposing this safety policy constraint prevents product improvements based upon the results of a valid and proper design FMEA

-18-



that would consider dynamic testing to reduce the likelihood of roof collapse. As a result, the implications to occupant safety is an unreasonable risk of serious injury due to roof collapse and breakage of the side glass occurring in reasonably foreseeable rollover accidents, such as occurred in this accident.

The rollover accident that occurred in this specific case resulted in the roof forced inward and downward from the left side impact, breakage of the side door glass, and downward crush of the A and B pillars. The fearful consequences of a Ford light truck designed to the FMVSS 216 static test procedure was recorded in Crash Test No. 2075 tested using a 30 mph dolly rollover of a 1973 F-series pick up with photographs that show the vehicle at rest with the belted dummies head and torso projecting out the side window above the roof crush. In this specific case, the deformation of the overhead roof laterally inward and downward exposed the right front passenger to the hazards of roof collapse, interior excursion, and partial ejection. The overall implication to occupant protection in a rollover emphasizes the importance for containment of the occupant (ejection prevention) within the confines of the occupant compartment, which is a recognized safety principle established through safety research, testing, and NHTSA accident data. In other words, keeping the occupants inside the vehicle is a known safety benefit. In general, the automotive industry recognizes the hazard of occupant ejection, and has taken the safety position that wearing seat belts is the best protection against ejection in accidents. This safety position is only beneficial if the vehicle cab structural integrity is maintained in the course of the accident. There is no known safety benefit for the occupants who wear their seat belts, when the cab deforms due to defects in the design of the roof structural members and collapses into the survival space.

Vehicle occupant packaging design of seat belts requires that the belted in occupant must have a certain designed in excursion level in the seat belt system. What this means is, the seat belt design allows the occupant head and torso to move within the vehicle interior with a known risk of being ejected out of the door /window openings. If the roof deforms and introduces webbing slack, the seat belt stretches, or the retractor spools out webbing, the resultant excessive excursion level can expose them to being "nut crackered" between the ground and body side or making contact with the ground during the rollover sequence.

The fact that the right front passenger was wearing his seat belt was negated by the



defective overhead structure and lack of rollover actuated lap and harness pretensioners that would minimize interior excursion or contain them within the cab survival space in this rollover. The technology to provide occupant restraint systems that can minimize occupant excursion levels was integrated into FMC production vehicle seats, seat belt retractors and air bags, and was readily available for actuation of properly designed pretensioners to prevent excessive excursion of the occupants. It has been my dismaying observation from investigation of hundreds of rollovers that the seats always fair much better than the occupants in rollovers. What this means is that if the occupant had been properly restrained to the seat, and the vehicle roof structure maintains the survival space, the occupant would ride out the rollover accident with minimum risk of impact exposure to serious injury similar to the seat.

## B. Restraint System Discussion

The restraint system of a vehicle comprises the seat, seat belt, door, glass, and occupant compartment. Some of its known safety functions are as follows:

1. Prevent ejection.
2. Provide crash occupant kinematic control.
3. Provide crash ride down.
4. Control interior excursion levels.
5. Prevent intrusion into the survival space.
6. Provide energy absorption during interior impacts.

In order for the restraint system to meet the above functional safety objectives, each system must be designed to maximize its performance and effectiveness under reasonably foreseeable "real world" collisions. Specifically, in rollover accidents the restraint system must contain the occupant within the restrictions of the seat and occupant compartment and the roof structure must provide adequate crush resistance to prevent occupant contact and excursion levels that expose occupants to injurious impacts and ejection. The design process is restricted and governed by the internal safety policies of the manufacture. In particular, FMC issues a written safety policy for each vehicle program which in turn is used by the corporate engineering activities to formulate design objectives to meet the safety policies. Since vehicle crashworthiness is also regulated by the minimum FMVSS of the NHTSA, each vehicle program has a safety policy to meet or exceed the



FMVSS. In addition, FMC has issued internal guidelines that generally exceed the FMVSS; however, the engineering divisions responsible for the meeting the design guidelines are constrained by internal safety policies to utilize the test and development objectives that conform to the basic FMVSS test requirements. As a result, following the design process to design the vehicle is flawed by the safety policies that govern it.

## C. Seat Belt and Glazing Discussion

The same hazard prevention analysis that was applied to the roof system pertains to the seat belt and glazing systems. FMC uses the same generic safety policy, procedures, and design process to design this part of the restraint system. The basic FMC management safety directives are the same for these systems. Under the established safety objectives imposed by FMC upper management there is no dynamic rollover test requirement for the 1994 Ranger, which means that FMC does not know the safety performance of their seat belts and glazing beyond monitoring accidents that occur in the field. I am unaware of any FMEA or DVP&R issued for the 1994 Ranger that addresses the performance requirements of these systems with respect to a dynamic rollover situation. Instead, FMC meets the minimum FMVSS and their internal guidelines that do not directly consider the system performance under dynamic rollover conditions. In choosing to apply their inadequate safety objectives to these occupant protection systems, FMC passes on the known risk of serious injury to its user's.

## 1. Seat Belt System Design Analysis

FMC designed the subject 1994 Ranger with a type II active (manual) seat belt anchored to the body structure. The active type II seat belt system must meet the requirements of FMVSS 208, 209 and 210. Only FMVSS 208 contains a requirement for dynamic testing of the seat belt system performance in a vehicle rollover condition, but only under the selected option of a totally passive occupant protection system. FMC did not select the passive option for the design of the subject vehicle. The seat belt harness was designed with an ELR functional retractor. The ELR is designed with a vehicle sensitive retractor to lock up and prevent harness webbing extraction under heavy braking and crash conditions. In a rollover, the retractor is designed to lock up due to either acceleration or vehicle orientation and is sensitive to webbing loading of the retractor. There are known



defects in the seat belt system designed by FMC with respect to the issues in this case:

- The ELR locking mechanism is dependent upon an inertial engagement device that can move into an unlocked position during the rollover impact events and cause webbing spool out and stretch.

- A by-pass design latch plate.

- A side release buckle that can inertial release.

A.    A B-Pillar mounted D-ring that will deform and introduce slack into the harness webbing.

These defective conditions can result in undesirable occupant excursion levels within the occupant compartment.  Worse, the slack belt from retractor spooling can result in partial or complete ejection of the occupant from the vehicle.

These defects in seat belts have been identified and published in peer reviewed technical literature that has been known to the automotive industry for decades. In addition, dynamic testing using sleds, rollover fixtures, laboratory component fixtures, and vehicles has demonstrated the defects occur under rollover conditions. The methodology used in testing and evaluating the performance of the seat belt system is established, accepted, and valid as recognized by the scientific community. The body of technical knowledge concerning seat belt system defects is information reasonably relied upon by experts who practice in my field.

2.  Glazing Design Discussion

Glazing is the term used for the type of glass used for automotive applications. FMC designed the 1994 Ranger glazing material dependent upon the design location in the vehicle. For example, the windshield uses laminated glass while the other positions use different thickness tempered glass. The physical properties of these two glazing systems are totally different. Laminated glass is manufactured with a plastic inner layer between two thickness of glass, and more recently with an added plastic laminated to the vehicle interior glass side. Tempered glass is a single piece that is treated so it will fracture into small fragments under impact.

-22-

One advantage of laminated glass is that it has very good energy absorbing characteristics (shatter resistant) due to the plastic laminate that allows fracture of the glass while remaining a composite. The addition of interior and exterior coatings reduces the exposure to glass fracture surfaces that can cause lacerations.

FMC designed the 1994 Ranger with three (3) tempered glass positions- sides and rear back lite. Since the vehicle has two doors, the tempered glass in the doors are movable, and by design cover the large openings in the doors from the belt upward to the roof.

The published technical literature; internal FMC reports, papers, and meeting reports; and other automotive manufacturer's internal information concerning the performance of laminated glass to contain occupants inside a vehicle in a rollover accident have demonstrated its capability to prevent ejection. These technical publications include vehicle rollover tests that compare the relative containment performance for belted and unbelted dummies, and have validated the capability of laminated glass to prevent ejection. One weakness in the testing process of comparing tempered and laminated glass stems from two sources:

1. FMC and other automotive manufacturer's rely on the side glass for a relatively high percentage of added roof strength. This applies to the windshield and side glass to increase the roof strength by becoming structural members.

2. The static test requirements of FMVSS 216 do not always expose the roof to sufficient forces and crush levels to cause complete glass fracture, cracking, or separation. When the glass does shatter or fracture, there is a dramatic decrease in the force to crush the roof shown in the data plots of the tests.

Because the roof design for the 1994 Ranger lacks adequate energy absorption performance without excessive roof collapse, the large size of the side door and body openings using tempered side glass will completely fracture under the dynamic deformations of the weak roof structure. In my hundreds of accident investigations, I have observed tempered side and rear glass completely fractured during rollover accidents. These investigations involve a wide variety of rollover accidents and vehicle models, and range from 15 mph to 70 mph rollover speeds on various terrains. In almost every case the tempered glass window fractured due to the crushing of the roof system. In addition, in the majority of these cases an

-23-



unbelted passenger was ejected out the window openings. That is one reason the glazing system in conjunction with the roof system design must consider the high risk of ejection out the large portals created by the fractured glass in rollovers. The major body of technical literature concerning the risk of ejection in rollovers is supported by accident statistics from several reliable sources, and are of a type reasonably relied upon by experts who practice in my field.

FMC has taken the safety position that the best way to prevent ejection of occupants involved in a rollover accident is to wear their seat belts. The consequence of taking this safety position is exemplified by what occurred in this accident. Even though the front passenger was wearing the lap and shoulder harness seat belt, the lateral and downward displacement of the roof fractured the tempered side window glass and created a large portal for him to be partially ejected from the vehicle.

IX.    Design Alternative Discussion

Ford Motor Company had the technology, capability, and knowledge to have integrated readily available, feasible, and economical design alternatives developed and assembled on production vehicles to have minimized the risk of the hazards under the condition of this accident. I have identified these in my opinions, and include them in this discussion.

These design alternatives are as follows:

    A.    Reinforcement of Pillars (HSS Materials);

    B.    Integration of Roll Bars;

    C.    Seat Belt Pretensioners and Web Grabbers (Ford Scorpio);

    D.    Reinforced Roof Panel (1980 Ford and GM Pick ups);

    E.    Laminated Glass/plastic side windows (Bronco II);

    F.    Structural Foam Filled Pillars (Ford Falcon);

G.    Integrated Seats (1974 GM Vega).

H.    Side window nets (F150 Trucks).

All of these design alternatives have been used over a compliment of production
vehicles and have been tested for reliability and safety performance establishing
their feasibility and practical application.

The integration of structural reinforcements into body systems was first introduced
in the 1970 Ford ESV program where innovative systems were integrated into the
vehicle e.g. (integrated roll bar, high strength steels, etc.)  A production 1969 LTD
Fairlane model was modified with these changes and crushed less than three (3)
inches at the B-Pillar from a two foot drop height, while the production vehicle
roof crushed to the belt line area under the same test conditions.  In addition,
Nissan Motor Company issued DOT HS807925 Final report in 1989 that lists the
successful reinforcing of roof and pillar structures to improve rollover protection.
In particular, Ford Motor Company improved their roof strength by extending the
B-pillar less than one-foot, although the improvement did not exceed their internal
design guidelines. Roll bars are safety devices used on race cars and
recreational/utility light trucks. Ford offers roll bars for their light truck vehicles as
accessories and options. The roll bars are installed both exterior, interior, and were
integrated into the B-pillars and rear plastic top panels on the Bronco and Blazer
models.  Testing of these roll bars has included FMVSS 216 (SAE J374), SM-1,
SAE J996 Drop Tests, SAE J875 Ramp Rollover, and FMVSS 208 Dolly rollover.
Prior to 1966, the GSA required 50 mph rollover testing for open top vehicles.
Jeep vehicles were testified with roll cages installed and test reports showed no
damage to the  roll cages tested to 50 mph.  Drop tests on roll caged vehicles from
up to 2 feet have limited roof crush to three inches of residual crush. This data was
confirmed by tests conducted in the Malibu series of tests reported in SAE papers.
The same result occurred in 30 mph dolly rollover tests with roll caged vehicles
compared to production vehicles. The production vehicles showed collapse of the
roof into the occupant compartment vehicle the roll caged vehicle showed
insignificant roof crush.

Ford Motor Company performed an FMVSS 216 static test on two roll bar
vehicles and the hydraulic ram stalled at 14,000 plus pounds below three inches of
ram travel.  More recently, Ford Crown Victorias had roll cages installed and

-25-



when tested to 25,000 plus pounds stalled the hydraulic ram at 3.4 inches while the production roof strength was recorded at 8,256 pounds and 2.8 inches of crush.

The recommendation of a roll caged design for the 1994 Ranger is to integrate the design premise of the accumulated design alternatives to achieve improved roof strength to meet a three foot drop height with three inches of residual crush or to prevent roof crush into the survival space.

Laminated glass is a glazing material that is used in all production vehicle windshields. Its primary safety advantage is that it will crack without shattering, has good energy absorbing qualities for head impact, and acts as a restraint system to prevent partial / full ejection out the large glass portal. Ford used laminated glass on its vehicles in the side locations along with other manufacturers in different locations. Laboratory and rollover testing of laminated glass windows in conjunction with a crush resistant roof has shown containment capability of passengers.

There were also economical side window nets that can be actuated and drop down to contain the occupant even if the laminated glass window opening is compromised in the accident. These nets have been used in open/closed body race cars for years for containment and are feasible, can readily be integrated into the vehicle, and are light weight. Ford has introduced drop down nets for their new model pick up trucks, and although it post dates the production of the subject vehicle, establishes the economical feasibility of its integration into the 1994 model.

The safety concern with rollover accidents is argued within the medical community concerning what is called the classical drivers injury. In terms of occupant protection the concern centers around the seat belted occupant experiencing inverted vehicle excursion that resulted in their head contacting the roof with then body loading injuries. There are published human factors text's that recommend a three inch headroom design for the 99% male sitting height. Providing this level of head room benefits the shorter sitting heights by providing greater head room. Complementing the head room allowance to minimize downward excursion of an occupant with the vehicle inverted, is the design of an integrated seat with pretensioners and web grabbers to provide restraint. Ford Motor Company offered pretensioners and web grabbers on their European models



prior to the production of the subject vehicle.

Had the design alternatives been integrated into the subject 1994 Ranger it is more probable than not, that the risk of roof collapse, excessive occupant excursion, and partial/full ejection would have been substantially reduced or eliminated under the conditions of this accident.

Respectfully submitted,

5-14-2004
Date

John M. Stilson
Safety and Automotive Consultant

# Exhibit I

September 2003

## STILSON CONSULTING

### JOHN M. STILSON

### FEE SCHEDULE

**     $5,000  RETAINER OUT-OF-STATE/CASE

**     $2,000  RETAINER ILLINOIS

**      $500   HOURLY FEE

**     OUT-OF-POCKET EXPENSES TO BE PAID BY CLIENT

**     8 HOUR MINIMUM:   OUT OF STATE DEPOSITION AND TRIAL
       TESTIMONY

**     4 HOUR MINIMUM: LOCAL (IN-STATE) DEPOSITION AND TRIAL
       TESTIMONY

**     MINIMUM CHARGE OF $1,500

****   TOTAL AMOUNT DUE MUST BE PAID PRIOR TO DEPOSITION OR TRIAL
       TESTIMONY

****   PAST DUE ACCOUNTS WILL BE CHARGED 1 ½ %

****   **RETAINER WILL BE APPLIED TO THE FINAL BILL**

       **FEES SUBJECT TO CHANGE WITHOUT NOTICE**

*JOHN STILSON WILL NOT BE AVAILABLE THE  MONTHS OF JUNE, JULY & AUGUST*

IF YOU ACCEPT THE TERMS OF THIS FEE SCHEDULE PLEASE
AND FAX BACK TO OUR OFFICE AT (847) 223-3180.

# Exhibit II



# JOHN M. STILSON

## TESTIMONY LIST

### 2004 TESTIMONY

McCoy v. Honda
Caruana v. Hyperion
Felton
Gonzlez v. Ford
Alaniz v. Ford
Haller v. Chrysler
Ferm v. Ford
Gruenloh v. Chrysler
Foster v. Ford
Duncan v. Ford
Pinto v. Ford

### 2003 TESTIMONY

Hill v. Ford
Castro v. Ford
Hirn v. Ford
Farr v. Toyota
Rodriguez v. Ford
Castro v. Ford
Musick v. Kenworth
Fowler v. Ford
Vu v. Ford
Sanchez v. Ford
Gibson v. Ford
Cunningham v. Honda
Razon v. Ford
Cansino v. Ford
McCoy v. Honda
Gonzalez v. Ford
Alaniz v. Ford
McClendon v. Nissan



Macha

## 2002 TESTIMONY

Schmitz v. GM
Gruenloh v. Chrysler
Silva v. Chrysler
Zaborowski
Ramczyk v. Ford
Cobb v. Chrysler
Yanta
Johnson v. Ford
Fenner
Hopper v. Nissan
Harrison v. GM
Alaniz v. Ford
Copeland v. Nissan

## 2001 TESTIMONY

Rivera v. GM
McDonnall v. GM
Aultman v. GM
Bachus v. Mazda
Cleveland v. Hyundai
Bertuca v. GM
Martin v. GM
Garcia v. GM
Guzman v. Chrysler
Green v. Ford
Lamba v. Ford
Martland v. Fleetwood
Cannon v. Ford
Stringfield v. GM
Silva v. Chrysler
Koenig v. GM
Gruenloh v. Chrysler
Seither v. Winnebago



## 2000 TESTIMONY

Alexander v. GM
Cannon v. Ford
LeCompte v. Chrysler
Petty v. Ford
Landry v. Chrysler
Barquin v. GM
Stringfield v. GM
Housh Construction Company
Taylor v. GM
Martin/Bradshaw v. Ford
Irecheta v. GM
Silva v. GM
Davis v. Saturn
Seither v. Winnebago
Garcia/Rangel v. GM
Butler
Balleza v. GM
Wilson v. GM
McElligott v. GM

# Exhibit III

May 20, 2003

# CURRICULUM VITAE

## OF

## JOHN M. STILSON

**PROFESSION:**        Consulting Engineer

**JOB TITLE:**        Safety and Automotive Consultant

**BUSINESS FIRM:**        Stilson Consulting
18544 Old Gages Lake Road
P.O. Box 367
Wildwood, IL  60030 (Grayslake)
(847) 223-3101
(847) 223-3180 Fax

**AREAS OF EXPERTISE:**        Mechanical Engineering
Automotive Engineering
Product Design Engineering
Product Safety Engineering
Product Test and Development
Product Quality Assurance
Product Problem Analysis
Manufacturing Processing
Prototype Design and Development
Accident Reconstruction and Cause Analysis
Vehicle Evaluation
Product Failure Mode Analysis
Product Reliability

**PREVIOUS EMPLOYMENT:**        **Polytechnic, Inc.**
3740 Morse Avenue
Lincolnwood, IL
1981-1983

**Ford Motor Company**
Building #1
Dearborn, MI
1971-1976
1978-1981

**Chrysler Corporation**
Engineering Center
Highland Park, MI
1967-1971

**Ford Motor Company**
Dearborn, MI
1965-1967

**Sunbeam Corporation**
Roosevelt Road
Chicago, IL
1964-1965

**PREVIOUS
POSITIONS:**

**Polytechnic, Inc.**

Director of Vehicle Lab
Senior Mechanical Engineer

**Ford Motor Co.**

Product Chassis Design Engineer
Group Leader-Vehicle Development
Product Body Design Engineer

**Chrysler Corp.**

Group Leader - Future Concepts Committee
Program Manager
Program Coordinator
Product Design Engineer
Product Development Engineer
Engineer Trainee

**Ford Motor Co.**

Co-Op Engineer

**Sunbeam Corp.**

Co-Op Engineer

**EDUCATION:**        Masters of Science, Mechanical Engineering

University of Michigan, 1969

Automotive Engineering Degree
Chrysler Institute of Engineering, 1969

Bachelor of Science, Mechanical Engineering
University of Michigan, 1967

**POST GRADUATE EDUCATION:**

Professional Development Program,
University of Michigan

Kemper-Tregoe Manager Courses

Ford Supervisor Institute, Management Training

Accident Reconstruction and Cause Analysis Studies
University of Wisconsin Extension
Madison, Wisconsin  April 1981

Accident Reconstruction Seminar
University of Georgetown
Washington, D.C. 1989

**SPECIAL WORK EXPERIENCE:**

Design Patent, Chrysler Corp., 1968
Chrysler Heat Transfer Project
University of Michigan Graduate Studies Instructor Assistant
President, University of Michigan Honor Council
University of Michigan Student Government Council
Chairman SAE Student Chapter

**PUBLICATIONS:**

**Accident Reconstruction**, 1984 Illinois Institute of Continuing Legal

**Education, Transportation and Negligence**

**Crashworthiness IICLE**

**MADD Article**

**National Head Injury Alliance**

**SEMINARS:**

The International Brain Injury Association and the Brain Injury Association of Spain Second World Congress on Brain Injury, "Advances in Neurotrauma from Research to Community Living" May 10-14 1997 Seville Spain.

3

| PROFESSIONAL | American Society of Mechanical Engineers |
|---|---|
| AND FRATERNAL | Society of Automotive Engineers |
| SOCIETIES: | American Society of Safety Engineers |
| | University of Michigan Alumni Association |
| | National Association of Fire Investigators |

## WORK EXPERIENCE:

**March 1, 1983
to Present**

**STILSON CONSULTING**

### SAFETY AND AUTOMOTIVE CONSULTANT

Independent consulting services offered to industry, the private sector, government, and the legal profession. Project work involves all aspects of safety engineering related to vehicles, vehicle systems, and industrial machinery, including:

- Product Design Performance
- Product Defect Analysis
- Engineering Problem Investigation
- Safety Engineering
- Accident Analysis
- Accident Reconstruction
- Failure Mode Analysis
- Technical Photography
- Photographic Preparation
- Videotaping
- Issuance of Engineering Reports
- Technical Analysis and Consulting
- System and Component Test
- Vehicle Testing
- Warning and Safety Labels
- Accident Investigation

### SPECIALTY AREAS INVESTIGATED

- Fuel System Integrity
- General Crashworthiness
- Vehicle Stability
- Park - to - Reverse
- Weld Quality
- Seat Structural Integrity
- Seat Back Strength
- Steering Column Performance
- Seat Belt Performance

4

Wheel and Tire Performance
Occupant Interior Protection in a Crash
Rollover Protection
Occupant Containment
Occupant Compartment Integrity
Vehicle Roll Away
Rear Wheel Separation
Brake System Performance
Passive / Air Bag System Performance
Sudden Vehicle Acceleration
Suspension System Performance
Side Impact Integrity
Delta V Calculation and Determination
Occupant Restraint System Performance
Machine Guarding
Motorcycle Performance
All Terrain Vehicle Stability
Three Wheeler Stability
Recreational Vehicle Performance
Slip and Fall Accidents
Mechanical Jacking Systems
Cargo Retention Systems
Industrial Vehicle Performance
R.O.P.S. and F.O.P.S. Performance
Door Retention Performance
Window Retention Performance
Hood Retention Performance
Child Restraint
Infant Seats
Warning Systems
Mini-Van Performance
4 x 4 Stability
Interior Padding
Steering System Performance
FMVSS Requirements
Wheel Retention
Seat Belt Inertial Release

**March 1, 1981**      **POLYTECHNIC, INC.**
**to March 1, 1983**

## DIRECTOR OF VEHICLE LABORATORY

Directly responsible for the management and administration of the vehicle laboratory department. Duties included directing work assignment, budgeting,

5

maintaining the facility, purchasing equipment, establishing procedure and policy.

Consulting services encompassed vehicle engineering, vehicle safety, design and manufacturing. Vehicles evaluated included; all passenger cars, trucks, industrial machines and vehicles, special all terrain vehicles, off-road vehicles, agricultural implements, motorcycles, bicycles, construction equipment and machinery.

## SENIOR MECHANICAL ENGINEER

Responsible for engineering safety consulting on projects associated with safety, product liability, expert testimony, accident investigation, product defect analysis, failure analysis, vehicle test evaluation and material analysis.

## AUTOMOTIVE PROJECT WORK

Seating systems, restraint systems, brake systems, rear axle and suspension, power train systems, drive line, front suspension, windshield glass, power and manual steering, wheels and tires, fuel system, exhaust system, sheet metal damage, body hardware (latches, hinges, mechanisms), electrical system, body mounts, transmission linkage, steering wheel and column, cooling and ventilating system, interior trim, engine and components, truck air brakes and truck systems, bus systems.

## SPECIAL AUTOMOTIVE PROJECTS

Off road vehicles, motorcycles, recreational vehicles, Mopeds, snowmobiles, heavy motor vehicles.

## COMMERCIAL PROJECT WORK

Truck tractors and trailers, front loaders, scrapers, graders, cranes, lift-gates, refuse trucks, pavers, ROPS.

## AGRICULTURAL PROJECT WORK

Tractors, Farm Implements

## INDUSTRIAL PROJECT WORK

Power presses, cold headers, welding, spun metal, roll presses, induction spinning, metal forming, injection molding, die casting, forging, casting, material coating, electroplating, electro-magnetic forming, screw machining, extrusions.

**1978 - 1981**                    **FORD MOTOR COMPANY**

6

## FORD LIGHT TRUCK HIGH STRENGTH STEEL (HSLA) MATERIAL COORDINATOR

## FORD LIGHT TRUCK HEAVY DUTY TIRE AND WHEEL DESIGN RELEASE

## FMVSS 127 COORDINATOR

## FORD LIGHT TRUCK CHASSIS DESIGN ENGINEER

Responsible for component design and release of advanced wheel programs. Duties included design, packaging, cost tracking, budget and financial analysis, cost reduction, FMVSS compliance, supplier manufacturing feasibility and certification, project test conformance and specification, product assumption, product description, warranty analysis, vehicle system testing, test and design specification, product planning objectives, product description, process control, customer acceptance standards, problem resolution, production launch task force assistance, project sign-off, production validation, program status reporting, project coordination, experimental part procurement, experimental design, design and test standards, system vehicle test sign -off, research and development and supplier sales interface.

**1976**              **FORD MOTOR COMPANY**

## FORD LIGHT TRUCK WHEEL PROGRAMS

**1978 Steel Styled Wheel**
**1977 ½ Aluminum Styled Wheel**
**16 - 16 ½ Style Wheel**
**16 - 16 ½ Tire Design**

## FORD LIGHT TRUCK CHASSIS DESIGN ENGINEER

Responsible for design of steel and forged aluminum styled wheels and    16 / 16.5 inch tires for the F-Series, Econoline and Bronco. Duties included design, packaging, systems test prove out, cost tracking, product, improvements, cost savings, project budgeting, safety compliance, supplier manufacturing prove-out, production feasibility, prototype procurement, prototype design, prototype test, engineering specifications, engineering drawings sign-off product description, warranty analysis, field problem resolution, process and quality control feasibility, customer acceptance specification, product problem resolution, status reporting, launch assistance,  styling feasibility.

**1975 - 1976**       **FORD MOTOR CO.**

**FORD LIGHT TRUCK FUEL ECONOMY PRODUCT ENGINEER**

Responsible for advance planning to meet corporate and mandated fuel economy objectives for light trucks. Duties included establishing fuel economy objectives for specific models, tracking and measurement of fuel economy values, coordination of objectives, coordination of objective measurement, establishment of data processing tracking and recording, evaluation of vehicle performance test standards, tracking and assistance with CAFE computation and reporting and compliance certification sign-off of vehicle and CAFE standards.

1973 - 1975          **FORD MOTOR CO.**

**FORD MOTOR COMPANY SENIOR DEVELOPMENT ENGINEER ON LIGHT TRUCK BODY, TRIM AND HARDWARE SYSTEMS**

**1975 Light Truck Sign Off Trip**
**1974 Light Truck Sign Off**
**1974 ½ Super Cab Launch Team Captain**
**1974 Light Truck Press Show Preparation**

Management position responsible for directing the work assignment of (5) engineers, measuring performance, providing technical assistance, administrative written test reports and establish product test and evaluation objectives and methods. Direct responsibility to test and evaluate product compliance with functional objectives. Work Assignments include GPAS sign-off, test track test performance, management reviews, trip sign-off, prototype procurement, prototype test and evaluation, manufacturing plant launch assistance, product problem determination and resolution, manufacturing plant problem resolution, GPAS issuance, design reviews, compliance vehicle preparation.

1972 - 1973          **FORD MOTOR CO.**

**FORD MOTOR COMPANY LIGHT TRUCK BODY STRUCTURAL ENGINEER**

**Acting Group Leader**
**Product Design Engineer**

Responsible for directing work activity of (5) engineers, providing technical assistance, administrate program objectives, product assumptions, design specifications, product problem resolution, plant launch assistance, design review meetings, issue design specifications, manufacturing, feasibility, prototype procurement, cost tracking, warranty analysis, program reporting, issue design release objectives.

8

| | |
|---|---|
| 1972 | **FORD MOTOR COMPANY LIGHT TRUCK CHASSIS DESIGN ENGINEER** |

Responsible for design release of body mounting systems for light trucks, design release, issue design specifications, release drawings, supplier contact, product problem resolution, cost tracking, warranty analysis, prototype procurement, design release objectives, plant launch assistance, supplier surveillance, product assumption, field complaint resolution, design reviews, vehicle test, product description.

| | |
|---|---|
| 1971 - 1972 | **FORD MOTOR COMPANY LIGHT TRUCK BODY, TRIM AND HARDWARE DESIGN ENGINEER** |

**1973 F Series New Program**
**1972 ½ Sliding Door Program Coordinator**
**1974 F Series Cost Reductions**

Responsible for coordination of design component, assembly processing, advanced design, product planning, development and supplier activities within production objectives. Specific responsibility for product design within established design, development and customer acceptance, Federal Regulatory compliance, corporate compliance and cost objectives.

| | |
|---|---|
| 1969 - 1971 | **CHRYSLER CORPORATION** |
| | **CHRYSLER CORPORATION DESIGN AND DEVELOPMENT ENGINEER INSTRUMENT PANEL SYSTEM FOR PASSENGER CARS** |

**1970 Future Products Concepts**
**1968 Air Bag Production Design Project**
**1968 Knee Bolster Project**
**1970 Plastic Crash Pad Project**

Responsible for design release and development of an instrument panel for A - Body. Specific duties included, design release, design studies, buck development, layout direction, product specifications, system packaging, prototype procurement and build, advance design liaison, prototype design aides, test specifications and to assist in production product problems resolution.

| | |
|---|---|
| 1967 - 1969 | **CHRYSLER CORPORATION** |
| | **CHRYSLER INSTITUTE OF ENGINEERING** |
| | **ENGINEER TRAINEE** |

9



Work assignments included:

Impact Laboratory - Assignment included the test and development of a new elastomeric bumper to meet a new government proposed safety standard for a 5 mph bumper. Work included testing of the bumper and the bumper retention system, pendulum impact testing to SAE procedures and prototype part design and development.

Advance Development Department - Responsible to assist in the development of a new internal caliper disc brake for Chrysler "C" body cars. Work assignment included developing a thermal energy dissipation method to simulate dynamometer braking heat transfer to resolve a thermal stress problem.

Chrysler Proving Grounds - Responsible to assist in the analysis of proving ground test vehicle reliability using test data and data reduction computer techniques to establish reliability. Also, assisted in the development of the aero-dynamic improvement of the Chrysler Charger 500 race car and development of an air foil on the rear of a station wagon to clean the rear back lite off without using mechanical devices.

Advance Design Department - Work assignment consisted of design and development of a drivers inflatable restraint system. With special consideration for the bag deployment system involving a high temperature, high speed gas generator filter device. Patent earned on a hot particle filtration system. Testing included sled tests and laboratory simulation. Responsible to assist in the design of a steering column mounted air bag system. I received a patent for a high temperature, high speed gas filtration device.

Detroit Universal Division Assembly Plant - Assembly plant manufacturing processing of passenger car prop-shaft assembly. Work assignment included assisting in the manufacturing of a new concept magnaflux prop-shaft assembly. Assembly operations included drop forging, broaching, metal forming, arc welding, cold heading, press forming and milling operations.

Instrument Panel Design Program Coordination - Assisted in the creation of a coordination group between advance design and production design to support program timing objections.

Automatic Transmission Development - Assisted in testing of the Chrysler A-727 and A-904 3 speed automatic transmissions using a new transmission fluid and friction plate material. Conducted vehicle drive evaluation, shift quality, dynamometer testing, transmission teardown and evaluation, transmission laboratory functional tests, transmissions endurance testing and transmission cooling analysis.



| | |
|---|---|
| **1964 – 1967** | **FORD MOTOR CO. AND SUNBEAM CORPORATION** |
| | **COOPERATIVE WORK EXPERIENCE** |
| | **FORD MOTOR COMPANY ENGINE AND FOUNDRY DIVISION** |

**SPRING 1967**    **ADVANCE ENGINE DESIGN DEPARTMENT**

Assignment consisted of working on computer programming for weight reduced aluminum piston and steel forged connecting rods. Work also included advanced racing engine layout and testing.

**SPRING 1967**    **ENGINE DYNAMOMETER LABORATORY**

Assignment consisted of working with physical laboratory testing using a dynamometer for endurance, oil consumption, fuel economy, wide open throttle, horse power and torque output, engine calibration and spark advance testing. Work involving assisting techniques with set-up, data output, data reduction and system maintenance.

**WINTER 1966**    **FUEL SYSTEM LABORATORY**

Assignment included the testing of gasoline engine carburetors. Work involved testing under laboratory simulated flow equipment used to measure flow rates, vacuum, pressure levels, valving and porting, efficiency, fuel island data, data reduction and fuel to air ratio measurement, and fuel consumption.

**WINTER 1966**    **ENGINE DRAFTING SECTION**

Assignment included engine drafting and layout work for various components; such as, pistons, connecting rods, crank shafts, valves, cams and engine accessories. Work involved application of Ford Motor Company drafting and layout procedures along with educational engineering skills. Various principles were used including true position dimensioning; drafting, standards, tolerancing sections, descriptive geometry, projections, true views along with proper engineering graphics and information that required thread sizing, surface finish and fastener design.

**SPRING 1966**    **FORD METAL STAMPING DIVISION STAFF MATERIAL HANDLING SECTION**

Assignment included design and layout of assembly and detail material handling equipment. Work included drafting of conveyors, bins, part storage containers, storage racks, die stamping of part and drafting procedures for all general part transfer mechanisms used in assembly plant operations.

11



**SUMMER 1965**          **FORD DEARBORN STAMPING PLANT**

Assignment included working with plant manufacturing engineering groups to learn the basic plant processing of metal formed, stamped and drawn parts. Work involved assisting a tool and die engineer in new tooling design, production volume capability and line trouble shooting. Metal stamping experience included large roof panels, hoods, body sides, pillars, floor pans, back panels, deck lids and small part operations using progressive die blanking, forming, drawing, deep drawing roll forming operations.

**WINTER 1964**          **FORD FRAME PLANT**

Assignment included working with the plant production control and material handling departments. Work involved design and processing of part distribution systems used in general material handling. Various equipment included stocking bins, racks, mobile racks and bins, conveyor and convenience devices. A portion of the work involved floor assignment as a foreman responsible for (50) employees who operated various industrial machines such as, electrical hand carts, hi-lo gas machines, overhead cranes, front end loaders, and steel coil tractors.

**1964**          **SUNBEAM CORPORATION COOPERATIVE ENGINEER**

Assignment included working with household appliances and their manufacturing process. Work included plant operational training in assembly processing of toasters, vacuum cleaners, fry pans, lawn mowers and food processors. Manufacturing processing experience involved aluminum die casting, zinc die casting, plastic injection molding, chrome plating, electrical coiling thermostat control, heli-arc welding, machining, polishing, packaging, painting, labeling, electro-static plating and general line trouble shooting and problem resolution.

12

## QUALIFICATIONS OF JOHN M. STILSON

Mr. Stilson is a practicing Automotive and Safety Consultant in the fields of Mechanical Engineering, Safety Engineering and Reconstruction. He worked as an automotive design and development engineer from 1965 to 1981, spanning nearly 15 years of work experience in the automotive industry. In 1981, he left the automotive industry to seek a career as an independent consultant working in the field of accident investigation. He is the owner of Stilson Consulting located in Wildwood, Illinois, North of Chicago. Mr. Stilson's work in accident investigation covers a period of almost 20 years of the 35 years of engineering and consulting work experience. He has testified as an expert witness in over forty (40) states. Over the last 20 years he has investigated thousands of accidents involving the products of several automotive and product manufacturers. He offers his independent consulting services to industry, business, government and the legal profession. He is a full member of The Society of Automotive Engineers, American Society of Safety Engineers, American Society of Mechanical Engineers and the American Society of Materials and National Association of Fire Investigators. He has published on the subjects of accident reconstruction, crashworthiness, inertia release of buckles and has been requested to speak at seminars for the National Head Injury Alliance on these subjects.

Mr. Stilson has been designated in this case to testify as an expert in the area of vehicle design. His qualifications include his graduation form the University of Michigan in 1967 with a Bachelors of Science in Mechanical Engineering, graduation from the University of Michigan in 1969 with a Master of Science in Mechanical Engineering, Graduation from the Chrysler Institute of Engineering in 1969, with a Masters in automotive Engineering and two certificates in the field of accident reconstruction, 1981 from the University of Wisconsin and 1990 from the University of Georgetown, Washington DC.

In 1965, Mr. Stilson was selected by Ford Motor Company as a cooperative engineer. He worked four months for Ford Motors and them went to school four months until he earned his bachelors degree. Beginning in 1965 as a co-op student with Ford, he started out working in the metal stamping division of Ford Motor Company. His work experience involved hands on work at the plant level working in production control, production tool design and material handling. The plants made steel stamped and formed parts that were assembled into a frame for passenger cars. He also assisted in the design and manufacturing of metal

stamping tools for the production of hoods, fenders, roofs, floor pans, body side panels, quarter panels and trunk lids from raw steel sheets and rolls.

In 1966, Mr. Stilson selected work assignments at the Ford Motor Company Research Center Electrical and Engine Division in Dearborn, Michigan. This work involved assignments on the drafting board as a draftsman drawing parts for engine components, such as, connecting rods, crank shafts, pistons, and other engine parts. He then worked in the advanced engine group and developed computer assisted analysis of connecting rods and aluminum pistons. He also worked in the carburetor lab on the testing of this part for engines. His last assignment was work in the Engine Dynamometer Test Labs testing engines for performance and endurance conditions.

Mr. Stilson left Ford Motor Company in 1967 after being selected by Chrysler Corporation to attend the Chrysler Institute of Engineering. The Chrysler Institute taught courses including engine design, automatic transmission design, axle design, steering column design, HVAC system design, suspension design, tire design laboratory, vehicle and system testing using applied technology and procedures. While a student, he also worked in various departments at the Chrysler Corporation, Highland Park Michigan Research Facilities. He worked on the advance design of air bag systems earning a patent in 1968 for a high speed, high temperature gas filtration device. He worked in the advanced development department working on brakes and air bag testing. He also worked on the testing of the three speed automatic transmission, vehicle performance testing of the charger 500 race car and production cars at the Chrysler Chelsea proving grounds, production of passenger car and truck propellor shafts at the Chrysler Assembly plant and finished his training in the advanced program coordination group. In 1969, he took a permanent management grade engineering position in instrument panel and crash pad design and development for passenger cars.

In 1971, Mr. Stilson voluntarily resigned from Chrysler Corporation and rejoined Ford Motor Company in their light truck and recreational products division. He began his work as a product design engineer on body structure systems. This work involved the design of doors, hoods, body sides, floor pans, roofs, tail gates and front end sheet metal components that make up the complete assembly of vans, pick ups and the utility Bronco. In 1972, he was assigned as a product design engineer responsible for door latches, hood hinges, window regulators, hood latches, tail gate latches, window mechanisms and door mechanisms.

In 1972, he was assigned as acting group leader on body structure systems responsible for seven (7) engineers. In 1973, he was promoted to group leader of the body, trim and hardware development for vans, pick ups and 4 x 4's, and the utility Bronco. His duties included the supervision of engineers and evaluating the performance of vehicle systems. In 1976, Mr. Stilson was assigned the position of product engineer on light truck fuel economy performance and then was assigned product design engineer on light truck wheels and tires in the frame, fuel and tire section.

Mr. Stilson voluntary retired from Ford Motor Company in 1981 and joined Polytechnic, Incorporated in Illinois. Polytechnic, Inc. is an independent consulting firm. Mr. Stilson started his consulting work as senior engineer assisting the president in engineering services. In 1982, he was promoted to director of the vehicle laboratory and began specializing in accident investigations. Mr. Stilson left Polytechnic , Inc. in 1983, and started his own independent consulting firm called Stilson Consulting where he has continued as the owner and principle engineer to the present. Mr. Stilson has specialized his consulting services as an automotive, safety and mechanical consulting engineer in the area of accident investigation. In recent years, his investigative work has concentrated on vehicle fires, roof construction, body construction, door retention, seat belt performance, seat system performance, structural performance, vehicle containment and general vehicle crashworthiness.

# FELTOON & ASSOCIATES, P.C.

### CLINICAL & NEUROPSYCHOLOGY
8025 Chalk Knoll
AUSTIN, TEXAS 78735

512-750-7164

H. DAVID FELTOON, PH.D.
LICENSED PSYCHOLOGIST
BOARD CERTIFIED
AMERICAN BOARD OF FORENSIC EXAMINERS
AMERICAN BOARD OF FORENSIC MEDICINE
AMERICAN ACADEMY OF PAIN MANAGEMENT

May 17, 2004

## PSYCHOLOGICAL EVALUATION

NAME:  Jose Angel Escobedo Viera
AGE: 22   DOB: 8-6-1981
DATE OF TESTING: 5-12-04
REFERRED BY:  Watts Law Firm
TESTS ADMINISTERED:   Beck Anxiety Inventory; Beck Depression Inventory; Rotter Incomplete Sentence Form; Minnesota Multiphasic Personality Inventory-2; and a Clinical Interview

**INTERPRETER:**

For purposes of interviewing and evaluating this Spanish speaking client, an interpreter, Julio Galvan was utilized.

**REFERRAL PROBLEM:**

The client was referred for an interview and psychological testing in order to evaluate underlying personality dynamics and intrapsychic conflicts.

**OTHER MATERIALS REVIEWED:**

-Deposition of Jose Angel Escobedo dated 3/9/04

**BACKGROUND:**

Jose Escobedo is a twenty-two year old male who has lived with a woman for three years in a common-law marriage.  They have one son, age three.  Mr. Escobedo said that his wife also has a five year old daughter from a prior relationship which the couple raises.  He has lived in San Bonito, Texas, for one year, moving there from Santa Rosa, Texas, where he lived for eight months.  Prior to this move he lived in Harlingen, Texas,

for five months, and again in San Bonito, Texas, for the four months immediately preceding this place of residence. He was born and raised in Mexico and came to the United States at the age of twenty-two, making his initial residence in San Bonito. He resides here on a work permit, employed for one year by Cardenas Motors, washing cars. His wife is not employed outside the home.

Describing his childhood as "very good, very happy," Mr. Escobedo grew up as the youngest with two brothers, ages thirty-six and thirty-four. He was educated for fourteen years in Mexico. His mother is still alive and well, living in Mexico; however, his father was killed in a motor vehicle accident on July 19, 2002.

Mr. Escobedo reported that he is taking no medication and is not under the care of a physician, psychologist or counselor. He did talk to a priest one time after his father was killed. He stated that he smokes "sometimes," consumes alcohol "sometimes," but he does not use illegal narcotics, and he has never had any difficulty with the legal system. He said that his appetite is diminished since the death of his father, and he has noticed a weight reduction of approximately three pounds. He denied having any suicidal ideations. He said that he has no other major stressors in his life aside from the death of his father, "just regular problems."

PRESENTING PROBLEM:

On July 19, 2002, Mr. Escobedo lost his father in a motor vehicle accident. He explained that his father was a passenger in a truck which rolled over. The elder Mr. Escobedo died on the way to the hospital.

CURRENT COMPLAINTS:

Mr. Escobedo stated that his father was working in Harlingen when he was killed. He was living there as well and often turned to his father for advice and support; he depended on his father for financial support as well as counsel. Emotionally, Mr. Escobedo is very affected by his father's death, and he began to cry as he said that he is often sad, thinking about his father every day. He added that he cries "a lot," frequently and uncontrollably. He also revealed that he sleeps more than he used to, wanting to escape from reality.

Withdrawing from his friends has resulted in having less pleasure in his life. Mr. Escobedo stated, "I don't feel like doing the things that I used to enjoy. I feel a need to take care of my mother; I have been visiting her every weekend." Mr. Escobedo also

2

described himself as more angry and irritable and asserted that his entire life has been altered. He also explained that he has felt a need "to become a man" since his father has died.

Crying uncontrollably, Mr. Escobedo depicted his father by saying, "He was a good person and a good father. I spent a lot of time with him." He further stated that his mother is not doing well since his father died. He feels that she has lost her will to live and is very depressed. Mr. Escobedo continued to cry uncontrollably as this part of the evaluation session ended.

MENTAL STATUS:

Mr. Escobedo was well dressed and neatly groomed. He was open and cooperative during the testing and interview session. His posture, actions and behavior were within normal limits. He and was oriented in time, place, person and situation. His mood was very depressed and his affective reaction was extremely sad and appropriate to his mood. He denied having suicidal ideations. His judgment, memory and insight seemed to be well within normal limits. There were no indications of any hallucinatory or delusional thought processes.

EVALUATION:

The Minnesota Multiphasic Personality Inventory-2 was administered. The Administrative Scales reveal that the profile is valid. Mr. Escobedo's protocol reveals that he is angry, anxious and depressed. He is trying to present himself as being very strong and places himself under a great deal of stress to do so.

The Beck Depression Inventory-II was administered. This is a scale designed to assess the severity of depression in patients. The test is based on the clinical observations and descriptions of symptoms frequently given by depressed patients as contrasted with those frequently given by non-depressed patients. Mr. Escobedo's score of Twenty-six (26) places him in the Moderately Depressed range. He reports feeling the following: I feel sad much of the time, I feel more discouraged about my future than I used to be, I have failed more than I should have, I get very little pleasure from the things I used to enjoy, I feel guilty over many things I have done or should have done, I feel I may be punished, I have lost confidence in myself, I am more critical of myself than I used to be, and I feel like crying, but I can't.

Mr. Escobedo went on to endorse the following items: I feel more restless or wound up than usual, I have lost most of my interest in other people or things, I find it more

3

difficult to make decisions than usual, I don't consider myself as worthwhile and useful as I used to, I have less energy than I used to have, I sleep a lot more than usual, I am much more irritable than usual, My appetite is somewhat less than usual, I can't concentrate as well as usual, I get more tired or fatigued more easily than usual, and I am less interested in sex than I used to be.

The Beck Anxiety Inventory was administered. It consists of twenty-one (21) descriptive statements of anxiety symptoms. Mr. Escobedo's score of Twenty-one (21) places him in the Moderately anxious range. He reports feeling the following: Feeling hot, Wobbliness in legs, Dizzy or lightheaded, Heart pounding or racing, Unsteady, Hands trembling, Shaky, Indigestion or discomfort in abdomen, Faint, and Sweating (not due to heat). He also reports feeling: Unable to relax, Fear of the worst happening, Terrified, Nervous, Fear of dying, and Scared.

The Incomplete Sentence Blank was administered. This is a projective instrument that presents patients with stems and requires them to express their real feelings as they complete each sentence. Mr. Escobedo's responses clearly reveal that he has been negatively impacted both physically and emotionally as a result of the MVA and the resultant death of his father. He states: I like -- to remember my father; The happiest time -- I spent with my father; Back home -- I remember my father; I regret -- not seeing him to days before his death; At bedtime -- I remember him very much; Men -- some remind me of my father; The best -- being with him at his burial; What annoys me -- not having seen him before his death; I feel -- my father's death; I can't -- get back being calm; When I was a child -- the best memories of my father; My nerves -- a little tense; and I suffer -- on account of my father's death.

Mr. Escobedo went on to state: I failed -- as a son with my father by not finishing school; My mind -- always has my father's memory; The future -- without direction; I need -- help; What pains me -- not being with my father; I am very -- worried for my future; I wish -- to be with him again; and My father -- the person that taught me everything I know, and the best that has happened to me.

CONCLUSIONS:

The symptoms that Mr. Escobedo is experiencing and the test results in this evaluation indicate that he is suffering from a Depressive Disorder. This is characterized by a pervasive feeling of sadness, recurrent and uncontrollable crying spells, and anhedonia. Mr. Escobedo reports that he is more angry and irritable since his father's death.

Mr. Escobedo acknowledges a sleep disturbance in which he sleeps more than he used to. This is an attempt to escape from the painful reality that he is experiencing. He

4

feels responsible for his mother and he visits her every weekend. He reports that his entire life is changed; he feels that he has had to give up being a boy and quickly become a man.

Holidays, anniversaries and birthdays are and will continue to be very painful for Mr. Escobedo. He was very close to his father. He is experiencing a major void in his life. Several factors place Mr. Escobedo at risk for a complicated and prolonged grief process. These would include his close and enduring relationship with his father, and the sudden, untimely, unexpected and preventable nature of his death

When a loved one is lost in a sudden, unexpected and preventable fashion this frequently results in a complicated bereavement process that is not easily resolved. The resulting mental anguish will tend to be enduring. The mental anguish and emotional pain that Mr. Escobedo suffers likely will continue for the rest of his life.

RECOMMENDATIONS:

Mr. Escobedo will require psychological counseling. He was encouraged to consult with his family physician in reference to anti-depressive medications

DIAGNOSTIC IMPRESSION:

    Axis  I:  Depressive Disorder
    Axis  II:  N/A
    Axis III:  N/A
    Axis  IV:  Personal, Familial, Occupational, and Social
    Axis  V: Current GAF: 59

PROGNOSIS:

The prognosis is fair to poor.

Thank you very much for this referral. If you obtain additional information or records relevant to my evaluation of this patient, please provide those as soon as possible. If you have any further questions, please do not hesitate to contact my office.

H. David Felloon, Ph.D.
Clinical Psychologist

5

# FELTOON & ASSOCIATES, P.C.
## CLINICAL & NEUROPSYCHOLOGY
8025 Chalk Knoll
AUSTIN, TEXAS 78735

512-750-7164

H. DAVID FELTOON, PH.D.
  LICENSED PSYCHOLOGIST
  BOARD CERTIFIED
    AMERICAN BOARD OF FORENSIC EXAMINERS
    AMERICAN BOARD OF FORENSIC MEDICINE
    AMERICAN ACADEMY OF PAIN MANAGEMENT

May 17, 2004

# PSYCHOLOGICAL EVALUATION

NAME: Luis Alberto Escobedo de Viera
AGE: 34    DOB: 2-18-1970
DATE OF TESTING: 5-12-04
REFERRED BY: Watts Law Firm
TESTS ADMINISTERED:    Beck Anxiety Inventory; Beck Depression Inventory; Rotter
Incomplete Sentence Form; Minnesota Multiphasic
Personality Inventory-2; and a Clinical Interview

=============================================================================

**INTERPRETER:**

For purposes of interviewing and evaluating this Spanish speaking client, an interpreter,
Julio Galvan was utilized.

**REFERRAL PROBLEM:**

The client was referred for an interview and psychological testing in order to evaluate
underlying personality dynamics and intrapsychic conflicts.

**BACKGROUND:**

Luis Escobedo is a thirty-four year old male who has been married for eight years. He
has two daughters, ages seven and five. He was born, raised and resides in Mexico.
Mr. Escobedo has been employed as a policeman for six years. His wife does not work
outside the home.

Describing his childhood as "good," Mr. Escobedo grew up as the middle child with two
brothers. He was educated for twelve years. His mother is still alive; however, his
father was killed in a motor vehicle accident on July 19, 2002.

Mr. Escobedo reported that he does not take any medication and is not under the care of a physician, psychologist or counselor. He stated that he does not smoke, consumes alcohol, but only beer, does not use illegal narcotics, and he has never had any difficulty with the legal system. He revealed that he has been eating more since his father was killed and has gained twenty pounds since that time. He denied any current suicidal ideations, but said that he did have such feelings for approximately one month after his father was killed. Mr. Escobedo stated that he has no major stressors in his life independent of those resulting from the death of his father.

## PRESENTING PROBLEM:

On July 19, 2002, Mr. Escobedo's father was killed in a motor vehicle accident. Mr. Escobedo reported, "I went to the accident scene and my father was already taken to the hospital. I went to see him at the hospital and he was brain dead, but his organs were still alive. They kept him alive for one hour at the hospital."

## CURRENT COMPLAINTS:

Mr. Escobedo stated, "I fainted at the site of the accident because on the police radio they said that he was dead. I was very close to my father, we did everything together. My house was next to his and we spent a lot of time together. I'm depressed. I have problems concentrating. I have a lack of interest in the things that I used to enjoy."

Mr. Escobedo went on to say, "I'm sad all the time and it is affecting my work, my relationship with my wife and my children, even my mother whom he described as "very down." He further stated about himself, "I just want to be left alone, to be by myself." Mr. Escobedo revealed that he cries approximately two or three times a week. He did state that his sleep is normal, and he does not suffer with nightmares.

## MENTAL STATUS:

Mr. Escobedo was well dressed and neatly groomed. He was open and cooperative during the testing and interview session. His posture, actions and behavior were within normal limits. He was oriented in time, place, person and situation. His mood was very depressed and his affective reaction was sad and appropriate to his mood. He acknowledged having suicidal ideations beginning after his father was killed; however these extreme feelings diminished after approximately one month. His judgment, memory and insight seemed to be well within normal limits. There were no indications of any hallucinatory or delusional thought processes.

2

## EVALUATION:

The Minnesota Multiphasic Personality Inventory-2 was administered. The Administrative Scales reveal that the profile is valid. Mr. Escobedo is experiencing some strange and unusual thought processes. He is experiencing a great deal of emotional stress; however he is mainly expressing this in a somatic fashion. He is suspicious and distrustful of others.

The Beck Depression Inventory-II was administered. This is a scale designed to assess the severity of depression in patients. The test is based on the clinical observations and descriptions of symptoms frequently given by depressed patients as contrasted with those frequently given by non-depressed patients. Mr. Escobedo's score of Thirty-five (35) places him in the Severely Depressed range. He reports feeling the following: I feel sad much of the time, I feel more discouraged about my future than I used to be, I don't enjoy things as much as I used to, I feel guilty over many things I have done or should have done, I feel I am being punished, I am disappointed in myself, I criticize myself for all of my faults, I have thoughts of killing myself, but I would not carry them out, and I feel like crying, but I can't.

Mr. Escobedo went on to endorse the following items: I feel more restless or wound up than usual, I have lost most of my interest in other people or things, I have trouble making any decisions, I feel more worthless as compared to other people, I don't have enough energy to do very much, I sleep a lot more than usual, I am much more irritable than usual, My appetite is somewhat greater than usual, It's hard to keep my mind on anything for very long, I am too tired or fatigued to do a lot of the things I used to do, and I am less interested in sex than I used to be.

The Beck Anxiety Inventory was administered. It consists of twenty-one (21) descriptive statements of anxiety symptoms. Mr. Escobedo's score of Eighteen (18) places him in the Moderately anxious range. He reports feeling the following psychophysiological concomitants of anxiety: dizzy or lightheaded, unsteady, difficulty breathing, indigestion or discomfort in abdomen, and faint. He also reports feeling: unable to relax, fear of the worst happening, fear of dying, and scared.

The Incomplete Sentence Blank was administered. This is a projective instrument that presents patients with stems and requires them to express their real feelings as they complete each sentence. Mr. Escobedo's responses clearly reveal that he has been negatively impacted both physically and emotionally as a result of the MVA and the resultant death of his father. He states: I regret — that my father is not with us; When I was a child — I remember my father very much. Mr. Escobedo went on to state: I suffer

3

— because my father is not with us, I failed — because I did not live more with my father, and My father — I miss his advice.

CONCLUSIONS:

The symptoms that Mr. Escobedo is experiencing and the test results in this evaluation indicate that he is suffering from a Depressives Disorder. This is characterized by a pervasive feeling of sadness, suicidal ideations, recurrent and uncontrollable crying spells, and anhedonia. He reports that he did "everything" with his father because they lived next door to each other. He is experiencing difficulty concentrating and he acknowledges a lack of interest in the things that he used to enjoy.

Mr. Escobedo has become extremely withdrawn. This has negatively impacted his work, his relationship with his wife, his relationship with his children and his relationship with his mother. "I just want to be left alone and to be by myself." He denies experiencing a sleep disturbance.

Holidays, anniversaries and birthdays are and will continue to be very painful for Mr. Escobedo. He was very close to his father and he is experiencing a major void in his life. Several factors place Mr. Escobedo at risk for a complicated and prolonged grief process. These would include his close and enduring relationship with his father and the sudden, untimely, unexpected and preventable nature of his death.

When a loved one is lost in a sudden, unexpected and preventable fashion this frequently results in a complicated bereavement process that is not easily resolved. The resulting mental anguish will tend to be enduring. The mental anguish and emotional pain that Mr. Escobedo suffers likely will continue for the rest of his life.

RECOMMENDATIONS:

Mr. Escobedo will require psychological counseling.

DIAGNOSTIC IMPRESSION:

    Axis  I:  Adjustment Disorder
    Axis  II:  N/A
    Axis  III:  N/A
    Axis  IV:  Personal, Familial, Social
    Axis  V:  Current GAF: 58

4

**PROGNOSIS:**

The prognosis is fair to poor.

Thank you very much for this referral.  If you obtain additional information or records relevant to my evaluation of this patient, please provide those as soon as possible.  If you have any further questions, please do not hesitate to contact my office.

H. David Feltoon, Ph.D.
Clinical Psychologist

5

# FELTOON & ASSOCIATES, P.C.
## CLINICAL & NEUROPSYCHOLOGY
### 8025 Chalk Knoll
### AUSTIN, TEXAS 78735

512-750-7164

H. DAVID FELTOON, PH.D.
LICENSED PSYCHOLOGIST
BOARD CERTIFIED
AMERICAN BOARD OF FORENSIC EXAMINERS
AMERICAN BOARD OF FORENSIC MEDICINE
AMERICAN ACADEMY OF PAIN MANAGEMENT

May 17, 2004

# PSYCHOLOGICAL EVALUATION

**NAME:** Febronia Viera Escobedo
**AGE:** 54   **DOB:** 1-27-1949
**DATE OF TESTING:** 5-12-04
**REFERRED BY:** Watts Law Firm
**TESTS ADMINISTERED:** Beck Anxiety Inventory; Beck Depression Inventory; Rotter Incomplete Sentence Form; Minnesota Multiphasic Personality Inventory-2; and a Clinical Interview

**INTERPRETER:**

For purposes of interviewing and evaluating this Spanish speaking client, an interpreter, Julio Galvan was utilized.

**REFERRAL PROBLEM:**

The client was referred for an interview and psychological testing in order to evaluate underlying personality dynamics and intrapsychic conflicts.

**OTHER MATERIALS REVIEWED:**

-Deposition of Febronia Viera Escobedo dated 3/8/04

**BACKGROUND:**

Febronia Escobedo is a fifty-four year old female who has been a widow "for almost two years, one year and ten months." She was married for thirty-six years. Mrs. Escobedo has three sons, ages thirty-six, thirty-four and twenty-two. She was born, raised and

resides in Mexico alone. She has sold products for Avon for fifteen years. Her deceased husband was in the construction business. Mrs. Escobedo stated that she and her husband had a good, stable marriage and were never separated.

Describing her childhood as "bad," Mrs. Escobedo grew up with two brothers, one older and one younger, and three sisters. Both of her brothers are now deceased. Her mother died when she was fourteen years old, and she explained that her father "had a lot of other women." She was the oldest girl left at home, thus she had to assume her mother's role in the house. It has been forty years since her mother died, and her father passed away six years ago. Mrs. Escobedo was educated for six years.

Mrs. Escobedo reported that she is taking no medication and is not under the care of a physician. She received psychological care from Dr. Mary Compos for the past two months. Initially she was seeing her twice week, but she is now having sessions once a week. Mrs. Escobedo explained, "I have been very upset since my husband died. Instead of recovering, I was getting worse. Dr. Compos sent me to another doctor, Dr. Biu for medicine. They are waiting to see if I become more stable with the therapy. If not they are going to give me medicine. I have seen Dr. Biu two times. She is waiting for me to have a couple of more sessions with the psychologist before she prescribes medicine."

Continuing, Mrs. Escobedo stated, "I went to the Social Security Hospital right after my husband died because I was so depressed, but they didn't do anything for me. I couldn't stop crying, couldn't sleep and didn't eat, so I went to another hospital in about March of this year because I knew I needed help. They sent me to the psychologist. I never saw a psychologist before."

Mrs. Escobedo also reported that she does not smoke, consume alcohol or use illegal narcotics, nor has she ever had any difficulty with the legal system. She revealed that her appetite is much diminished since her husband's death; she has lost eight pounds and weighs ninety-two pounds now. Beginning to cry, she admitted to having suicidal ideations, stating, "I don't think that I could do it, but I think about it." Mrs. Escobedo denied having any other major stressors in her life independent of her husband's death.

PRESENTING PROBLEM:

On July 19, 2002, Mrs. Escobedo lost her husband as a result of a motor vehicle accident. She gave the following account of the incident. "He was going to work. He was not the driver. They had a problem with a tire and the truck rolled over."

2

## CURRENT COMPLAINTS:

Mrs. Escobedo described herself by saying, "I've been very depressed. I'm sad all the time and cry everyday, uncontrollably. There are a lot of days that I'm so depressed that I don't do anything." Mrs. Escobedo also revealed that she has problems falling asleep and has no appetite. Her doctor has injected her with vitamins and also given her some vitamins to take because she was not eating. She said, "I don't want to do anything."

Mrs. Escobedo does not date and has little pleasure in her life. She has friends who try to help her. Asked if she has family with whom she is in contact, she said that she has two sisters who live in Houston; she does not see her other sister very often. Mrs. Escobedo depicted her husband as a good man, very responsible and with a great deal of energy. She stated, "He was good to me, he took care of me."

## MENTAL STATUS:

Mrs. Escobedo was well dressed and neatly groomed. She was open and cooperative during the testing and interview session. Her posture, actions and behavior were within normal limits. She was oriented in time, place, person and situation. Her mood was very depressed and her affective reaction was extremely sad and appropriate to her mood. She acknowledged having suicidal ideations; however, she stated "I don't think that I could do it." She has experienced a significant weight loss since her husband's death. Her judgement, memory and insight seemed to be well within normal limits. There were no indications of any hallucinatory or delusional thought processes.

## EVALUATION:

The Minnesota Multiphasic Personality Inventory-2 was administered. The Administrative Scales reveal that the profile is valid. Mrs. Escobedo is experiencing a great deal of emotional distress. Her profile reveals that she is severely depressed.

The Beck Depression Inventory-II was administered. This is a scale designed to assess the severity of depression in patients. The test is based on the clinical observations and descriptions of symptoms frequently given by depressed patients as contrasted with those frequently given by non-depressed patients. Mrs. Escobedo's score of Forty-six (46) places her in the Severely Depressed range. She reports feeling the following: I am so sad or unhappy that I can't stand it, I feel my future is hopeless and will only get worse, I feel I am a total failure as a person, I get very little pleasure from the things I used to enjoy, I feel quite guilty most of the time, I feel I am being

3

punished, I have lost confidence in myself, I blame myself for everything bad that happens, I have thoughts of killing myself, but I would not carry them out, and I cry over every little thing.

Mrs. Escobedo went on to endorse the following items: I am so restless or agitated that I have to keep moving or doing something, It's hard to get interested in anything, I have trouble making any decisions, I don't consider myself as worthwhile and useful as I used to, I don't have enough energy to do anything, I wake up 1-2 hours early and can't get back to sleep, I am more irritable than usual, My appetite is much less than before, I can't concentrate as well as usual, I get more tired or fatigued more easily than usual, and I am much less interested in sex now.

The Beck Anxiety Inventory was administered. It consists of twenty-one (21) descriptive statements of anxiety symptoms. Mrs. Escobedo's score of Twenty-seven (27) places her in the Severely Anxious range. She reports feeling the following psycho-physiological concomitants of anxiety: Numbness or tingling, Feeling hot, Wobbliness in legs, Dizzy or lightheaded, Heart pounding or racing, Unsteady, Feelings of choking, Hands trembling, Shaky, Difficulty breathing, Indigestion or discomfort in abdomen, Faint, Face flushed, and Sweating (not due to heat). She also reports feeling: Unable to relax, Fear of the worst happening, Terrified, Nervous, and Scared.

The Incomplete Sentence Blank was administered. This is a projective instrument that presents patients with stems and requires them to express their real feelings as they complete each sentence. Mrs. Escobedo's responses clearly reveal that she has been negatively impacted both physically and emotionally as a result of the MVA and the resultant death of her husband. She states: My greatest fear – an accident; I can't – sleep as I would like; My nerves -- terrible; and I suffer – very much; What pains me – to see my family suffer; My greatest worry – my family.

CONCLUSIONS:

The symptoms that Mrs. Escobedo is experiencing and the test results in this evaluation indicate that she is suffering from a Major Depressive Disorder. She experiences a pervasive mood of sadness, recurrent and unwanted crying spells, and a sleep disturbance. She has experienced a severe diminution in her appetite and a significant weight loss. She also reports experiencing suicidal ideations.

Mrs. Escobedo reports that there are days when she cannot function. "I am so depressed that I don't do anything." She has become extremely withdrawn. There is less pleasure in her life.

4

Holidays, anniversaries and birthdays are very painful for Mrs. Escobedo. She is extremely tense, nervous and anxious. Mrs. Escobedo's social life and pleasurable activities were centered on those of her husband. She was very close to her husband and she is experiencing a major void in her life. "He was good to me and he took care of me."

Several factors place Mrs. Escobedo at risk for a complicated and prolonged grief process. These would include her close and enduring relationship with her husband and the sudden, untimely, unexpected and preventable nature of his death.

When a loved one is lost in a sudden, unexpected and preventable fashion this frequently results in a complicated bereavement process that is not easily resolved. The resulting mental anguish will tend to be enduring. The mental anguish and emotional pain that Mrs. Escobedo suffers likely will continue for the rest of her life.

## RECOMMENDATIONS:

Mrs. Escobedo was encouraged to continue seeing her psychologist for psychological counseling. She is aware that her doctors are in the process of making the decision as to whether or not to put her on antidepressant medications.

## DIAGNOSTIC IMPRESSION:

Axis I: Major Depressive Disorder
Axis II: N/A
Axis III: N/A
Axis IV: Personal, Familial, Social
Axis V: Current GAF: 54

## PROGNOSIS:

The prognosis is guarded.

Thank you very much for this referral. If you obtain additional information or records relevant to my evaluation of this patient, please provide those as soon as possible. If you have any further questions, please do not hesitate to contact my office.

H. David Feltoon, Ph.D.
Clinical Psychologist

5

# FELTOON & ASSOCIATES, P.C.

## CLINICAL & NEUROPSYCHOLOGY
### 8025 Chalk Knoll
### AUSTIN, TEXAS 78735

512-750-7164

H. DAVID FELTOON, PH.D.
LICENSED PSYCHOLOGIST
BOARD CERTIFIED
    AMERICAN BOARD OF FORENSIC EXAMINERS
    AMERICAN BOARD IN FORENSIC MEDICINE
    AMERICAN ACADEMY OF PAIN MANAGEMENT

May 17, 2004

# PSYCHOLOGICAL EVALUATION

NAME:  Jose Enrique Escobedo Viera
AGE: 36   DOB: 7-15-1967
DATE OF TESTING:  5-12-04
REFERRED BY:  Watts Law Firm
TESTS ADMINISTERED:   Beck Anxiety Inventory; Beck Depression Inventory; Rotter
                      Incomplete Sentence Form; Minnesota Multiphasic
                      Personality Inventory-2; and a Clinical Interview

---

**INTERPRETER:**

For purposes of interviewing and evaluating this Spanish speaking client, an interpreter, Julio Galvan was utilized.

**REFERRAL PROBLEM:**

The client was referred for an interview and psychological testing in order to evaluate underlying personality dynamics and intrapsychic conflicts.

**OTHER MATERIALS REVIEWED:**

-Deposition of Jose Enrique Escobedo dated 3/9/04

**BACKGROUND:**

Jose Escobedo is a thirty-six year old male who has been married for nine years.  He has two children, a seven year old son and a four year old daughter.  Mr. Escobedo was born, raised and resides in Mexico, near Matamoras.  He works in Monterrey, Mexico, where he has driven a taxi for five years.  His wife is not employed outside the home.

Describing his childhood as "good, happy," Mr. Escobedo grew up as the eldest with two brothers. He was educated for fourteen years. His mother is still alive; however, his father was killed in a motor vehicle accident on July 19, 2002.

Mr. Escobedo reported that he is taking no medication and is not under the care of a physician, psychologist or counselor. He stated that he does not smoke, consume alcohol or use illegal narcotics, and he has never had any difficulty with the legal system. Mr. Escobedo has noticed no change in his appetite or weight, and he denied having any suicidal ideations. He does not have any major problems in his life independent of the death of his father.

PRESENTING PROBLEM:

On July 19, 2002, Mr. Escobedo lost his father as a result of a motor vehicle accident.

CURRENT COMPLAINTS:

Mr. Escobedo explained that he feels depressed and sad. He admitted that he cries, although he added that he does not do so often. In contrast, he seems to have more difficulty controlling his anger, and he feels that he gets angry more frequently and more easily. Although he did not see his father often, he said that he spoke to him by telephone once a week. He has no difficulty initiating sleep, however he awakens repeatedly during the night, every night. He revealed that he suffers with nightmares since his father was killed, although this does not happen very often.

Beginning to cry, Mr. Escobedo described his father as "very responsible, a good father." He explained that he is worried about his mother whom he said is "very depressed." He also stated that her weight is too low, and she does not do much.

MENTAL STATUS:

Mr. Escobedo was well dressed and neatly groomed. He was open and cooperative during the testing and interview session. His posture, actions and behavior were within normal limits. He was oriented in time, place, person and situation. His mood was depressed, and his affective reaction was appropriate to his mood. He denied having suicidal ideations. His judgment, memory and insight seemed to be well within normal limits. There were no indications of any hallucinatory or delusional thought processes.

2

**EVALUATION:**

The Minnesota Multiphasic Personality Inventory-2 was administered. The Administrative Scales reveal that the profile is valid. Mr. Escobedo is naïvely attempting to present himself in the most positive light possible. He is depressed; however he is mainly expressing this through somatization.

The Beck Depression Inventory-II was administered. This is a scale designed to assess the severity of depression in patients. The test is based on the clinical observations and descriptions of symptoms frequently given by depressed patients as contrasted with those frequently given by non-depressed patients. Mr. Escobedo's score of Twenty-five (25) places him in the Moderately Depressed range. He reports feeling the following: I feel sad much of the time, As I look back, I see a lot of failures, I don't enjoy things as much as I used to, I am more critical of myself than I used to be, and I cry more than I used to.

Mr. Escobedo went on to endorse the following items: I feel more restless or wound up than usual, It's hard to get interested in anything, I have much greater difficulty in making decisions than I used to, I feel more worthless as compared to other people, I don't have enough energy to do very much, I sleep a lot more than usual, I am more irritable than usual, my appetite is somewhat less than usual, I can't concentrate as well as usual, I am too tired or fatigued to do most of the things I used to do, and I am less interested in sex than I used to be.

The Beck Anxiety Inventory was administered. It consists of twenty-one (21) descriptive statements of anxiety symptoms. Mr. Escobedo's score of Three (3) places him in the Non anxious range. He reports feeling the following psychophysiological concomitants of anxiety: Feeling hot, Indigestion or discomfort in abdomen. He also reports feeling: Unable to relax.

The Incomplete Sentence Blank was administered. This is a projective instrument that presents patients with stems and requires them to express their real feelings as they complete each sentence. Mr. Escobedo's responses clearly reveal that he has been negatively impacted both physically and emotionally as a result of the MVA and the resultant death of his father. He states: I regret – not having seen my father on my birthday; I wish – (to spend) more days with my mother; and My father – I wish to be like him.

3

**CONCLUSIONS:**

The symptoms that Mr. Escobedo is experiencing and the test results in this evaluation indicate that he is suffering from an Adjustment Disorder with depressive features. This is characterized by a pervasive feeling of sadness, recurrent and uncontrollable crying spells, a terminal sleep disturbance, nightmares, and anhedonia.

Mr. Escobedo reports that he feels very guilty about not spending more time with his father. He states, "I didn't see him that often but I talked to him by telephone once a week." He described his father as being a good man who was very responsible. He describes himself as being more irritable and more easily angered since his father was killed.

Holidays, anniversaries and birthdays are and will continue to be very painful for Mr. Escobedo. He was very close to his father even though they lived some distance apart. He is experiencing a major void in his life. He is extremely concerned about his mother's severe depression.

Several factors place Mr. Escobedo at risk for a complicated and prolonged grief process. These would include his close and enduring relationship with his father and the sudden, untimely, unexpected and preventable nature of his death.

When a loved one is lost in a sudden, unexpected and preventable fashion this frequently results in a complicated bereavement process that is not easily resolved. The resulting mental anguish will tend to be enduring. The mental anguish and emotional pain that Mr. Escobedo suffers likely will continue for the rest of his life.

**RECOMMENDATIONS:**

Mr. Escobedo would do well to avail himself of psychological counseling.

**DIAGNOSTIC IMPRESSION:**

    Axis  I:  Adjustment Disorder with depressive features
    Axis  II:  N/A
    Axis III:  N/A
    Axis IV:  Personal, Familial, Social
    Axis  V: Current GAF: 63

**PROGNOSIS:**

The prognosis is fair to poor.

Thank you very much for this referral. If you obtain additional information or records relevant to my evaluation of this patient, please provide those as soon as possible. If you have any further questions, please do not hesitate to contact my office.

H. David Feltoon, Ph.D.
Clinical Psychologist

5

# FELTOON & ASSOCIATES, P.C.
### CLINICAL & NEUROPSYCHOLOGY
5350 S. Staples St., Suite 200                    8025 Chalk Knoll
Corpus Christi, Tx 78411              Austin, Texas 78735
361-992-7780                         512-750-7164

H. David Feltoon, Ph.D
Licensed Psychologist
Board Certified
   American Board of Forensic Examiners
   American Board of Forensic Medicine
      American Academy of Pain Management

## SUMMARY VITA

NAME:  H. David Feltoon, Ph.D.
DOB: 5-23-44
BIRTHPLACE:  Philadelphia, PA                OFFICE: 8025 CHALK KNOLL DR.
WIFE: Evelyn                                      AUSTIN, TEXAS 78735
CHILDREN:  Jason, Lauren

## EDUCATION

B.A.   University of Delaware, 1967
       Psychology

M.S.   Trinity University, 1969
       Psychology

Ph.D.  Texas Tech University, 1973
       Clinical Psychology

       Internship in Clinical Psychology, 1972-1973
       University of Texas Medical School at San Antonio

## CONTINUING EDUCATION

American Academy of Pain Management, 26 CE Credits Earned, October 14,
   1993 - October 17, 1993

Texas Psychological Association  3 CE Credits Earned, November  4, 1993

MSI in Couples Therapy, 4 CE Credits Earned, November 4, 1993

-2-

Issues in School Psychology, 1 CE Credit Earned, November 5, 1993

Shenandoah Valley Pain Clinic, 4 CE Credits Earned, March 9, 1994

Shenandoah Valley Pain Clinic, 4 CE Credits Earned, March 23, 1994

American Academy of Pain Management, 6 CE Credits Earned, August 18, 1994
     to August 21, 1994

Texas Psychological Association  4 CE Credits Earned, November 10, 1994

Texas Psychological Association  6 CE Credits Earned, November 11, 1994

Forensic Neuropsychology: controversies in Civil and Criminal Litigation,
     7 CE Credits Earned, August 11, 1995

American Academy of Pain Management, 32 CE Credits Earned, September 14,
     1995 to September 17, 1995

Texas Psychological Association: The Problem of Minor Head Injury, 3 CE Credits
     Earned, November 11, 1995

American Academy of Pain Management, 30 CE Credits Earned, September 26,
     1996 to September 29, 1996

National Academy of Neuropsychology, 18 CE Credits Earned, October 30, 1996
     to November 2, 1996

- The Ethical and Credible Practice of Forensic Neuropsychology
- ABPN: Preparation for Application, Work Sample Submission and Examination for
  Board  (Diplomat) Certification
- Neurometrics: Aplications for the 21st Century
- Challenges to Validity and Reliability in Neurotoxic Assessment of Mass Injuries
- The Practice of Forensic Neuropsychology
-

National Academy of Neuropsychology, 12 CE Credits Earned, November 4
     to November 10, 1998

- Compensating for Cognitive Deficits (Rehabilitation)

-3-

- Case Interpretation of Adult HRNB Profiles: Small Group/Interactive Format (Clinical)
- Neurology for Neuropsychologist (Clinical)

American Academy of Pain Management, 25 CE Credits Earned, September 23-26, 1999

American Academy of Pain Management, 24 CE Credits Earned, September 21-24, 2000

American Academy of Forensic Psychology, 21 CE Credits Earned, February 21-23, 2001
 -Evaluating Childhood Trauma
 -Assessing Malingering & Defensiveness
 -The Use of the Rorschach in Personal Injury Evaluations

American Academy of Forensic Psychology, 14 CE Credits Earned, March 8-9, 2002
 -Expert Witness Liability, Immunity & Ethics
 -Recent Developments in the Admissibility of Psychological Evidence

## PROFESSIONAL CERTIFICATION AND LICENSING

Certification as a psychologist in Texas, 1974

Licensed Psychologist, State of Texas, # 1128, March 1975

Texas Health Service Provider Designation, 1976

National Health Service Provider, 1978

Diplomate:  American Academy of Pain Management, 1990
  Certificate #:  1704

American Academy of Pain Management Cert #:  1704, September 1990

Texas State Board of Examiners of Marriage and Family Therapists
  License #:  002423-002465, August 1992-1998

National Chronic Pain Outreach Association, July 1993

Diplomate:  American Board of Forensic Examiners, 1994
  License #:  384

Diplomate:  American Board of Forensic Medicine, 1996

-4-

ID #: 123

## PROFESSIONAL EXPERIENCE

- **Clinical Training**

  Psychiatric Clinic, Texas Tech University, September 1970-September 1972

  Clinical Psychology Internship, University of Texas Medical School, September 1972 -August 1973

- **University Teaching Positions**
  Associate Professor of Psychology
  Del Mar College 1975-1978

  Adjunct Clinical Professor of Psychology
  Texas A&M University at Corpus Christi, 1978-1981

- **Practice of Clinical Psychology**

  Seaview Psychiatric Hospital, Director of Psychology, August 1973-June 1975

  Physicians and Surgeons Hospital, Director of Psychology, June 1975-June 1977

  Private Practice, June 1977-present

- **Consultant**

  Corpus Christi Independent School District, Corpus Christi, Texas

  Beeville Independent School District, Beeville, Texas

  Texas Rehabilitation Commission, Corpus Christi, Texas

  Texas Youth Council, Corpus Christi, Texas

  Texas Rehabilitation Commission, Determination Division, Austin, Texas

-5-

Coastal Bend Youth City, Corpus Christi, Texas

Headstart Program, Corpus Christi, Texas

Sinton Juvenile Probation, Sinton, Texas

Beeville Juvenile Probation, Beeville, Texas

Focus Healthcare, Brentwood, Tennessee

Texas Department of Human Resources
       Bee County
       Duval County
       Jim Wells County
       Brooks County
       Nueces County
       San Patricio County
       Aransas County

- **Corpus Christi, Texas Hospital Affiliations**

Memorial Medical Center
Doctor's Regional Medical Center
Corpus Christi Osteopathic Hospital
Riverside Hospital
Driscoll Hospital
Spohn Hospital
Charter Hospital

- **Military Experience**

June 1979    Psychological Consultant to Dr. Lewis Richmond, M.D.  Performed
   to      psychological evaluations on military personnel and their dependents in
June 1984    San Antonio, Texas.

July 1981    Consultant to Beeville Independent School District. Performed psychological
   to      consultation on military personnel and their dependents in Beeville, Texas.
July 1991

-6-

| March 1985<br>to<br>April 1992 | Performed contract services at Corpus Christi Naval Air Station including counseling, program development and needs assessment for military personnel and their dependents in Corpus Christi,Texas. |
|---|---|
| April 1985<br>to<br>April 1992 | Performed contract services at Chase Field Naval Air Station including counseling, program development and needs assessment for military personnel and their dependents in Beeville, Texas. |
| April 1985<br>to<br>April 1992 | Performed contract services at Kingsville Naval Air Station including counseling, program development and needs assessment for military personnel and their dependents in Kingsville, Texas. |

## PUBLICATIONS

Crowder, James, & Feltoon, H. David. (1973). <u>Transference: Analysis of the Concept and Review of the Research</u>. San Antonio: Tri-way.

Feltoon, H. David. <u>Is "Social Reinforcement" Really A Reinforcer</u>? Unpublished Master's Thesis, Trinity University, 1969

Feltoon, H. David. <u>Measuring Transference Expectations In A University Counseling Center</u>, Unpublished Doctoral Dissertation, Texas Tech University, 1973

## AWARDS AND HONORS

President, Clinical Psychology Council 1971-1972

Graduate School Academic Honors 1971-1972

## RESEARCH

| 1967-1969 | Research Assistant, Trinity University, San Antonio, Texas |
|---|---|
| 1970-1973 | Research Assistant, Texas Tech University, Lubbock, Texas |

-7-

## **PROFESSIONAL MEMBERSHIPS**

American Psychological Association

Texas Psychological Association

National Academy of Neuropsychologists

National Academy of Pain Management

# CURRICULUM VITAE

**JOSEPH LAWSON BURTON**

| | |
|---|---|
| Date of Birth: | February 10, 1945 |
| Marital Status: | Married, One Child<br>Sean Lawson, Age 17 (Died 12/15/87) |
| Wife: | Judy Puckett Burton |
| Home Address: | 13010 New Providence Road<br>Alpharetta, Georgia 30004 |
| Office/Mailing<br>Address: | 13784 Highway 9<br>Alpharetta, Georgia 30004<br>Ph.  770/777-0437<br>Fax: 770/753-4389 |
| Profession: | Forensic Pathology - Doctor of  Medicine. |
| Title: | Consultant in Forensic and Environmental Pathology<br>and Medicine<br>Chief Medical Examiner, Emeritus - Dekalb County<br>and Senior Consulting Pathologist -<br>Cobb, Gwinnett & Paulding County Medical<br>Examiner's Offices-State of Georgia |
| Appointments: | Chief Medical Examiner:<br>(a) Dekalb County 1978 to 2000.<br>(b) Cobb County 1978 to 1999.<br>(c) Paulding County 1983 to 1999.<br>(d) Clayton County 1988 to 1997.<br>(e) Gwinnett County 1988 to 1999. |

JOSEPH LAWSON BURTON
Page 2

Director Forensic Pathology Training Program -
Emory University School of Medicine,
Atlanta, Georgia,
1981 to 1984.

Clinical Associate Professor -
Forensic Pathology - Emory University
School of Medicine, Atlanta, Georgia, 1978.

Regional Pathologist Federal Aviation Administration,
1979 to present.

Pathologist for United States Federal Penitentiary,
Atlanta, Georgia,
1978 to 1992.

Consultant - National Transportation Safety Board.

Consultant - Georgia Arson Investigators,
Atlanta, Georgia.

Instructor - Department of Public Safety Training
Programs - Dekalb, Cobb, Clayton, Paulding and
Gwinnett Counties,
1978 to present.

Certified Instructor, Forensic Medicine & Pathology.
Police Officers Standards and Training,
Georgia Police Academy.

Instructor Criminal Justice Education
Program, 1980 to present.

Forensic Consultant to several Metro Atlanta hospitals.

Consultant in Forensic Pathology to various State and
Southeastern United States District Attorney's Offices
and United States Federal District Attorney's Offices.

JOSEPH LAWSON BURTON
Page 3

Instructor in Forensic Pathology,
University of Miami, Pathology,
Training Program, 1974.
Instructor, Insurance Adjustors School of America,
1973 - 1974.

Instructor, Federal Narcotics Law
Enforcement Training Program,
Miami, Florida, 1974.

Instructor, Public Safety Department,
Cadet Training Program,
Miami, Florida, 1973 - 1974.

Instructor, Forensic Pathology,
Grady Memorial Hospital Pathology
Training Program, Atlanta, Georgia,
1975 - 1976.

Lecturer:

1. Emory University School of Medicine.
2. Emory University School of Law.
3. Georgia Criminal Justice Council.
4. Georgia State University School of Law.
5. National Law Enforcement Training
   Institute of California.

Special
Appointments:

Board of Directors, Regional Sudden
Infant Death Foundation.

Board of Directors, Sudden Infant
Death Syndrome Research Foundation, Atlanta.

Who's Who In Georgia - 1988-89.

Governor's Task Force on Unexplained
Child Fatalities, Ga. (1989-1990)

Governor's Task Force on Child Abuse.
(1989-1990)

JOSEPH LAWSON BURTON
Page 4

Member, Medical Task Force-Coalition
Against Sexual Abuse of Children,
January 1990 to 2000.

President, Institute for Infant and Child Survival, Inc.
1992 to 1998.

National Network for Child Fatality Review,
Los Angeles, California
Consultant-Forensic Expert, 1992 to present.

Appointed to Governor's Statewide
Child Abuse Prevention Panel.
Atlanta, Ga., July 1993 - July 1995.

International Autopsy Protocol Committee,
Children's Hospital,
San Diego, California 1992 to 1995.

Board of Directors, Institute for Injury Reduction,
1995.

Georgia Trauma Advisory Council,
Member (Evaluation Committee),
1994 to 1998.

Training:                    House Physician & Surgeon - Pathology
Emory University Hospital System,
Atlanta, Georgia, 1971 -1972.

Resident Pathology, Emory University
Hospital System, Atlanta, Georgia,
1972 - 1973.

Fellow of American Cancer Society,
1972 - 1973.

JOSEPH LAWSON BURTON
Page 5

Assistant Pathologist, Office of the
Medical Examiner, Fulton County,
Atlanta, Georgia,
November 1972 - June 1973.
Resident Fellow in Forensic
Pathology, Dade County Medical
Examiner's Office, Miami, Florida
1973 - 1974.

Degrees & Education:    B.A. - Emory University, Atlanta,
Georgia, 1967.
M.D. - Emory University School of Medicine,
Atlanta, Georgia, 1971.
Board Eligible-Qualified Anatomic and
Forensic Pathology by American Board
of Pathology, 1976.
Forensic Pathology Boards - 1977 (passed).

Medical Licensure:    Georgia State License to practice
Medicine and Surgery by Examination, 1972.
Number - 14892.

Previous Employment:    Acting Deputy Chief Medical Examiner,
Dade County, Miami, Florida,
January 1974 to June 1974.

Associate Chief Medical Examiner,
Fulton County, Atlanta, Georgia,
1974 - 1978.

Present Employment:    Georgia State Appointment as Medical
Examiner since July 1974.

Medical Examiner, Metropolitan Atlanta, Georgia, 1974
to 2000.

Consultant Forensic Pathology - Forensic Medicine, 1975
to present.

JOSEPH LAWSON BURTON
Page 6

Forensic Consultant - Metro Atlanta
Department of Family and Children
Services. Crimes against children.
Metro Law Enforcement Agencies -
Child abuse (physical/sexual).

Professional
Associations:

Fellow of American Academy of Forensic Sciences.
Member National Association of Medical Examiners.

CASAC - Coalition Against Sexual
Abuse in Children, Cobb County,
1991 to present.

Fellow of Royal Society of
Medicine, London, England, 1992
Member Society of Automotive Engineers, 1995.
Association for the Advancement of
Automotive Medicine, 1995.
Member of American Academy of Family
Practice. (past)
Member of American Heart Association. (past)
Member of Georgia Heart Association. (past)
Member of Georgia Peace Officers Association.
American Medical Association.
American Humane Association -
Children's Division, 1993 to present.
International Wound Ballistics Association, 1999.
Member American Society of Civil Engineers.
Member American College of Sports Medicine.

Other Employment:

Chief of Staff, Kathy Crawford Nursing Home (formerly
Martin Luther King, Sr. Nursing Home), Atlanta,
Georgia, 1975 - 1978.

Special Forensic
Case Involvements:

Atlanta Missing & Murdered Children -
was the coordinating consultant to the FBI and
GBI on the entire investigation's forensic aspects,
1980, 1981, and 1982.

JOSEPH LAWSON BURTON
Page 7

Theodore Bundy Case. Florida

20/20 Television - Began an investigation
into a "Murder" which happened 25 years ago in
Arkansas - was the lead forensic expert chosen
for the State of Arkansas, 1985.

"Unsolved Mysteries" - State Prosecutor's Office,
Little Rock, Arkansas. Forensic Expert - Investigation
into death of two teenage boys, April 1988. National
television coverage.

Presentation on CBS Evening News
"Automatic Seatbelts - Passive Belt Systems"
June 13, 1991.

Presentation on Marketplace - Canada
Canadian Broadcasting News
"Automatic Seatbelts - Passive Belt Systems"
June 1991

Presentation on Connie Chung's Eye to Eye Program,
"Passive Restraints"
March 31, 1994.

HBO Special - "Autopsy III-Voices From the Grave"
Presentation of Crime Scene, Blood Spatter
Reconstruction - Salt Lake City, Utah.
HBO Feature Special 1996.

HBO Special - "Autopsy IV - Crime Scene
Reconstruction and Injury Pattern"
Analysis of Alleged Perpetrator's Injuries - 1997.

ABC Television-20/20 Show
"Secrets And Lies"
January 5, 1998

Court TV - "Prosecution Of A
26 Year Old Murder Case"
April 7, 1998

JOSEPH LAWSON BURTON
Page 8

Consultant to Kansas City Star
Dale Earnhardt and other Seatbelt Related Issues
May 10-11, 2001

Inside Edition  - WSB
"Danger of Automatic Passive Restraints/
Nikki Taylor Story"
May 11, 2001

Consulting Expert – Dateline
"Potential Dangers of Low Shield Child Booster Seats"
September 5, 2002


Special Areas of
Expertise:

Scene reconstruction and injury pattern interpretation.

Exhumations.

Occupant & pedestrian injuries, injury causation,
biomechanics, and occupant kinematics.

Drug abuse.

Child abuse - physical/sexual.

Deaths occurring during legal intervention
and/or police custody.

Gunshot injuries and wounding potential of
various firearms.


Publications and
Presentations:

"Automated Analysis of Serum Histidine"
Clinical Chemistry, 1967.

Research - 1) Pathologic Aspects of
Snake Envenomation, Procedures and Techniques.
2) Forensic Aspects of Exhumations.

JOSEPH LAWSON BURTON
Page 9

Forensic Medicine in the Emergency Room
Post Graduate Course for Emergency Department
Nursing, Miami Beach, Florida, 1973.

"Investigation of Intoxication - Pitfalls and Problems,"
American Industrial Health Conference,
Miami, Florida, 1974.

"Sex-Rape Murders & Multiple Murders"
Death Investigation, Seminar Criminal Justice
Division, Institute of Government,
University of Georgia, Athens, Georgia,
April 1978.

"Asphyxial Deaths"
"Drowning"
"Exhumation" - Comprehensive Investigation of Death.
American Society of Clinical Pathologists,
Orlando, Florida, 1978.

Advanced Death Investigation University of Georgia -
Institute of Government. "Interpretation of Trauma -
Vehicular, Industrial, Homicide, Fire".
Athens, Georgia, May 4, 1980.

"Forensic Medicine - Terms and Procedures" Seminar,
National Shorthand Reporters Association,
Callaway Gardens, Pine Mountain, Georgia,
October 15, 1983.

National Shorthand Reporters Midyear Seminar.
"Forensic Medicine - Terms and Procedures."
Atlanta, Georgia, March 1984.

"Creative Crime Scene Investigation Seminar", National
Law Enforcement Institute, Inc.
Atlanta, Georgia, October 1983.

JOSEPH LAWSON BURTON
Page 10

"The Medical Examiner as a Defense Witness and
Forensic Death Investigation." Seminar in Criminal
Defense Litigation - The Super Star - 1984.
Atlanta Bar Association, Atlanta Hilton Hotel,
Atlanta, Georgia, June 21, 1984.

"Difficult Forensic Cases" -
National Law Enforcement Training Seminar, 1985.

Drug Abuse and its consequences -
Program to local Schools and Civic Organizations.
Leadership Cobb - Crime: "Who Really Pays," Marietta,
Georgia, April 1985.

Northside Hospital - Medical Explorers -
"Forensic Pathology." Atlanta, Georgia, May 1985.

National Defenders - Investigators Association
Conference - "Forensic Pathology." June 1985.

Atlanta Pathology Society - Speaker
(Complex Forensic Cases), June 1985.

Emory - Grady Medical School Resident Training
Conference, Speaker, (Exhumations), Fulton County
Medical Examiner's Office, December 1985.

"Advance Evidence Technician Training Seminar",
Essex Institute of Public Service, Gainesville, Georgia,
January 27, 1986.

Georgia Probation Association, Mid Winter Conference,
Unicoi State Park, Helen, Georgia,
March 13, 1986.

"Forensic Pathology in the Community",
Optimist Club, Marietta, Georgia, March 14, 1986.

JOSEPH LAWSON BURTON
Page 11

"Answers from the Dead? - Just Ask!"  Speaker -
Joint Meeting - Medical Association of Atlanta and
Medical  Staff - West Paces Ferry Hospital,
Atlanta, Georgia, March 24, 1986.

"Substance Abuse...Terminal Consequences."
B.A.C.C.H.U.S., Alcohol & Drug Awareness, Georgia
State University, Atlanta, Georgia. October 21, 1986.

Emory University - Law Interns -  Speaker.
Marietta, Georgia,  October 27, 1986.

Sun Insurance Services - Speaker "Techniques &
Procedures in the Medical Examiner's Office",
Atlanta, Georgia, October 28, 1986.

Emory University - Law Students -  Speaker.
Atlanta, Georgia, November 6, 1986.
National Law Enforcement Institute Seminar - Speaker
"Death Scene Analysis", Atlanta, Georgia,
November 20, 1986.

Criminal Justice Program for Leadership Dekalb.
"Medical Examiner's Role in Criminal Justice System."
Decatur, Georgia, November 20, 1986.

East Cobb Rotary Club - Speaker
"In Search of the Truth - Forensic  Medicine." Marietta,
Georgia, January 1987.

Decatur Rotary Club - Speaker
"The Medical Examiner - A Health Detective."  Decatur,
Georgia, January 1987.

Georgia Legal Secretaries - Speaker.
"The Medical Examiner - pro vs. con or Just the Truth."
Marietta, Georgia, February 1987.

North Marietta Kiwanis Club - Speaker
"Forensic Medicine in your Community."
Marietta, Georgia, February 1987.

JOSEPH LAWSON BURTON
Page 12

North Georgia Police Academy, Lecturer - "The Role of
the Medical Examiner in Criminal Profiling."
Marietta, Georgia, February 1987.

Leadership Cobb - "Forensic Pathology -
The Medical Examiner." Marietta, Georgia,
March 11, 1987.

Georgia Claims Association of Insurance Investigators-
"Forensic Medicine and its Role in Death Investigation,"
Atlanta, Georgia,
March 19, 1987.

Kennestone Hospital Medical Staff,
"Trauma Victims - Clinical Pathological Correlation,"
Marietta, Georgia, April 8, 1987.

Georgia State University Biology Club
"Forensic Pathology." Atlanta, Georgia,
April 22,1987.

Explorer Scouts - "Forensic  Pathology."
Northside Hospital, Atlanta, Georgia,
May 4, 1987.

Federal Criminal Investigators Association - "Wounding
Potential of Various Handguns & Ammunition."
Atlanta, Georgia, June 9, 1987.

Douglas County "D.U.I." Offender Rehab Program.
"Alcohol & Drug Awareness Lecture."
Douglasville, Georgia, August 1987.

Emory University - Law Intern -  Speaker,
Atlanta, Georgia, October 15, 1987.

Georgia State College, "Chemical Abuse-Terminal
Consequences," Atlanta, Georgia, October 20, 1987.

JOSEPH LAWSON BURTON
Page 13

National Law Enforcement Institute Homicide Seminar
"Drug Related Deaths, i.e. Cocaine-Crack," "AIDS."
Ann Arbor, Michigan, October 27, 1987

National Law Enforcement Institute Homicide Seminar
"Drug Related  Deaths, i.e. Cocaine-Crack," "AIDS"
Dallas, Texas, November 5, 1987.

Leadership Dekalb, "The Medical Examiner's Role in the
Criminal Justice System."  Decatur, Georgia,
November 12, 1987.

National Law Enforcement Institute" AIDS."
Atlanta, Georgia, November 19, 1987.

Dekalb County Librarians -
Speaker "AIDS Awareness."  Decatur, Georgia,
February 8, 1988.

Cobb County Rotary Club "Forensic Medicine - Impact
on Your  Community."  Marietta, Georgia,
February 22, 1988.

Hickory Hills School
"Drug Abuse." Marietta, Georgia,
February 24, 1988 & March 4, 1988.

Cobb County Grand Jury - Consultant.
"Drug Abuse in the Community."
Marietta, Georgia, April 4, 1988.

National Law Enforcement Institute,
"Deceptive Causes of Death - AIDS, Drug - Cocaine
Related Deaths, Complicated Suicides."
Chicago, Illinois, April 21, 1988.

Georgia Legal Secretaries Seminar
"Forensic Medicine in the Community."
Atlanta, Georgia, April 29, 1988.

JOSEPH LAWSON BURTON
Page 14

State Prosecutor's Office, Forensic Expert -
Investigations into death of two teenage boys on railroad
tracks. Little Rock, Arkansas, April 1988.

Dekalb County Employees, "AIDS - Awareness, Facts
about AIDS." Decatur, Georgia, May 4, 1988.

Northside Hospital Medical Explorers Post 401,
"Forensic Pathology." Atlanta, Georgia, May 16, 1988.

Jackson City Council, Forensic Expert - Investigation
into Alleged Suicide Death. Jackson, Mississippi,
May 1988.

National Law Enforcement Institute,
"Deceptive Causes of Death - AIDS, Drug - Cocaine
Related Deaths, Complicated Suicides."
Phoenix, Arizona, June 17, 1988.

Georgia Prosecutors Council.
"DUI, Accident Reconstruction and the Medical
Examiner." Savannah, Georgia, July 7, 1988.

National Law Enforcement Institute.
"Deceptive Causes of Death - AIDS, Drug -
Cocaine Related Deaths, Complicated Suicides."
Philadelphia, Pennsylvania, July 15, 1988.

National Law Enforcement Institute.
"Deceptive Causes of Death - AIDS, Drug -
Cocaine Related Deaths, Complicated Suicides."
Denver, Colorado, July 29, 1988.

Dekalb County Youth Rally.
"Youth Against Crime & Drugs."
Decatur, Georgia, August 20, 1988.

24th Southeastern Arson Seminar.
"Fire Deaths, Carbon Monoxide and Electrical
Deaths", Athens, Georgia, September 1, 1988.

JOSEPH LAWSON BURTON
Page 15

"Drugless, Ya'll."  Drug Prevention on Georgia
Campuses. Georgia State University,
Atlanta, Georgia, September 9, 1988.

Dekalb County Employees
"AIDS - Awareness - Facts about AIDS"
Decatur, Georgia, September 21, 1988.

Atlanta Falcon Football Training Camp
"Terminal Consequences of Substance
Abuse Including Steroids."
Lawrenceville, Georgia, October 25, 1988.

Snapfinger Woods Business Men's Association.
"Medical Examiner's Office and Drugs."
Lithonia, Georgia,  October 5, 1988.

Marietta Civitan Club
"Drug Abuse."
Marietta, Georgia, October 18, 1988.

Georgia State University
Students for Drug Free Campuses "Substance Abuse."
Atlanta, Georgia, October 18, 1988.

National Law Enforcement Institute
"Death Scene Analysis and Serial Murders."
Kansas City, Missouri, October 20, 1988.

Georgia State University College of  Law Center for
Continuing Legal Education.  Troublesome Aspects of
Georgia Criminal Law. "Testimony by Medical
Examiners and Crime Scene Re-creation Experts."
Atlanta, Georgia, November 9, 1988.

Atlanta Bar Association,
"Forensic Medicine - The Expert - The System."
Atlanta, Georgia, January 1989.

JOSEPH LAWSON BURTON
Page 16

Georgia Insurance underwriters,
"Forensic Medicine - The Answers to Many Investigative
Questions."
Atlanta, Georgia, February 1, 1989.

Mercer University, School of Medicine.
"Terminal Consequences of Substance Abuse."
Macon, Georgia, February 8, 1989.

Auburn University.
"Terminal Consequences of Substance Abuse
Including Steroids."
Auburn, Alabama, February 22, 1989.

Mercer University - Macon Campus
"Substance Abuse."
Macon, Georgia, June 15, 1989.

South Dekalb Rotary Club.
"Impact of Forensic Medicine on the Community."
Lithonia, Georgia, June 22, 1989.

Blue Ridge Circuit Juvenile Court
Cherokee County.
Juvenile Intensive Diversion Program.
"Substance Abuse."
Cumming, Georgia, August 2, 1989.

Northside Hospital Emergency Department
Conference. "Role of the Medical Examiner
in Emergency Medicine."
Atlanta, Georgia, August 4, 1989.

25th Southeastern Arson Seminar
"Fatal Fires" - Advanced, Civil, and Criminal.
University of Georgia.
Athens, Georgia, August 28, 1989.

Dekalb County Crime and Drug Youth Rally.
"Telling It Like It Is."
Decatur, Georgia, October 14, 1989.

JOSEPH LAWSON BURTON
Page 17

District Attorneys & Law Enforcement Personnel -
Gwinnett & Paulding Counties. "DNA" Lecture.
October 2, 1989.

Emory University Law Students
"Forensic Expert & Litigation."
Atlanta, Georgia, October 12, 1989.

Dekalb County Youth Rally  Sponsored by NAACP.
"Youth Against Crime & Drugs."
Decatur, Georgia, October 14, 1989.

Georgia Trial Lawyers Association Seminar.
"Forensic & Environmental Pathology, an Untapped
Resource." Atlanta, Georgia, December 8, 1989.

Georgia Association of Criminal Defense Lawyers
Seminar. "Impartiality & the Medical Examiner."
Atlanta, Georgia, January 12, 1990.

National Collegiate Drug Awareness Week - Conference.
"Substance Abuse - Terminal Consequences."  Atlanta,
Georgia, January 30, 1990.

Marietta Kiwanis Club
"Forensic Pathology - Impact on Community Health."
Marietta, Georgia, February 15, 1990.

Leadership Cobb
"Forensic Pathology - Impact on Community Health."
February 15, 1990.

Dallas Rotary Club.
"How the Medical Examiner Works for You in Paulding
County Georgia." February 20, 1990.

Dekalb College - North Campus.
"Substance Abuse - Terminal Consequences."
Dunwoody, Georgia, February 23, 1990.

JOSEPH LAWSON BURTON
Page 18

National Collegiate Drug Awareness Week. "Substance
Abuse - Terminal Consequences."
The College at New Paltz,
Albany, New York, March 6, 1990.

Southeastern Home Office Underwriters
Association Conference. "Forensic Medicine, It's
Application to Life Insurance Industry."
Mobile, Alabama, April 5, 1990.

Cobb County Trial Lawyers Association
"Forensic Medicine & Injury Pattern Interpretation."
Marietta, Georgia, May 9, 1990.

Georgia Association of Special Programs Personnel
Conference. "What's Killing our Future?"
Jekyll Island, Georgia,  May 17, 1990.

East Cobb Kiwanis Club
"Forensic Medicine in your Community."
Marietta, Georgia, May 30, 1990.

Gwinnett County Family & Children's Services.
"Children Born with Drug Addiction - Long Term
Effects." Lawrenceville, Georgia, June 18, 1990.

Georgia Southern University Upward Bound Project.
"Substance Abuse - Terminal Consequences."
Statesboro, Georgia,  June 28th & 29th, 1990.

Morris Brown College Upward Bound Project.
"Substance Abuse - Terminal Consequences."
Atlanta, Georgia, July 11, 1990.

Georgia Community Action Association.
"Focus on the Family - Substance Abuse."
 Atlanta, Georgia, July 23rd & 24th, 1990.

Georgia Southern University
"Substance Abuse - Terminal Consequences."
 Statesboro, Georgia, September 13, 1990.

JOSEPH LAWSON BURTON
Page 19

Abraham Baldwin College
"Substance Abuse."
Tifton, Georgia, September 25, 1990.

Emory University Law Students Speaker
Atlanta, Georgia, October 4, 1990.

Gwinnett Hospital System Emergency Nurses -
Course Instructors "Child Abuse."
Lawrenceville, Georgia, October 16, 1990.

Leadership Dekalb - "The Medical Examiner's Role
in the Criminal Justice System."
Atlanta, Georgia, October 19, 1990.

Georgia Trial Lawyers Fall Workshop
"Forensic & Environmental Pathology and Medicine -
Answers from the Dead And the Almost Dead."
Atlanta, Georgia, October 26, 1990.

Georgia Police Academy
"Child Deaths"
Forsyth, Georgia, October 31, 1990.

National Defender Investigator Association,
1990 National Conference,
"Impartiality and the Medical Examiner."
Atlanta, Georgia, November 8, 1990.

Cobb County Law Enforcement Association.
"Medical Examiner's Role in  Law Enforcement."
Marietta, Georgia, January 10, 1991.

Southern Methodist University
"Substance Abuse - Terminal Consequences."
Dallas, Texas, February 11, 1991.

Dekalb College, North Campus
"Substance Abuse - Terminal Consequences."
Dunwoody, Georgia, March 4, 1991.

JOSEPH LAWSON BURTON
Page 20

Mercer College - Macon Campus
"Substance Abuse – Terminal Consequences."
Macon, Georgia, March 7, 1991.

Criminal Trial Lawyers
"Impartiality and the Medical Examiner."
Atlanta, Georgia, April 19, 1991.

National Law Enforcement Institute
"Death Scene Analysis."
Pittsburgh, Pennsylvania, April 22, 1991.

Metro Marietta Kiwanis
"The Criminal Justice System."
Marietta, Georgia, April 29, 1991.

Joint Meeting of the Royal College of Pathologists of
Australia and National SIDS Council.
"Discussion & Protocol for Infant Death Investigation
including SIDS Deaths - Paper." April 1991.

Perimeter Center Kiwanis Club
"Substance Abuse."
Atlanta, Georgia, May 6, 1991.

Course Director
Advanced Death Investigation - 40 hours.
Sponsored by Cobb County Law Enforcement Training
Division. Marietta, Georgia, May 20th-May 24th, 1991.

Golden Key National Honor Society Convention.
"Biophysiology of Drug Use - Drug Abuse."
Ritz Carlton, Atlanta, Georgia, August 10, 1991.

The Coalition Against the Sexual Abuse of Children.
"Physical Injury, Bruising, Shaken Baby Syndrome,
Broken Bones, Internal Injuries." Kennestone Hospital,
Marietta, Georgia, August 15, 1991.

JOSEPH LAWSON BURTON
Page 21

Southeastern Arson Seminar.
"Fatal Fires." University of Georgia,
Athens, Georgia, August 29, 1991.

NAACP - Dekalb County  Georgia Branch
Anti-Crime and Drug Prevention
Decatur, Georgia, September 21, 1991.

Emory University Law Students
Expert Witness - Litigation
Atlanta, Georgia, October 10, 1991.

University of North Carolina at Charlotte
"Substance Abuse - Terminal Consequences."
Charlotte, North Carolina,  October 14, 1991.

State Child Abuse Fatality Committee.
"Forensic Pathologist Role in Child Abuse and Child
Death Cases." Macon, Georgia, November 6, 1991.

Baron Users Group - 12th Annual Convention.
"Drugs in the Work Place."
Atlanta, Georgia, November 8, 1991.

Contributor - Legal Medicine 1991
Edited by Cyril H. Wecht, M.D., J.D.
Chapter - "Crime Scene Videos",
Mark Curriden, Butterworth Legal Publishers,
1992

National Law Enforcement Institute Seminar.
"Crime Scene Analysis - Masqueraded Deaths."
Atlanta, Georgia, November 19, 1991.

Georgia Claims Association
"Drugs in the Work Place."
Atlanta, Georgia, January 16, 1992.

Brown Court Reporting and Medical Transcription
School.  "Introduction to Forensic Sciences."
Atlanta, Georgia, January 28, 1992.

JOSEPH LAWSON BURTON
Page 22

The National Kidney Foundation Regional Forum
"Controversies in Organ Donation."   Presenter.
Atlanta, Georgia, February 18, 1992.

Dekalb College, Central Campus
"Substance Abuse - Terminal Consequences."
Decatur, Georgia, March 4, 1992.

Kennestone Hospital Trauma Conference
"Murder or Suicide-Stabbing in a 43 Year Old Female"
Marietta, Georgia, April 8, 1992.

Georgia Fire Academy
Fire, Lightning, Electrical and Carbon Monoxide Deaths.
Forsyth, Georgia, April 17, 1992.

Shepherd Spinal Center
"Drugs in the Work Place."
Atlanta, Georgia, April 27, 1992.

Course Director
Advanced Death Investigation - 40 hours.
Sponsored by Cobb County Law
Enforcement Training Division.
Marietta, Georgia, May 18th - May 22nd, 1992.

Buckhead Exchange Club
"Interesting & Complicated Forensic Cases."
Atlanta, Georgia, May 26, 1992.

Seminar Instructor,
"Death Scene Investigation and Deaths Occurring During
Legal Intervention and/or Police Custody."  "Gunshot
Injuries and Wounding Potential of Various Firearms."
Little Rock, Arkansas, August 24, 1992.

"Investigation SIDS and Other Infant Deaths."
Published - Journal of the Medical Association of
Georgia, Page 433-436.  September, 1992.

JOSEPH LAWSON BURTON
Page 23

Dekalb College Athletes
"Substance Abuse - Terminal Consequences."
Decatur, Georgia, October 14, 1992.

American Association of Suicidology Conference.
Panel Member - "Community Responses to Suicide."
Atlanta, Georgia, October 18, 1992.

North Georgia Police Academy
Death Investigation Seminar - General Aspects of
Forensic Medicine & Motor Vehicle Biomechanics and
Occupant Kinematics.
Marietta, Georgia, January 11, 1993.

Hemlock Society of Georgia
"Suicide"
Atlanta, Georgia, January 16, 1993.

American Association of Legal Nurse Consultants -
Atlanta Chapter  "The Forensic Expert in Civil
Litigation."  Atlanta, Georgia, January 19, 1993.

North Fulton Hospital Trauma Advisory Committee
"Presentation of Unusual Accidental Death of a Two
Year Old."  Roswell, Georgia, January 20, 1993.

Kennestone Hospital Medical Staff
"Child Abuse"
Marietta, Georgia, January 27, 1993.

Scottish Rite Children's Hospital Medical Staff
"Pitfalls in the Recognition and Diagnosis of Physical
and Sexual Abuse in Children."
Atlanta, Georgia, March 18, 1993.

Metro Swat Team
"Prevention & Recognition of Suicides in Hostage
Situations."   Decatur, Georgia, April 14, 1993.

JOSEPH LAWSON BURTON
Page 24

Dekalb Addiction Clinic
"Substance Abuse - Terminal Consequences."
Atlanta, Georgia, May 11, 1993.

Georgia Indigent Defense Counsel Seminar
"Child Molestation - Physical Aspects."
Mableton, Georgia, May 14, 1993.

Course Director
Advanced Police/Medical Death
Investigation Course
Speaker:
1. General Forensic Pathology and Medicine.
2. Problems and Solutions in "Under the Influence"
Prosecution.
3. Child Abuse - Physical, Recognition and Diagnosis.
4. Child Abuse - Sexual, Recognition and Diagnosis.
5. Motor Vehicle Accidents - General Forensic
Information.
6. Motor Vehicle Accidents - Biomechanics and
Occupant Kinematics.
Marietta, Georgia, May 17-21, 1993.

Georgia Trial Lawyers Annual Meeting and Seminar,
"Use of Forensic Evidence & Witnesses in Civil
Litigation - The Forensic Pathologists Role in
Understanding of the Biomechanics & Kinematics of
Occupant & Pedestrian Injuries in Motor Vehicle
Accident Cases." Atlanta, Georgia, May 21, 1993.

Emergency Nurses Association
Scottish Rite Children's Medical Center
"Patterns of Injury in Children."
Atlanta, Georgia, May 24, 1993.

Douglas County Advanced Death Investigation Course
Course Director - Speaker
"Child Abuse, Gunshot Wounds, Blunt & Sharp Injuries,
and Occupant Kinematics/Biomechanics - Motor Vehicle
Accidents."
Douglasville, Georgia, September 14, 1993.

JOSEPH LAWSON BURTON
Page 25

Georgia Fire Academy
"Fire, Carbon Monoxide & Electrical Death
Investigations." Forsyth, Georgia, September 24, 1993.

Metropolitan Atlanta Homicide Commanders
"Intersection of Medical Examiner and Law Enforcement
& Other Agencies within the Criminal Justice system."
Lawrenceville, Georgia,
October 13, 1993.

Leadership Dekalb "The Medical Examiner -
An Advocate for the People."
Decatur, Georgia, October 21, 1993.

National Law Enforcement Institute Homicide Seminar
"Death Scene Analysis & Deceptive Means
& Causes of Death."
Atlanta, Georgia, November 4, 1993.

Clayton County Police Services
"Child Abuse"
Jonesboro, Georgia, February 14, 1994.

Dekalb College
"Substance Abuse - Terminal Consequences."
Dunwoody, Georgia, February 22, 1994.

American Bar Association National Institute on
Emerging Issues in Motor Vehicle Litigation.
"Injury Enhancement in Victims of Automobile
Accidents - Real Life Experience - A Forensic
Pathologist's Viewpoint."
Phoenix, Arizona, March 24, 1994.

Gwinnett County - Trauma Rounds
"Biomechanics and Kinetics of Injury
Causation in Motor Vehicle Accidents."
Lawrenceville, Georgia, April 6, 1994.

JOSEPH LAWSON BURTON
Page 26

Memorial Medical Center - Fatal Child
Abuse Seminar "Patterns of Injury in Children -
Physical and Sexual Abuse."
Savannah, Georgia, April 8, 1994.

Automotive Safety Seminar
"The Role of Forensic Pathology and Medicine in Motor
Vehicle Accidents, Biomechanics and Occupant
Kinematics." Cleveland, Ohio, May 12, 1994.

St. Ives County Club
"The Medical Examiner as a Public Health Physician."
 Alpharetta, Georgia, August 19, 1994.

University of Georgia,
Office of Insurance & Fire Commissioner - 30th Annual
Southeastern Arson Seminar "Fatalities in Fires, and
Carbon Monoxide, and Electrical Deaths." Athens,
Georgia, August 25, 1994.

Cobb County Police Department
"Communicable Diseases - AIDS, Hepatitis,
Tuberculosis, etc." Marietta, Georgia, August 26,1994.

National Law Enforcement Institute
Homicide Investigation Seminar, "Deceptive Causes of
Death (Homicide vs. Suicide vs. Accidental vs. Natural)",
"Time of Death", "Most Frequent Errors Made by
Homicide Investigators from Your Point of View",
"Disease Exposure", "SIDS and Child Deaths",
Atlanta Airport Marriott Hotel, College Park, Georgia,
October 25, 1994.

Ridgeview Institute, Coalition for Child Abuse
Prevention, "Our Common Agenda:  Our Children's
Future." "Diagnosis of Physical and Sexual Abuse in
Children-Pitfalls." Smyrna, Georgia, October 27, 1995.

JOSEPH LAWSON BURTON
Page 27

Association for the Advancement of Automotive
Medicine Course: The Biomechanics of Impact
"Chest and Abdomen: Anatomy and Biomechanical
Characteristics."
"The Medical Examiner's Contribution
to Understanding Vehicular Injuries."
   a. Diagnosis of Cervical Injuries.
   b. Diagnosis of Belt Use based on
      Anatomical findings.
   c. MVA fires and occupant carbon monoxide levels
   d. General discussion of role of Medical Examiner
      in biomechanics and kinematics of injury
      causation.
Chicago, Illinois, November 14, 1995

Kennestone Hospital System Trauma Rounds
"Application of Biomechanic and Kinematic information
in the diagnosis of injuries sustained
in motor vehicle accidents" Marietta, Georgia
March 13, 1996

Clayton County Abuse and Child Death Team
Continuing Education Seminar
"Pitfalls in the Diagnosis of Physical and Sexual
Abuse in Children" Jonesboro, Georgia  April 2, 1996

Georgia Court Reporters Association
"Forensic Medicine in the Community"
Stone Mountain, Georgia, October 5, 1996

Association for the Advancement of Automotive
Medicine "Chest and Abdomen: Anatomy and Injuries in
Motor Vehicle/Crashes," December 9, 1996;

"The Medical Examiner's Contribution to Understanding
Motor Vehicular Injuries,"
Chicago, Illinois December 10, 1996

JOSEPH LAWSON BURTON
Page 28

Southern Trial Lawyers Association
"Pathology" - "Modre Wol Out"
New Orleans, Louisiana, February 8, 1997

AIEG Spring Seminar
"Head and Spine Injuries in Roof Crush
and Rollover Accidents", Atlanta Airport Hilton, Atlanta,
Georgia May 9, 1997

The Georgia Council on Child Abuse,
13th Annual Training Symposium
"The Power of Prevention"
"Pitfalls in the Diagnosis of Physical and Sexual
Abuse in Infants and Children".
Crowne Plaza Ravinia,
Atlanta, Georgia, June 9-11, 1997.

American Bar Association Emerging Issues in Motor
Vehicle Product Liability Litigation,
"Air Bag Injuries to Infants,
Children and Small Adults".
Phoenix, Arizona
April 2-3, 1998

Coalition for Child Abuse Prevention
Annual Conference, - "The Assessment
and Investigation of Physical Abuse
Cases and Child Deaths".
Atlanta, Georgia, April 24, 1998

Kennestone Hospital Emergency Room Staff -
"Assessment of Patterned Injuries
and Steroid Psychosis"
Marietta, Georgia, April 27, 1998

Clinical Management of Crime Victims From
Trauma To Trial.
"Career Development In Forensic Health Science"
Forensic Expert Panel
Georgia State University, Atlanta, Georgia
May 1, 1998

JOSEPH LAWSON BURTON
Page 29

Motor Vehicle Products Liability Seminar
"Biomechanics and Occupant Kinematics
Issues-Forensic Investigation, Injury
Reconstruction, Vehicle Inspections and
Use of Visual Aids in Presenting Cases".
Little Rock, Arkansas
May 15, 1998

AIEG Auto Focus 1998 Seminar
"Air Bag Injuries"
September 24, 1998
San Francisco, California.

AIEG Auto Focus 1998 Seminar
"Head & Neck Injuries in
Roof Crush & Rollover Accidents"
September 25, 1998
San Francisco, California.

International Association Of Bomb
Technicians And Investigators Region VI, 1
998 Regional Training Conference
"The Medical Examiner's Role In Investigations
Of Bombings And Of Explosive Type Events"
October 12-16, 1998
Marietta, Georgia

Cobb County Bar Association's Death &
Accident Investigation Seminar
"Biomechanics & Occupant Kinematics-
Automotive Crash Injuries Including Air Bags"
Marietta, Georgia, September 16, 1999

Seoul 2000 FISITA World Automotive Congress
"Belt Integrated Vehicular Seat Rear Impact Studies"
Seoul, Korea, June 12-15, 2000: Paper #F2000G279
Kenneth J. Saczalski, Ph.D., Joseph L. Burton, M.D.,
Paul R. Lewis, Jr., Todd K. Saczalski, Peter E. Baray.

JOSEPH LAWSON BURTON
Page 30

> Atlanta Volunteer Law Foundation
> Annual Jury Trial Seminar
> Emory University Law School-Mock Trial
> Plaintiff's Expert Witness
> December 15, 2000
>
> "Air Bag Injuries to Infants, Children and
> Small Adults".
> Paper G-96 - Presented at Proceedings of the American
> Academy of Forensic Sciences 53rd Annual Meeting
> Seattle, Washington, February 23, 2001
> Successful Handling of Wrongful Death Cases
> in Florida-Seminar
> "Proving Cause of Death-The Child Death Case"
> Miami, Florida, June 28, 2001
>
> Georgia Defense Lawyers Association
> 34th Annual Convention
> "Forensic Medicine-Answers From the Dead – And Not
> So Dead - Real World Application of Forensic Scientific
> Principles"
> Sandestin, Florida, July 20, 2001
>
> ASME International Congress and Exposition
> "Evaluation of Rear Impact Seat System Performance
> Using Combined Load Neck Injury Criteria and
> Hybrid III Surrogates"
> Kenneth J. Saczalski, Ph.D., Joseph L. Burton, M.D.,
> Paul R. Lewis, Jr., Todd K. Saczalski, Peter E. Baray.
> New York, NY November 11-16, 2001
>
> "Post Collision Vehicle Fires-Determination of
> Probability of Occupant Survival Post Impact"
> Paper #531 - Presented at Proceedings of the American
> Academy of Forensic Sciences 54th Annual Meeting
> Atlanta, Georgia, February 15, 2002

JOSEPH LAWSON BURTON
Page 31

Successful Handling of Wrongful Death Cases in
Florida-Seminar
"Proving Cause of Death-Children's Unique Proof
Circumstances".
Lorman Education Services
Miami, Florida, September 20, 2002

ASME International Mechanical Engineering
Congress and Exposition
"Study of Seat System Performance Related to Injury of
Rear Seated Children & Infants in Rear Impacts"
New Orleans, Louisiana, November 17-22, 2002
Paper #IMECE2002-33517
Kenneth J. Saczalski, Ph.D., Joseph L. Burton, M.D.,
Paul R. Lewis, Jr., Keith Friedman, Todd K. Saczalski

40th International ISA Biomedical Sciences
Instrumentation Symposium
"Experimental Data for Injury to Children Seated Behind
Collapsing Front Seats in Motor Vehicle Rear Impacts"
Biloxi, Mississippi, April 11-13, 2003, Paper #2003-046
Kenneth J. Saczalski, Ph.D., Anthony Sances, Ph.D.,
Joseph L. Burton, M.D., Paul R. Lewis, Jr.

American Bar Association
Tort Trial & Insurance Practice Section Self-Insurers' &
Risk Manager's Committee presents
Transportation Megaconference VI
"Biomechanics-Kinematics-Conscious Pain & Suffering"
New Orleans, Louisiana, April 17, 2003

SAE International Digital Human Modeling for Design
and Engineering ASME International Mechanical
Engineering Conference and Exhibition
"Experimental Verification of Biomechanical Occupant
Response Predictions for Front & Rear Seated Passengers
Subjected to Rear Impacts"
Montreal, Canada, June 16-19, 2003
Paper #2003-03-2205
Kenneth J. Saczalski, Ph.D., Jay Saul, CSE, Joseph L.
Burton, M.D., Paul R. Lewis, Jr.

# *CURRICULUM-VITAE*

Andrew Damien Irwin
5746 Richmond Avenue
Dallas, Texas  75206
(214) 320-8686

## *EDUCATION*

**University of Texas:  Austin, Texas**
   *Bachelor of Science in Architectural Engineering, May 1988*

**Northwestern University:  Evanston, Illinois**
   *Traffic Accident Investigation I, April 1998*
   *Traffic Accident Reconstruction I, April 1998*
   *Traffic Accident Reconstruction II, April 1998*

**Texas A&M University:  College Station, Texas**
   *Conference on Reconstruction and Safety on the Highway, October 1998*
       *Vehicle Crash Tests, Crash Algorithms and Crush Analysis*
   *Commercial Vehicle Inspection and Collision Investigation, August 1999*

**Society of Accident Reconstructionists 1998 Annual Conference: Colorado Springs, Colorado**
   *Investigation of Accidents Involving Vehicle Fire & Vehicle Fire Demonstration*
   *Daytime/Nighttime Visibility Issues in Accident Investigation*
   *Motorcycle Collision Investigation*
   *Injury Biomechanics in Low Speed Collisions*

**Engineering Dynamics Corporation:**
   *Human, Vehicle, Environment (HVE) Forum, April 1999*
   *EDC Reconstruction, January 2000*

**United States Air Force:**
   *Officer Training School, November 1988*
   *Specialized Undergraduate Navigator Training, September 1989*
   *Combat Survival School, October 1989*
   *Lead-In Fighter Training, December 1989*
   *F-111D Weapon Systems Officer Conversion Training, June 1990*
   *Water Survival School, June 1990*
   *F-111F Instructor Weapon Systems Officer Course, October 1992*
   *F-111F Flight Examiner/Evaluator Weapon Systems Officer Upgrade Program, April 1993*
   *F-15E Weapon Systems Officer Conversion Training, December 1994*

Curriculum Vitae
Andy Irwin
Page - 2

*Squadron Officer's School, February 1995*
*Arctic Survival School, February 1996*
*F-15E Functional Check Flight Weapon Systems Officer Upgrade Program,*
*February 1996*
*F-15E Instructor Weapon Systems Officer Course, May 1996*
*F-15E Flight Examiner/Evaluator Weapon Systems Officer Upgrade Program,*
*December 1996*
*Supervisor of Flying Upgrade Program, December 1996*

## North Harris County Community College: Houston, Texas
*Automotive Engines I, May 1983*

## *EXPERIENCE*

*Current:*           **Accident Reconstructionist: The Irwin Company**
                     Accident investigation, reconstruction, and analysis for passenger
                     and commercial vehicles through employment of engineering and
                     scientific disciplines. Accident scene and vehicle inspection,
                     photography, and measurement. Production of trial and testimony
                     aids such as accident site diagrams, maps, charts, and crime scene
                     exhibits. Deposition and trial testimony.

*November 1988 to*   **Professional Military Officer: The United States Air Force**
*December 1997*      Combat Mission Ready aircrew in the F-111D, F-111F, and F-15E
                     fighter aircraft. Responsible for world-wide deployment and
                     employment of U.S. Air Force fighter aircraft. Responsible for the
                     direct employment of air to ground and air to air weaponry.
                     Instructor responsibilities included academic, simulator, and in-
                     flight instruction on operation and employment of both aircraft.
                     Flight Examiner responsibilities included evaluation and
                     certification of Combat Mission Ready status for all unit assigned
                     aircrew. Conducted in-flight testing, evaluation and certification of
                     F-15E aircraft being returned to flying status. Responsible for
                     overseeing daily fighter flying operations for the entire base.

                     Career Flying Experience:
                                          Total Fighter Time: 1496 hours
                                          Combat Time: 126 hours

Curriculum Vitae
Andy Irwin
Page - 3

## *PRESENTATIONS*

*"Accident Reconstruction and Air Bag Data"*
Allstate Insurance Company, The Woodlands, Texas, June 2003

*"Accident Reconstruction & Technology"*
Texas Criminal Defense Lawyers Association, Fort Worth, Texas, December 2002

*"Accident Reconstruction"*
American Academy of Forensic Sciences 54th Annual Conference, Atlanta, GA, February 2002

*"Automobile Accident Reconstruction"*,
Society of Automotive Engineers, Arlington, Texas, November 2001

*"Vehicle Measurement and Damage Analysis Utilizing 3-Dimensional Digitizers"*
Texas A&M CRASH 98 Conference, October 1998.

*"F-15E Close Air Support Capabilities in Bosnia and Herzegovina"*, presented to The Secretary of Defense of the United States of America; the Honorable William J. Perry, Aviano Air Base, Italy, November 1995.

*"Close Air Support Operations on the Korean Peninsula"*, presented to the Vice Commander of the United Nations Command for The Republic of Korea, the Chairman of Korean Joint Chiefs of Staff, and the Commanding General of the 2nd Infantry Division (U.S. Army), Camp Red Cloud, Republic of Korea, April 1994.

## *AWARDS AND DECORATIONS*

NATO Medal
Air Medal, with 1st Oak Leaf Cluster (OLC)
Aerial Achievement Medal
Air Force Commendation Medal
Army Commendation Medal
Air Force Outstanding Unit Ribbon, with 2nd OLC
Southwest Asia Service Medal, with 1st OLC
Armed Forces Expeditionary Medal
Combat Readiness Medal, with 2nd OLC
National Defense Service Medal
Air Force Overseas Short Tour Ribbon
Air Force Longevity Service Award Ribbon, with 1st OLC
Small Arms Expert Marksmanship Ribbon
Air Force Training Ribbon

Curriculum Vitae
Andy Irwin
Page - 4


Pacific Air Forces Inspector General Outstanding Performer Citation


*__AFFILIATIONS__*

The Society of Automotive Engineers

Texas Association of Accident Reconstruction Specialists

# *CURRICULUM-VITAE*

Stephen Alan Irwin
5746 Richmond Avenue
Dallas, Texas 75206
(214) 320-8686

## *EDUCATION*

**University of Texas at Arlington:  Arlington, Texas**
  *Bachelor of Science in Civil Engineering*
**Northwestern University:  Evanston, Illinois**
  *At-scene Accident Investigation, May 1989*
  *Technical Accident Investigation, May 1989*
  *Traffic Accident Reconstruction, December 1989*
  *Traffic Accident Reconstruction II, November 1990*
  *Traffic Control Devices, January 1993*
**Texas A&M University:  College Station, Texas**
  *Commercial Vehicle Accident Reconstruction, December 1991*
  *Applied Physics in Accident Reconstruction, July 1994*
  *Motorcycle Accident Reconstruction, February 1995*
  *Conference on Reconstruction and Safety on the Highway, March 1997*
    *Vehicle Trailer Underrides, Low Speed Collisions, Night Vision*
  *Conference on Reconstruction and Safety on the Highway, October 1998*
    *Vehicle Crash Tests, Crash Algorithms and Crush Analysis*
**Burlington Northern Railroad**
  *Grade Crossing Accident Investigation, November 1990*
**Texas Association of Accident Reconstruction Specialists**
  *Staged train crossing accident: train and passenger vehicle.*
  *Staged train crossing accident: train and school bus.*
  *Pedestrian and pedacyclist vehicle accident reconstruction.*
  *The Physics and Basics of Photography, Photogrammetry and Digital Cameras*
**Society of Automotive Engineers**
  *Heavy Vehicle Roll-over, April 1993*
**American Society of Civil Engineers**
  *HEC II Stream Analysis, 1985*
  *Roadside Design:  AASHTO Design Guide, January 1997*

Curriculum Vitae
Steve Irwin
Page - 2

## *EXPERIENCE*

*Current:*        **Owner:      The Irwin Company**
Accident investigation, reconstruction and analysis for passenger and
commercial vehicles through employment of engineering and scientific
disciplines.   Consultation regarding construction and configuration of
roadways and their characteristics including: signing, width, condition,
curvature, grade, etc. and analysis of their impact on vehicular or industrial
accidents.   Production of trial and testimony aids such as accident site
diagrams, maps, charts, crime scenes, and exhibits.

*May 1988 to*     **Associate:  Accident Reconstruction Lab, Inc.**
*August 1990*     Investigation and reconstruction of passenger and commercial vehicle and
train accidents.  Responsible for on site investigation, data collection and
subsequent accident site diagrams.  Including analysis of vehicle points of
perception-reaction, impact, and rest.  Assisted in the analysis of over 150
vehicle accidents including all calculations of those properties vital to
accident reconstruction.

*May 1986 to*     **Project Manager:  G.D.I. and Associates**
*May 1988*        Street and Highway engineering design company.   Responsible for the
production of roadway construction documents.   Design of roadway
configuration parameters such as horizontal and vertical alignments, to be
in accordance with federal, state and local requirements.

*Feb. 1984 to*    **Project Engineer:  Graham Associates Inc.**
*May 1986*        Street and Highway engineering design company.   Assisted project
manager in the production of roadway construction documents.
Additional work included on-site inspection of the construction of one
mile of roadway in Arlington, Texas including pavement and drainage
facilities, water and sewer utilities.   Responsible for contractor
supervision, insuring the adherence to the construction documents and to
the City of Arlington standards.  As well as resolving design conflicts.

Curriculum Vitae
Steve Irwin
Page - 3

## *INSTRUCTION AND SPEECHES PRESENTED*

1.  National Transportation Safety Board
    *"The Use of Total Stations on Accident Scenes"*
2.  Texas Association of Accident Reconstruction Specialists
    *"The Physics and Basics of Photography, Photogrammetry and Digital Cameras"*
3.  Society of Automotive Engineers
    *"Accident Reconstruction Using Conservation of Momentum and Energy"*
4.  Texas Department of Insurance, Course Number 17619CA030
    *"Physics, Facts and Video Tape"*
5.  81st Annual Kansas Transportation Engineering Conference
    *"Computer Animation of Traffic Accidents"*
6.  National Association of County Engineers:  National Conference 2000
    *"Computer Animation of Traffic Accidents"*
7.  Philadelphia Trial Lawyer's Association
    *"Accident Investigation and Reconstruction"*
8.  Washington Association of Accident Reconstructionists and Texas Association of Accident Reconstruction Specialists
    *"Computer Generated Measurement and Mapping of Accident Scenes"*
9.  National Association of Legal Investigators
    *"Computer Generated Measurement and Mapping of Accident Scenes"*
10. Bucks County Bench/Bar Conference
    *"Accident Investigation and Computer Generated Measurements"*
11. Canadian Insurance Claims Managers Association
    *"Computer Generated Measurement and Mapping of Accident Scenes"*
12. National Association of Fleet Administrators: New Jersey Chapter
    *"Accident Reconstruction and Technology"*
13. National Association of Fleet Administrators: Pennsylvania Chapter
    *"Accident Reconstruction and Technology"*
14. American Trial Lawyer's Association (Panel Discussion Group)
    *"Grade Crossing Accident Investigation and Reconstruction"*
15. American Road and Transportation Builders Association
    *"Accident Investigation and Reconstruction in Work Zones"*
16. American Society of Mechanical Engineers
    *"Accident Reconstruction"*
17. Texas Trial Lawyers Association
    *"Low Speed Accident Reconstruction"*
18. Texas Bar Association
    *"Accident Reconstruction and Physical Evidence"*

Curriculum Vitae
Steve Irwin
Page - 4

19.    Society of Automotive Engineers
       *"Automobile Accident Reconstruction"*
20.    Oklahoma Society of Land Surveyors – 33rd Annual Conference
       *"The Use of Total Stations on Accident Scenes"*
21.    Texas Criminal Defense Lawyers Association
       *"Accident Reconstruction & Technology"*

## *AFFILIATIONS*

Texas Association of Accident Reconstruction Specialists
National Association of Professional Accident Reconstruction Specialists
New Jersey Association of Accident Reconstructionists
Society of Automotive Engineers
American Congress on Surveying and Mapping
       American Cartographic Association
       National Society of Professional Surveyors
American Society of Civil Engineers
American Society for Photogrammetry and Remote Sensing
American Board of Forensic Examiners

## *PUBLISHED PAPERS*

1.    Accident Investigation, Reconstruction Interpretation and the Law 1995
      *"Accident Scene Measurement With the Total Station, and Animation Evidence Admission"*
2.    Fourth International Symposium on Railroad-Highway Grade Crossing Research and Safety:  The University of Tennessee Transportation Center
      *"Grade Crossing Accident Investigation and Reconstruction"*
3.    Lawyers and Judges Publishing - Forensic Investigations
      *"Accident Investigations"*
4.    Texas Trial Lawyers Association
      *"Low Speed Accident Reconstruction"*
5.    Oklahoma Society of Land Surveyors – 33rd Annual Conference
      *"The Use of Total Stations on Accident Scenes"*

## *CERTIFICATES*

1.    State of Illinois
      *Illinois Local Governmental Law Enforcement Officers Training Board*
2.    American Board of Forensic Examiners

Curriculum Vitae
Steve Irwin
Page - 5

      *Diplomate, Board Certified Forensic Examiner, Number 3640*

3.   New Jersey Association of Accident Reconstructionists
      *Certified Accident Reconstructionist*

STEPHEN M. HORNER, PH.D.
Economic, Business & Statistical Consulting
P.O. Box 2685
Corpus Christi, Texas 78403
512/883-1686

## CURRICULUM VITAE

### EDUCATION
Ph.D., Economics, The University of Michigan, Ann Arbor, Michigan, 1977
M.P.P., Public Policy Studies, The University of Michigan, Ann Arbor, Michigan, 1973
B.Sc., Economics, California Institute of Technology, Pasadena, California, 1970
Graduated, W.B. Ray High School, Corpus Christi, Texas, 1966

### CONSULTING
| | |
|---|---|
| 1985-Present | General Economic, Business and Statistical Consulting, Various Defense and Plaintiff's Attorneys; Personal Injury and Commercial Damage Economic Evaluation; Antitrust Analysis |
| 1987 | Corpus Christi Warehouse and Storage, Corpus Christi, Texas; Lease Negotiation Support |
| 1985 | Susser Petroleum Corporation, Apache Fuels, Corpus Christi, Texas |
| 1978 | Urban Systems, Inc., Cambridge, Massachusetts |
| 1976 | City of Ann Arbor Cablecasting Commission, Ann Arbor, Michigan |

### EMPLOYMENT
| | |
|---|---|
| 1979-1989 | Executive Vice President, Oil Field Equipment Co., Corpus Christi, Texas |
| 1977-1979 | Assistant Professor of Economics, Wellesley College, Wellesley, MA. |
| 1976-1977 | Lecturer in Economics, Wellesley College, Wellesley, MA. |
| 1975 | Lecturer, School of Public Health, The University of Michigan, Ann Arbor, MI |
| 1974-1975 | Teaching Assistant, School of Public Health, The University of Michigan, Ann Arbor, Michigan |
| 1972-1975 | Research Assistant, The Institute of Public Policy Studies, The University of Michigan, Ann Arbor, Michigan |
| 1971 | Teaching Assistant, Industrial Engineering, School of Engineering, The University of Michigan, Ann Arbor, Michigan |
| 1970-1971 | Special Administrative Assistant to the Chairman of the Board, International Business Machines Corporation, IBM Internship Program, Armonk, New York |

### PROFESSIONAL ASSOCIATIONS
American Economic Association
National Association of Forensic Economists, (Western Vice-President, 1992 - 1996)
*Journal of Forensic Economics*, Board of Editors
Western Economic Association, International
National Academy of Economic Arbitrators
American Academy of Economic and Financial Experts
National Association of Credit Management of Texas (Board of Directors, 1982 - 1984)
American Statistical Association

### PUBLICATIONS
Review of Gamboa, Jr., A. M. (1995): *The New Worklife Expectancy Tables*, in *Journal of Applied Rehabilitation Counseling*, Volume 27, Number 3, Fall 1996, page 67
"Reference Guide for Valuing Economic Loss in Personal Injury, Wrongful Death and Survival Actions," with Thomas R. Ireland and James D. Rodgers, in *Expert Economic Testimony: Reference Guides for Judges and Attorneys*, by Thomas R. Ireland, Stephen M. Horner, James D. Rodgers, Patrick A. Gaughan, Robert R. Trout and Michael J. Piette. Tucson, AZ: Lawyers & Judges Publishing Company, 1998.