IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 0 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| FEBRIONA VIERA ESCOBEDO INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF JOSE ANGEL ESCOBEDO RODRIGUEZ, DECEASED; AND LUIS ALBERTO ESCOBEDO VIERA, JOSE VIERA ESCOBEDO and JOSE ANGEL ESCOBEDO, JR. | § § § § § § § § § | CIVIL ACTION |
| V. | § § | NO. B-03-135 |
| FORD MOTOR COMPANY, MICHELIN NORTH AMERICA, INC. AND WALMART STORES, INC. D/B/A SAM'S WHOLESALE CLUB | § § § § | |

**BRIEF IN SUPPORT OF FORD MOTOR COMPANY'S MOTION
FOR PARTIAL SUMMARY JUDGMENT – CLAIMS BASED UPON
ALLEGED POST-SALE DUTIES TO RECALL OR WARN**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Defendant Ford Motor Company files the following brief in support of its motion for partial summary judgment – claims based upon alleged post-sale duties to recall or warn.

**I.
TEXAS DOES NOT RECOGNIZE ANY
POST-SALE DUTIES APPLICABLE TO THIS CASE**

In Texas, "[a] manufacturer is not under a continuing duty to improve the manufacturer's product, nor does a manufacturer have a duty to remedy dangerous

defects in a product that are not discovered until after manufacture and sale." 59 TEX. JUR. 3D PRODUCTS LIABILITY § 29 (1999). In Texas, there is no "cause of action for a failure to warn about hazards discovered after a product has been manufactured and sold." *Syrie v. Knoll Int'l*, 748 F.2d 304, 311 & 312 (5th Cir. 1984) (noting that "Texas does not impose on manufacturers the duty to warn about or to recall products for which a safer design has been developed"). *See also Arkwright-Boston Manufacturers Mut. Ins. Co. v. Westinghouse*, 844 F.2d 1174, 1185 (5th Cir. 1988) (holding that "under Texas law there is no post-sale common law duty to warn. . ."); *McLennan v. American Eurocopter Corp., Inc.*, 245 F.3d 403, 430 (5th Cir. 2001) ("Texas courts generally do not recognize any post-sale duty to warn of product hazards arising after the sale.").

In fact, a manufacturer's duties concerning product liability are fixed by law *at the time of sale. American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 438 (Tex. 1997). In *Grinnell*, the Texas Supreme Court affirmed a summary judgment in favor of the cigarette manufacturer on the plaintiff's liability claims premised on alleged failures "to take remedial measures to prevent harm . . . after the cigarettes were placed in the stream of commerce." 951 S.W.2d at 438. *See also General Motors Corp. v. Saenz*, 873 S.W.2d 353, 356 (Tex. 1993) (stating that "determination of whether a duty to warn exists is made as of the time the product leaves the manufacturer"). Moreover, whether a product is dangerous is determined when it leaves the manufacturer's hands and enters the stream of commerce; subsequent acts have no bearing on the issue. *Turner v. General Motors Corp.*, 584 S.W.2d 844, 848 (Tex. 1979). Accordingly, the Texas Pattern Jury Charge

intentionally and carefully poses product liability questions to the jury in terms of defects "at the time it [the product] left possession of [the manufacturer]." PJC 71.3, 71.4, 71.5.

Some Texas courts have recognized a very narrow exception to the general rule that a manufacturer has no post-sale duties where, subsequent to the initial sale, the manufacturer (1) takes title and actual control of the product, (2) undertakes a replacement program *and* (3) re-sells the product to the plaintiff after having learned of dangers that were not apparent at the time of the initial sale. *See Bell Helicopter Company v. Bradshaw*, 594 S.W.2d 519 (Tex. Civ. App.--Corpus Christi 1979, *writ ref'd n.r.e.*) ("*Bradshaw*"). This exception did not recognize a new duty. *Id.* ("This Court does not adopt the rule enunciated in *Noel*. . . that a manufacturer is under a continuing duty to improve his product, nor is it necessary for us to hold in this case that a manufacturer has a duty to remedy dangerous defects in a product which are not discovered until after manufacture and sale."). In fact, the Texas Supreme Court last year declined to recognize or create a general post-sale duty to warn:

> In *Bradshaw*, the court of appeals held that a manufacturer who regained control of a product but failed to remedy a defect before it was resold could be liable in both strict liability and negligence. *Bradshaw*, 594 S.W.2d at 531-32. In this case, the plaintiffs do not base Torrington's liability upon its status as the bearing's manufacturer or upon any control that it may have regained over the bearing. Instead, the plaintiffs contend that Torrington assumed a duty toward them by undertaking to investigate and identify defective bearing. *Thus, we are not called upon to recognize any post-sale duty to warn*, or to determine whether the control-based duty the *Bradshaw* court recognized applies. And although the plaintiffs cite several other sections of the *Restatement of Torts: Products Liability*, including sections 10, 11, 12, and 13, they expressly disavow an intent to have this Court recognize *any new duties*, and merely argue that their undertaking theory comports with mainstream case law. Thus, we express no opinion whether those *Restatement* sections are consistent with established Texas law.

3

*Torrington v. Stutzman*, 46 S.W.3d 829, 836-37 (Tex. 2000) (emphasis added). Had the Court desired to recognize such a duty, the opportunity to do so was present. Moreover, the *Torrington* Court refused to decide the case under sections 10, 11, 12, and 13 of the Restatement (Third) Of Torts: Products Liability.

Courts applying *Bradshaw* have held that it represents nothing more than a traditional negligent undertaking theory. *See, e.g., McLennan v. American Eurocopter*, 245 F.3d at 430 ("Most cases, however have recognized that the *Bradshaw* control-based duty is probably no broader than the well-recognized negligence-based duty to exercise reasonable care when undertaking to provide a post-sale warning."). In *Dion v. Ford Motor Company*, 804 S.W.2d 302 (Tex. App. -- Eastland 1991, writ denied), for example, the Court of Appeals affirmed the decision of the "trial court [that] refused to submit issues on the claim that the manufacturer had a post-sale duty to warn the tractor's owner of its propensity to rollover." *Id.* at 302. In that case, a tractor manufactured by the defendant rolled over on the plaintiff, causing substantial injuries, which were the result of a lack of a rollover protection device. *Id.* At the time of the accident, rollover protection systems were standard on all tractors manufactured by the defendant and rollover prevention devices were readily available and installable on old tractors. *Id.* at 305. The defendant did not warn the plaintiff of the dangers of tractors not equipped with rollover protection devices. The court held that a manufacturer cannot be held liable for post-sale negligence unless it affirmatively acted to assume a duty to warn consumers, but then does not use reasonable means to discharge that voluntarily assumed duty. *See Dion*, 804 S.W.2d at 310 (citing the rule in *Bradshaw*). The court noted that unlike the

4

manufacturer in *Bradshaw*, the *Dion* manufacturer never instituted and then negligently implemented a replacement program, which was the "critical factor" creating the limited post-sale duties found in *Bradshaw*. *Id.* at 310. The mere fact that the manufacturer "sold rollover protection systems to retrofit unequipped tractors and encouraged dealers to encourage owners to install rollover protection systems" was not sufficient to constitute a replacement program and create a post-sale duty to warn. *Id.; see also Torres v. Caterpillar, Inc.*, 928 S.W.2d 233 (Tex. App. – San Antonio 1996, pet. denied) (affirming summary judgment in favor of Caterpillar on plaintiffs' claims based upon post-sale liability).

**Ford does not come under the limited *Bradshaw/Dion* exception because (1) it never undertook a replacement program; and (2) it never regained control over this product.** Accordingly, Ford is entitled to judgment as a matter of law on all such claims.

## II.
## CLAIMS REGARDING AN ALLEGED FAILURE TO REPORT A SAFETY RELATED DEFECT TO NHTSA ARE FURTHER PREEMPTED BY FEDERAL LAW

The core assumption underpinning this particular claimed post-sale duty to recall or warn is that (a) Ford Motor Company had an obligation under federal law to notify the National Highway Traffic Safety Association ("NHTSA") about the defects of which plaintiff complains; (b) had Ford Motor Company notified NHTSA, NHTSA would have ordered a recall; and (c) had the product been recalled, plaintiff would not have been injured. Inherently, plaintiff seeks to enforce the provisions of the federal Safety Act. Those claims are impliedly preempted by federal law. Only NHTSA can enforce the provisions of the federal Safety Act.

5

A.  **The "Safety Act"**

*The Original 1966 Safety Act.* Before Congress enacted the Safety Act, neither federal nor state law provided a mechanism for recalling motor vehicles. The 1966 Safety Act initiated a shift in the law, with Congress ultimately settling on an elaborate scheme governing motor vehicle defect notification and correction that vests exclusive oversight authority in NHTSA. The Safety Act aimed "to reduce traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101. Observing that "manufacturers ha[d] not always taken effective steps to insure the speedy and efficient repair of [safety-related] defects," Congress found an "essential" need to establish "Federal oversight of defect notification, and correction." S. Rep. No. 89-1301, at 2 (1966); *reprinted in* 1966 U.S.C.C.A.N. 2709, 2710 (emphasis added). The Safety Act reflects Congress's conclusion that "the primary responsibility for regulating the national automotive manufacturing industry must fall squarely upon the Federal Government." *Id.* at 4, *reprinted in* 1966 U.S.C.C.A.N. at 2712.

The initial means chosen to accomplish these objectives were twofold. *First,* Congress delegated authority to the Department of Transportation to "prescribe motor safety vehicle standards" for all vehicles sold in the United States. 49 U.S.C. § 30111(a). *Second,* and more relevant here, the statute imposed upon manufacturers obligations to notify consumers of safety-related defects. *See id.* § 30118. Congress reinforced the importance of this requirement by providing for "Federal oversight," targeted to ensure manufacturers' compliance with the "essential" obligation of providing "uniform" consumer notice. S. Rep. No. 89-1301, at 2, 8, *reprinted in* 1966 U.S.C.C.A.N. at 2710,

6

2716. The Secretary of Transportation was to exercise this oversight "with extreme caution," making certain to evaluate carefully both "the risks to traffic safety" and the need "to avoid premature publicity of unevaluated reports as to suspected defects." *Id.* at 8, 9, *reprinted in* 1966 U.S.C.C.A.N. at 2716, 2717.

***The 1974 Recall Amendments.***  In 1974, the Congress changed the Safety Act through the Motor Vehicle and School Bus Safety Amendments ("Recall Amendments"). *See* Pub. L. No. 93-492, 88 Stat. 1470 (1974). Congress concluded that the original Safety Act's remedy of notice alone had proved to be an insufficient means of protecting consumers from products posing risks of failure and injury. There existed a plain "necessity" for a new form of relief – an "adequate and timely remedy of a motor vehicle with a defect . . . ." *Id., reprinted in* 1974 U.S.C.C.A.N. at 6050-51. Congress endeavored not only to create the new remedy, but to develop new and improved "administrative mechanisms" to ensure its effective implementation. *Id., reprinted in* 1974 U.S.C.C.A.N. at 6050.

Congress added to the Safety Act a provision obligating manufacturers to remedy safety-related defects without charge to consumers. 49 U.S.C. § 30120(a). The Recall Amendments also empowered NHTSA to enforce this recall obligation. *Id.* § 30118(b). Congress determined that a recall remedy should issue only after NHTSA follows prescribed "administrative procedures." H.R. Rep. No. 93-1191, at 20 (1974), *reprinted in* 1974 U.S.C.C.A.N. [1st page], 6055. Any consumer can request a defect investigation. 49 U.S.C. § 30162(a). But, recall orders cannot issue before NHTSA determines, "through testing, inspection, investigation, or research," that a vehicle contains a safety-

7

related defect. *Id.* § 30118(a). Even then, NHTSA must both "giv[e] the manufacturer an opportunity" to rebut the agency's findings and permit "any interested person" to "present information, views, and arguments" as to whether a product presents risks warranting a recall remedy. *Id.* § 30118(b).

The Recall Amendments also expanded upon the original Act's consumer notification scheme. Congress added provisions touching on virtually every detail of a manufacturer's notice. As amended, the Safety Act requires that the notice include "a clear description of the defect"; an evaluation of the risk to motor vehicle safety reasonably related to the defect"; "the measures to be taken to obtain a remedy of the defect"; "a statement that the manufacturer giving notice will remedy the defect . . . without charge"; "the earliest date on which the defect . . . will be remedied"; and "the procedure the recipient of a notice is to follow to inform the Secretary of Transportation when a manufacturer, distributor, or dealer does not remedy the defect . . . without charge." 49 U.S.C. § 30119(a). The aim of all this is "to ensure that notifications of defects . . . adequately inform and effectively motivate owners of potentially defective . . . motor vehicles [or related equipment] . . . to have such vehicles or equipment inspected and, where necessary, remedied as quickly as possible." 49 C.F.R. § 577.2.

In crafting its 1974 amendments, Congress stopped short of adding judicial remedies to the statutory scheme. Instead of enacting a Senate provision permitting NHTSA to bypass administrative proceedings with a lawsuit seeking declaratory or injunctive relief for products posing "immediate and unreasonable risk[s]" to consumer safety, *see* S. 355, 93d Cong. § 113(1) (1973), Congress opted for mandatory agency

action in the first instance. Congress concluded that administrative (as opposed to judicial) recall mechanisms would commit NHTSA "to act swiftly when a motor vehicle or . . . equipment presents an unreasonable risk" through expedited agency proceedings.

Congress also declined to allow any judicial intervention into the administrative scheme. *See, e.g.,* S. 355, § 113(g)(2) (unenacted provision that would have entitled "any person" to challenge administrative proceedings in this Court); 120 Cong. Rec. 27,807, 27,808 (1974) (statement of Rep. Eckhardt) (urging adoption of a private right of action permitting citizens to challenge NHTSA determinations that ultimately was not adopted), *reprinted in* IV LEG. HISTORY at 174, 514. Congress again opted for exclusive administrative enforcement, informed through an open and inviting petition process made available to any interested consumer. *See* 49 U.S.C. § 30162(a). The Safety Act obligates NHTSA to rule promptly on consumer petitions for defect investigations; reasons for a denial must be published in the Federal Register, a mechanism reinforcing the importance of agency accountability. *Id.* § 30162(d).

In short, over a decade, the Safety Act evolved into a pervasive regulatory scheme reflecting measured congressional judgments about how best to protect consumers and manufacturers alike. Congress recognized that some risks to public safety mandate prospective action in the form of a product recall and a consumer notification campaign. Yet this mandate was not to issue without informed analysis, balanced negotiating, and careful tailoring. Congress instilled this obligation in an expert administrative agency, NHTSA, and expressly declined to give courts (either state or federal) the right to unilaterally order vehicle recalls.

AUS:2148422.1
1.809

The Safety Act confers broad remedial authority upon NHTSA to ensure manufacturer compliance with the statute's commands. *See id.* §§ 30118, 30120(e); 49 C.F.R. pt. 554. The statute empowers the agency to order a recall and notification campaign. *See* 49 U.S.C. §§ 30118(b)(2), 30162; 49 C.F.R. § 552.3. NHTSA may enforce its recall orders via a civil action in federal district court. *Id.* § 30163. Alternatively, NHTSA can choose not to enter an order if it finds that a product presents risks "inconsequential to motor vehicle safety." 49 U.S.C. § 30118(d). Before settling on non-enforcement, however, NHTSA must permit "any interested person to present information, views, and arguments" to the contrary. *Id.*

By creating this administrative mechanism for resolving, on a uniform nationwide basis, concerns about alleged safety-related motor vehicle defects, Congress intended to preclude vehicle owners (and/or their lawyers) and courts (both federal and state) from circumventing and usurping NHTSA's authority via private state law-based lawsuits. The instant attempt by plaintiffs to have a single federal-court jury, and not NHTSA, decide when the Safety Act has been violated under the guise of state common-law claims is decidedly *not* the way Congress intended such matters to be addressed.

Plaintiffs' attempted "semantic" recharacterization of their basically "fraud-on-the-agency" claims as nothing more than state law "negligence" claims has been attempted by other litigants and *expressly* rejected – by the United States Supreme Court:

> We must also reject respondent's attempt to characterize both the claims at issue in *Medtronic* (common-law negligence action against the manufacturer of an allegedly defective pacemaker lead) and the fraud claims here as "claims arising from violations of FDCA requirements."

10

* * *

> In the present case, however, the fraud claims exist solely by virtue of the FDCA disclosure requirements. Thus, although *Medtronic* can be read to allow certain state-law causes of actions that parallel federal safety requirements, it does not and cannot stand for the proposition that any violation of the FDCA will support a state-law claim.

*Buckman v. Plaintiffs' Legal Committee*, 531 U.S. 341 at 352, 121 S.Ct. 1012 at 1019-20 (2001).

To *avoid* state law liability under plaintiffs' recharacterized "negligence" theory, the manufacturer would need to flood the agency with information which the agency neither requested nor wants. That is exactly why such claims based upon violation of the Safety Act *are preempted*:

> Conversely, fraud-on-the-FDA claims would also cause applicants to fear that their disclosures to the FDA, although deemed appropriate by the Agency, will later be judged insufficient in state court. Applicants would then have an incentive to submit a deluge of information that the Agency neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application. As a result, the comparatively speedy § 510(k) process would encounter delays, which would, in turn, impede completion among predicate devices and delay health care professionals' ability to prescribe appropriate off-label uses.

* * *

> State-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Agency's judgment and objectives. As a practical matter, complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants – burdens not contemplated by Congress in enacting the FDCA and the MDA.

*Buckman*, 531 U.S. at 350-51, 121 S.Ct. at 1018-19.

In a landmark ruling, the U.S. Supreme Court in *Buckman* held that allegations of fraud on federal agencies "inevitably conflict" with the federal legislative and regulatory

11

scheme giving federal agencies broad discretion to balance their policy objectives in regulating disclosures made to them, and are therefore preempted. *Id.* at 350.

In contentions mirrored in this case, the plaintiffs in *Buckman* asserted claims under state law that were based upon alleged violations of requirements to disclose information to a federal agency, there the Food and Drug Administration ("FDA"). *Id.* at 343-44. Plaintiffs alleged that the defendants made fraudulent representations to the FDA regarding an allegedly defective medical device and that as a result the devices were improperly put on the market and were subsequently used to plaintiffs' detriment. *Id.* at 347. In analyzing the preemption issue presented in *Buckman*, the Supreme Court emphasized that the states have always been far removed from any involvement in the determination of claims that a federal agency has been defrauded:

> Policing fraud against federal agencies is hardly a field which the States have traditionally occupied . . . . To the contrary, the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law.

*Id.* at 347 (internal quote and citation omitted).

Specifically, the Court concluded that there is an inescapable conflict between a state-law claim based on regulatory fraud and the federal law governing required disclosures to the agency. "State-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives." *Id.* at 350 (emphasis added). The Court explained the nature of the conflict as follows:

> The conflict stems from the fact that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and that this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives. The balance sought by the Administration can be skewed by allowing fraud-on-the-FDA claims under state tort law.

*Id.* at 348. In addition, permitting state-law suits for fraud on a federal agency would subject the agency to inquiries into its internal deliberations and second-guessing by state courts of the outcome of particular investigations or proceedings. The prospect of such intrusive inquiries and attendant litigation poses significant potential for diverting an agency's resources and distorting its internal decision-making processes.

The same comprehensive regulatory history that exists under the Federal Food, Drug and Cosmetic Act (FDCA) addressed in *Buckman* exists under the Safety Act. *See generally Gier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 120 S.Ct. 1913 (2000) (analyzing the comprehensive nature of the Safety Act and finding conflict preemption). Ford's post-*Buckman* and *Gier* analysis of the Safety Act is the correct one. *See Namovicz v. Cooper Tire & Rubber Company*, 225 F.Supp.2d 582 (D. Maryland 2001); *In re Bridgestone/Firestone, Inc., Tires Products Liability Litigation*, 153 F.Supp.2d 935 (S.D. Ind. 2001). In fact, citation to case law on preemption predating *Buckman* and *Gier* without explanation is suspect.

**B.   All Claims Based Upon a Violation of the Safety Act are Preempted**

Settled principles of federal jurisdiction establish that plaintiffs' nominally state-law-based suit – which seeks relief that only NHTSA has the power to order – cannot proceed in federal court in the face of the comprehensive regulatory scheme described

13

above. "A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l. Foreign Trade Council*, 530 U.S. 363, 372 (2000). The Constitution also empowers Congress to preempt a request for a particular state-law based remedy. *See Brown v. Kerr-McGee Chem. Corp.*, 767 F.2d 1234, 1237 (7th Cir. 1985). *See also Railway Labor Execs. Assoc. v. Pittsburgh and Lake Erie RR Co.*, 858 F.2d 936, 941-42 (3d Cir. 1988). "Complete preemption" occurs when "Congress . . . so completely pre-empt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987).

As the above description of the Safety Act's history, structure, and purposes shows, basic principles of complete preemption foreclose plaintiffs' state-law negligence claim based upon their contention that Ford violated the Safety Act. Indeed, a federal district court has already held that a plaintiffs' state law claims seeking a recall of allegedly defective motor vehicle parts based upon violations of the Safety Act is completely preempted. *Namovicz v. Cooper Tire & Rubber Co.*, No. CIV. A. WMN-00-3676, 2001 WL 327886, at #2 (D. Md. Feb. 26, 2001). And two other federal district courts have dismissed claims seeking motor vehicle recalls on the basis of ordinary preemption by the Safety Act of those state law-based claims. *See In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 153 F.Supp. 2d 935, 943-48 (S.D. Ind. 2001); *Lilly v. Ford Motor Company*, No. 00 C 7322, 2002 WL 84603 (N.D. Ill. January 22, 2002).

AUS:2148422.1
1.809

In each of these cases – *Namovicz, In re Bridgestone/Firestone,* and *Lilly* – the courts have held that, through the federal Safety Act, Congress vested in NHTSA exclusive authority to determine the need for, and if necessary supervise the implementation of, motor vehicle recalls. In enacting the Safety Act and its comprehensive scheme for regulating automotive recalls and consumer notification campaigns, Congress expressed a strong preference for using administrative (not judicial) processes to protect the interests of consumers and manufacturers alike. As these courts have recognized, administrative agencies like NHTSA possess the expertise and perspective necessary to assess risks to public safety and to devise flexible, tailored responses to risks deemed too severe. A parallel, competing system of court-ordered and supervised recalls and enforcement of the Safety Act would undermine and frustrate the Safety Act's objectives of prospectively protecting the public interest through a scheme of administratively enforced remedies. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492-95 (1987).

In *Railway Labor*, the Third Circuit distilled these complete preemption principles into a two-part test, both elements of which are met here. In the *first* part of the *Railway Labor* test, a court considering whether federal law completely preempts a plaintiffs' state-law claims must consider "whether the statute relied upon by the Defendant as preemptive contains civil enforcement provisions within the scope of which the Plaintiffs' state claim falls." *Id.*, 858 F.2d at 942. In other words, the federal statute must create a "federal cause of action vindicating the same interest the plaintiffs' state cause of action seeks to vindicate." *Id.* If the federal statute vindicates that same interest, the first

15

part of the complete preemption test is met, even if that federal statute does not "provide[] the same remedy available to the plaintiff under state law." *Id.*

As described at length above, the Safety Act contains comprehensive "civil enforcement provisions" through which owners of allegedly unsafe vehicles may vindicate their interest in obtaining binding determinations as to whether their vehicles have safety-related defects and, if so, obtaining mandatory recalls of those vehicles. The Safety Act grants NHTSA the authority to investigate complaints by consumers and others relating to alleged safety-related defects, and to order manufacturers to recall any vehicle found to have such a defect. Plaintiffs implicitly seek a vehicle recall under Texas state-law tort theories. Their ostensible state-law claims, therefore, fall within the scope of the Safety Act's civil enforcement provisions.

The Safety Act does create a "federal cause of action." As noted previously, the Act authorizes NHTSA to file a lawsuit in federal court to enforce its administrative order directing a manufacturer to recall unsafe vehicles. That the Safety Act does not allow private consumers to do the same thing is hardly a reason to find that it does not completely preempt state law-based suits seeking the same remedy. Indeed, the opposite conclusion is more logical. Where (as here) the Act clearly confers exclusive authority in an administrative agency to litigate the issue of motor vehicle recalls in federal court, this is a strong sign that the federal legal regime governing such matters completely preempts efforts by private consumers and their lawyers to litigate this same issue in state court – a result that would undermine NHTSA's exclusive authority.

For the Safety Act to work and redound to consumers' benefit, NHTSA's authority over enforcing the Safety Act must remain exclusive, as Congress intended. *See Illinois v. Milwaukee*, 731 F.2d 403, 414 (7th Cir. 1984). ("[I]t would be extraordinary for Congress, after devising an elaborate permit system that sets clear standards, to tolerate common-law suits that have the potential to undermine the regulatory structure."). Accordingly, this Court should find that plaintiffs' negligence claims, as set forth above, are completely preempted by the Safety Act.

### III.
### CONCLUSION

Based upon existing Texas common law and the preemption clause of the United States Constitution, Ford is entitled to summary judgment on *all* pled claims for recovery based upon any alleged post-sale duty, whether characterized as a duty to recall or warn.

Respectfully submitted,

RODRIGUEZ COLVIN, CHANEY &
SAENZ, L.L.P.
1201 East Van Buren
Brownsville, TX 78520
(956) 542-7441 - Telephone
(956) 541-2170 - Facsimile

By: _____
Jaime A. Saenz
State Bar No. 17514859

## CERTIFICATE OF SERVICE

     I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all known counsel of record as set forth below in compliance with the Federal Rules of Civil Procedure on this __10__ day of June, 2004.

Ray R. Marchan
WATTS LAW FIRM, L.L.P.
1926 Elizabeth
Brownsville, TX 78520

Mikal C. Watts
WATTS LAW FIRM, L.L.P.
555 N. Carancahua, Suite 1400
Corpus Christi, TX 78478

Tom Bullion
Brown McCarroll, L.L.P.
111 Congress Avenue, Suite 1400
Austin, TX 78701

_____
Jaime Saenz