ʖₒ4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

AUG 2 5 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| FEBRIONA VIERA ESCOBEDO | § | |
| INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE ESTATE | § | |
| OF JOSE ANGEL ESCOBEDO | § | |
| RODRIGUEZ, DECEASED; AND | § | CIVIL ACTION |
| LUIS ALBERTO ESCOBEDO VIERA, | § | |
| JOSE VIERA ESCOBEDO and | § | |
| JOSE ANGEL ESCOBEDO, JR. | § | |
| **Plaintiffs,** | § | |
| | § | |
| V. | § | NO. B-03-135 |
| | § | |
| FORD MOTOR COMPANY, | § | |
| MICHELIN NORTH AMERICA, INC. | § | |
| AND WALMART STORES, INC. | § | |
| D/B/A SAM'S WHOLESALE CLUB | § | |
| **Defendants.** | § | |

## DEFENDANT FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Defendant Ford Motor Company, Inc., ("Ford") hereby moves this Court to enter summary judgment in its favor because plaintiffs cannot produce any evidence establishing a genuine issue as to any material fact. Plaintiffs cannot produce any evidence that the subject Ford Ranger: (1) was defective and unreasonably dangerous; or (2) that the alleged defects caused plaintiff's injuries. This motion is brought pursuant to Fed.R.Civ.P. 56 and is supported by the accompanying Memorandum of Points and Authorities.

/ / /

/ / /

/ / /

/ / /

-1-

RESPECTFULLY SUBMITTED this _____ day of August, 2004.

RODRIGUEZ, COLVIN,
  CHANEY & SAENZ, L.L.P.
1201 East Van Buren
Brownsville, TX 78520
(956) 542-7441 - Telephone
(956) 541-2170 - Facsimile

By:    _____
       Jaime A. Saenz
       State Bar No. 17514859
       ATTORNEYS FOR DEFENDANT
       FORD MOTOR COMPANY

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   FACTUAL BACKGROUND

This lawsuit arises out of an accident that occurred on July 19, 2002.  Complaint, ¶ 4.1.   Juan Rangel Espinoza was driving a 1994 Ford Ranger ("Ranger") heading northbound on a highway.  Complaint, ¶ 4.1.  Jose Angel Escobedo was a passenger in the vehicle.  The vehicle went out of control and rolled.  Complaint, ¶ 4.1.  As a result, Mr. Escobedo died.  Complaint, ¶ 4.1.  According to the driver, one of the rear tires detreaded, causing him to lose control and resulting in the roll over.  *See* Deposition of Juan Espinoza, pp. 23 and 24, attached as Exhibit A.  Apparently, the tire was put on the Ranger approximately three weeks prior to the accident.  Exhibit A, p. 15.  The tire came from a 1978, or thereabouts, station wagon that the driver's brother purchased in Mexico.  Exhibit A, p. 14.

### II.   PROCEDURAL BACKGROUND

Plaintiffs sued Ford alleging the following claims regarding the 1994 Ford Ranger:  1) product liability claim; 2) negligence; 3) misrepresentation; and 4) willful acts or omissions, gross neglect, and malice.   Specifically, plaintiffs alleged stability, roof deformation, window glass, and seat belt claims.

### III.   LEGAL ARGUMENT

#### A.   A SUMMARY JUDGMENT MUST BE GRANTED IF THERE IS NO EVIDENCE TO SUPPORT PLAINTIFFS' CLAIM.

This is a no-evidence motion for summary judgment. Fed.R.Civ.P. 56(b). Summary judgment is designed to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  In this motion, Ford identifies the elements of the pled theories of recovery for which plaintiffs bear the burden of proof at trial and for which no evidence exists.

B.   **PLAINTIFF MUST PROVE ALL ELEMENTS OF THE ALLEGED CLAIMS.**

1.   **Products Liability Claim**

Under Texas law, a plaintiff asserting a claim of design defect must establish that: (1) the product is defective; (2) the defect rendered the product unreasonably dangerous; (3) the product reached the consumer without substantial change in its condition from the time of original sale; and (4) the defective product was the producing cause of the injury to the user.   *Syrie v. Knoll International*, 748 F.2d 304, 306 (5th Cir. 1984), citing *Turner v. General Motors Corp.*, 584 S.W.2d 844, 850 (Tex. 1979).   As demonstrated below, plaintiffs fail to prove that the Ranger is defective and unreasonably dangerous and caused decedent's injuries.

2.   **Negligence Claim**

To prove a negligence claim, plaintiffs must prove four essential elements: (1) a legal duty owed to plaintiffs by the defendant; (2) a breach of that duty; (3) an actual injury to plaintiffs; and (4) a showing that the breach was a proximate cause of the injury. *Williams v. Southern Pacific Transp. Co.*, 804 S.W.2d 132, 138 (Tex. App.Houston 1990).   As demonstrated below, plaintiff fails to prove a causal connection between the Ranger's alleged defects and decedent's injuries.

C.   **SUMMARY JUDGMENT ON THE STABILITY CLAIM IS APPROPRIATE BECAUSE PLAINTIFFS CONCEDED THAT PLAINTIFFS ARE NOT MAKING A STABILITY CLAIM.**

Steve Irwin, plaintiffs' accident reconstructionist, concluded in his report that the Ranger rolled off-road.   Recognizing this, plaintiffs' counsel acknowledged that plaintiffs are not pursuing a stability claim.   *See* letter dated July 9, 2004, attached as Exhibit B. Therefore, summary judgment on the stability claim is appropriate.

D.   **SUMMARY JUDGMENT ON THE ROOF CLAIM IS APPROPRIATE BECAUSE PLAINTIFF HAS NO EVIDENCE TO ESTABLISH THE ELEMENT OF PROXIMATE CAUSE.**

Plaintiffs' causation expert, Dr. Burton, admitted that the roof deformation did not contribute to Mr. Escobedo's injuries. *See* Deposition of Dr. Burton, pp. 73 and 74, attached as Exhibit C. Since plaintiffs' expert admitted there is no causal connection between the roof deformation and Mr. Escobedo's injuries, plaintiffs cannot prove the element of proximate cause and, thus, plaintiffs cannot meet the burden of proof for the roof claim under strict liability or negligence theories. Accordingly, summary judgment on this claim should be dismissed.

**E.  SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM OF A WINDOW DEFECT IS APPROPRIATE BECAUSE PLAINTIFF HAS NO EVIDENCE TO ESTABLISH THE ELEMENT OF PROXIMATE CAUSE.**

The plaintiffs' expert, Dr. Burton, admitted that since the passenger window was down at the time of the accident and still intact in the door panel, nothing about the window glass, also known as glazing, caused or contributed to Mr. Escobedo's injuries. Exhibit C, p. 91. Therefore, based on Dr. Burton's testimony, there are no admissible facts to claim that the alleged glazing defect contributed to Mr. Escobedo's injuries. Thus, whether under a strict liability or negligence theory, summary judgment is appropriate because plaintiffs cannot meet their burden of proof on this claim.

**F.  PLAINTIFFS' SEAT BELT CLAIM FAILS AS A MATTER OF LAW BECAUSE THERE IS NO ADMISSIBLE EVIDENCE THAT THE DECEDENT WAS WEARING THE SEAT BELT.**

There is no witness who has testified that Mr. Escobedo was wearing his seat belt at the time of the rollover crash. Instead, the eye witnesses establish that Mr. Escobedo was completely ejected during the rollover and he was found several feet from the truck. For example, the driver of the pickup truck, Juan Espinoza, testified that both he and Mr. Escobedo were ejected from the Ranger. Exhibit A, pp. 30 and 31. Mr. Espinoza testified that he landed on the grass about seven or eight feet away from Mr. Escobedo. Exhibit A, pp. 30 and 31. Mr. Espinoza also testified that no one moved Mr. Escobedo until the police arrived. Exhibit A, p. 61. Additionally, Mr. Pena, who owned the land where the pickup truck landed, testified that on the morning of the accident, he

woke up from the noise of the crash.  *See* Deposition of Ruben Balderas Pena, p. 5, attached as Exhibit D.  Within two minutes of hearing the crash, Mr. Pena saw two people on the grass, outside of the truck, in front of his house.  Exhibit D, pp. 5 and 6.  Thus, based on the eyewitness testimonies, Mr. Escobedo was ejected.

Although there are no witnesses who testified that Mr. Escobedo was wearing his seat belt, Dr. Burton rendered opinions about how an unidentified defect in the seat belt enhanced Mr. Escobedo's injuries.  *See* Dr. Burton's Expert Report, p. 19, attached as Exhibit E.  He opined that a defect in the seat belt caused or enhanced Mr. Escobedo's injuries because it failed to contain him in the Ranger.  Exhibit E, p. 19.

Dr. Burton's opinions were based upon an assumption that Mr. Escobedo was wearing the seat belt.  His assumptions are based upon statements from plaintiffs' counsel and counsel's assistant about why the passenger's seat belt was cut and their belief that Mr. Escobedo was belted and partially ejected. [1]  Exhibit C, pp. 23, 36-37.  Specifically, plaintiffs' counsel told Dr. Burton that some unknown person allegedly told plaintiffs' counsel that, as a general rule, a seat belt is cut to remove a person:

> Q.    Have you assumed or relied upon Mr. Marchan's statements to you about what some investigating officer said to him with respect to the reason the belt was cut?
>
> A.    In part, yes, because I inquired as to why – if anyone knew who cut the belt or why the belt was cut, because it's not typical to cut a belt if somebody is ejected from the vehicle, unless you want to tie something down with it.  And there is no evidence anyone tied anything down with the belt, so I assume that probably Mr. Escobedo was wearing the belt and, after the crash, the vehicle was upside down, and someone cut the belt to remove him from the vehicle.  And I asked Mr. Marchan about that, and he indicates the police officers, at least, indicated – I think he said police officer – that that [sic] was what they believe had occurred.  That's all that I know about that.
>
> Q.    You don't know whether Mr. Marchan spoke to a police officer, a civilian, or someone else?

---

[1] Although Dr. Burton initially testified that he observed markings on the D-ring, which is where the shoulder belt passes through a loop on the pillar, which he thought were consistent with belt use. Exhibit C, p. 22. Dr. Burton corrected himself a few minutes earlier and testified that the marks he found were for the driver's seat belt and that there were no such marks on the passenger's seat belt. Exhibit C, pp. 25-26.

A.    True.

Exhibit C, pp. 21– 22.  Further, Dr. Burton testified:

> if he [Mr. Escobedo] had these injuries and he wasn't fully ejected, then he could only get them being partially ejected.  I only assumed, from Mr. Marchan's office [plaintiffs' counsel], that there was information initially that **led them** [plaintiffs' counsel] to believe he [Mr. Escobedo] was belted.

Exhibit C, p. 37.  (emphasis added). The other statement that Dr. Burton relied on was made by an assistant of plaintiffs' counsel.  Dr. Burton testified that early in the case, Letty Fierros, plaintiffs' counsel's assistant, told Dr. Burton that plaintiffs' counsel had some information from the driver that Mr. Escobedo was belted.  Exhibit C, p. 23.  This is contrary to the driver's and landowner's sworn testimony, both of which were not supplied to Dr. Burton.  Exhibit C, p. 20.  Dr. Burton assumed that Mr. Escobedo was only partially ejected out the window and that he was wearing his seat belt, but he conceded that Mr. Escobedo's injuries could be explained by Mr. Escobedo's failure to wear a seat belt, which allowed him to be fully ejected.  Exhibit C, pp. 25, 36-38.

Dr. Burton's testimony that an alleged defect in the seat belt caused Mr. Escobedo's injuries is inadmissible because it is unreliable.  *See Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999) (stating that when an expert's "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . , the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'"); F.R.E. 702.

The "overarching subject [of a *Daubert* inquiry] is the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997).  In more concrete terms, the purpose of a *Daubert* inquiry is:

> To make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom *the same level of intellectual rigor* that characterizes the practice of an expert *in the relevant field.*

*Kumho Tire*, 526 U.S. at 152 (emphasis added).   It is within the <u>relevant</u> scientific community context that the trial court examines the *Daubert* factors.   Those factors include:

    --  Whether a "theory or technique...can be (and has been) tested";

    --  Whether it "has been subject to peer review and publication";

    --  Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and

    --  Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."

*Daubert*, 509 U.S. at 592-94. These factors are, in the Fifth Circuit, a "starting point" for analysis in the usual case.  *Black v. Food Lion, Inc.,* 171 F.3d 308, 311 (5th Cir. 1999)(*citing Moore v. Ashland Chemical,* 151 F. 3d 269, 275 (5th Cir. 1998)).  An expert may not rely on data not ordinarily relied upon by experts in the field.  *Wooley v. Smith & Nephew Richards, Inc.*, 67 F.Supp.2d 703, 708 (5th Cir. 1999) (citation omitted)(excluding testimony of plaintiff's expert because he relied on "nothing more than litigation reports and lawyer prepared summaries," [which] "are not of a type reasonably relied upon by experts in a particular field.")  Dr. Burton's causation opinion, based on statements made by plaintiffs' counsel and assistant, is not reliable because experts in the field of biomechanics do not rely on hearsay statements of plaintiff's counsel.  Because plaintiff has no admissible evidence to support the claim that Mr. Escobedo was wearing his seat belt and that any defect in the seat belt caused Mr. Escobedo's injuries, summary judgment on plaintiffs' seat belt claim under the product liability and negligence theories is appropriate.

### G.    THERE IS NO EVIDENCE TO SUPPORT PLAINTIFFS' MISREPRESENTATION CLAIM.

Plaintiffs' claims for recovery based on a misrepresentation are governed by section 402B, *Restatement (Second) of Torts*, which provides:

> One engaged in the business of selling chattels who, by advertising labels, or otherwise, makes to the public a <u>misrepresentation of material fact</u> concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a <u>consumer of the chattel</u> caused by <u>justifiable reliance</u> upon the misrepresentation, even though
>
> (a) it is not made fraudulently or negligently, and
>
> (b) the consumer has not bough the chattel from or entered into any contractual relation with the seller.

Restatement (Second) of Torts section 402B (1965) (emphasis added). Thus, to sustain a section 402B cause of action, plaintiffs must establish, in addition to causation, the existence of <u>a misrepresentation of material fact</u> and <u>justifiable reliance</u> upon that alleged misrepresentation. Through the written discovery, Ford requested from plaintiffs the production of documents that support plaintiffs' misrepresentation claim. In response to Ford's request, plaintiffs admitted that they have no such documents. *See* Plaintiff Febriona Viera Escobedo, as representative of the estate of Jose Angel Escobedo Rodriguez, deceased answers to defendant Ford Motors' second set of interrogatories and request for production, Request For Production No. 5, attached as Exhibit F. In the present case, plaintiffs cannot prove any of these elements because (1) the Ford Ranger is not Mr. Escobedo's truck and, therefore, Ford did not misrepresent any facts to Mr. Escobedo; (2) Mr. Escobedo could not have relied on any statements made by Ford because Mr. Escobedo does not own and never owned the Ranger; (3) plaintiffs have not disclosed any alleged misrepresentation; and (4) and (5) even if plaintiffs had disclosed evidence of misrepresentation, there is no causal connection between plaintiffs' claims and decedent's injuries. Accordingly, plaintiffs fail to establish any misrepresentation by Ford.

## CONCLUSION

Ford respectfully requests the Court to enter a summary judgment in its favor.

**RESPECTFULLY SUBMITTED** this _____ day of August, 2004.

Rodriguez Colvin, Chaney & Saenz, L.L.P.
1201 East Van Buren
Brownsville, TX 78520
(956) 542-7441 - Telephone
(956) 541-2170 - Facsimile

By: _____
    Jaime A. Saenz
    State Bar No. 17514859

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all known counsel of record as set forth below in compliance with the Federal Rules of Civil Procedure on this 25 day of August, 2004.

Mikal C. Watts
Ray R. Marchan
WATTS LAW FIRM, L.L.P.
1926 Elizabeth
Brownsville, TX 78520

Tom Bullion
Brown McCarroll, L.L.P.
111 Congress Avenue, Suite 1400
Austin, TX 78701

Jaime A. Drabek
Drabek & Associates
1720 E. Harrison, Suite B
Harlingen, Texas 78550

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF TEXAS

 3                 BROWNSVILLE DIVISION

 4            CIVIL ACTION NO.:  B-03-135

 5                 * * * * * * * * * * * * * *

 6   FEBRIONA VIERA ESCOBEDO, INDIVIDUALLY AND AS

 7   REPRESENTATIVE OF THE ESTATE OF JOSE ANGEL

 8   ESCOBEDO RODRIGUEZ, DECEASED; AND LUIS ALBERTO

 9   ESCOBEDO VIERA AND JOSE VIERA ESCOBEDO

10   VERSUS

11   FORD MOTOR COMPANY, MICHELIN NORTH AMERICA, INC. AND

12   WALMART STORES, INC., DBA SAM'S WHOLESALE CLUB

13        * * * * * * * * * * * * * * * * * * * * * * * *

14        The deposition of JUAN R. ESPINOZA, a Witness

15   herein, was taken through an interpreter at the

16   instance of the Defendant, Michelin North America,

17   Inc. herein, before and by Paige R. Robinson, a

18   Certified Court Reporter, License #94002, in and for

19   the State of Louisiana, and in conjunction with

20   videotaping provided by Video Reflections, Inc., at

21   the offices of Baton Rouge Court Reporters, Inc.,

22   located at 11832 Newcastle Avenue, Suite 16, Baton

23   Rouge, Louisiana, on the 8th day of July, 2004,

24   commencing at 2:05 P.M., and ending at 3:54 P.M.

25
```

```
 1          from the friend of your employer?
 2   A      I'm sorry.  I don't understand you.
 3   Q      Sure.  Did you ever change out the tires after
 4          you bought the vehicle?
 5   A      Yes.
 6   Q      On how many occasions did you do that?
 7   A      About two times.
 8   Q      The tires that were on the vehicle when they
 9          accident occurred, where did you purchase those
10          tires?
11   A      My brother bought a station wagon in Mexico.
12              INTERPRETER:
13                  I'm sorry.
14   A      And the station wagon that my brother bought
15          had -- those tires was on it.
16   BY MR. SAENZ:
17   Q      And do you know what the model was of the
18          station wagon?
19   A      It was around 1978.
20   Q      Do you know what make of vehicle?
21   A      Dutch.
22   Q      Now, would it be one tire, two tires, or all
23          four tires?
24   A      The four tires.
25   Q      If you remember, Mr. Espinoza, how long was that
```

```
 1           before the accident occurred?  Was it a couple
 2           of months before, was it a year, if you
 3           remember?
 4    A      About three weeks.
 5                MR. DRABEK:
 6                     How long?
 7                THE WITNESS:
 8                     Tres semanas, dos semanas.
 9                MR. DRABEK:
10                     Thank you.
11    BY MR. SAENZ:
12    Q      And if you know, did those tires come with the
13           station wagon or had -- was it your brother or
14           brother-in-law?  I'm sorry.
15    A      My brother.
16    Q      Did your brother buy those tires someplace?
17    A      The person, the owner of the station wagon, had
18           brought them.
19    Q      At Sam's?
20    A      At Sam's, yes.
21    Q      And how did you know that?  Who told you that?
22    A      My brother.
23    Q      And what's your brother's name, and where does
24           he live, sir?
25    A      Jorge Rangel Espinoza, and he lives in Valle
```

Page 23

```
 1   A    It's a little bit high, not too high, but it's
 2        high.
 3   Q    Just tell us in your own words what you're doing
 4        in the seconds before something happened and
 5        then the accident occurred.  Just tell us what
 6        you and Mr. Escobedo are doing.
 7   A    Nothing.  We were just talking.
 8   Q    And do you recall what the speed limit in
 9        kilometers was where the accident occurred?
10   A    No.
11   Q    Do you know how fast you were going in miles per
12        hour or kilometers when the accident happened?
13   A    I was driving at forty-five or fifty, probably a
14        little bit more.
15   Q    And that's forty-five to fifty miles per hour?
16   A    About fifty-five, more or less.
17   Q    But the fifty-five, is that miles per hour or
18        kilometers per hour?
19   A    Miles.
20   Q    Okay.  And as you're driving along, Mr.
21        Espinoza, tell us what happened.
22   A    One of the rear tires was detreaded.  I got
23        ahold of the steering wheel very well.  I didn't
24        brake so the car would stop by itself.  I was
25        just holding the steering wheel and guiding the
```

```
 1            car until it would lose velocity.  Then the
 2            truck stopped by itself, braked by itself.  It
 3            went half round -- half around.  And then the
 4            two tires remained on the -- off the road and
 5            that's when it started to roll over.  And,
 6            accordingly, I think one of the irons on the
 7            truck was broken, because that's what I found
 8            out later on.
 9   Q        Okay.  And after the vehicle rolled, as you
10            described, what do you remember next?
11   A        I would be talking to this man and he would not
12            answer.  He would only be complaining.  Then a
13            man right there, he asked me for my phone number
14            and I gave him the number.  I called my house
15            and talked to my family.  Then the police
16            arrived.  And they were going to take Mr.
17            Escobedo on the police truck, because the
18            ambulance was going to take some time, and I
19            don't know the reason why, but they said the
20            ambulance will take some time to arrive.  They
21            were going to take some time -- they were going
22            to take some time to take in advance before the
23            ambulance arrived, and then as soon as they
24            would see the ambulance, then they would get
25            help.  They forgot that I was laying down as
```

```
 1        direction?

 2   A    It was inside of the patio in the house -- of

 3        the house.

 4   Q    Now, were you thrown from the vehicle?

 5   A    Yes.

 6   Q    When the vehicle came to rest, where did your

 7        body come to rest?

 8   A    At first the truck was there, and then a little

 9        bit ahead I was there.

10   Q    If you remember, approximately how many feet

11        were you ahead of the vehicle from its point of

12        rest?

13   A    No, I don't remember, but somewhat far away from

14        it.

15   Q    And where was Mr. Escobedo, from your personal

16        observation, after the vehicle came to rest?

17   A    It was further away from me, further away from

18        the vehicle than I was.

19   Q    How much further away; can you recall?

20   A    About seven or eight feet further away from me.

21   Q    And did you notice him right away when you were

22        out and you could still see the tires spinning?

23   A    I saw him, but he was not answering anymore.  He

24        was only complaining.

25   Q    All right.  But when you first saw him, was it
```

Page 31

```
 1        immediately when the accident had already
 2        occurred and then you looked around, or did some
 3        time pass before you saw him?
 4   A    No, I saw him at that same time.
 5   Q    So based on your perception at the time, was Mr.
 6        Escobedo also thrown from the vehicle?
 7             INTERPRETER:
 8                  On or off of the vehicle?
 9             MR. SAENZ:
10                  Thrown from the vehicle.
11             INTERPRETER:
12                  Okay.
13   A    Yes.
14   BY MR. SAENZ:
15   Q    Now, I know you said you and he then were ahead
16        of the vehicle.  Does that mean that you and he
17        were further away from the roadway?
18   A    Away from the truck was.
19             MR. SAENZ:
20                  Gentlemen, I want to just draw a
21        diagram.  Sorry to do this when you guys are on
22        the phone, but I'm not understanding exactly
23        where they were.  I'll describe what I'm
24        drawing.
25   BY MR. SAENZ:
```

1    did you perceive that another human being went

2    to go see Mr. Escobedo before they went to go

3    see you?

4  A    No.

5        MR. MARCHAN:

6            I think the translation was wrong.

7  BY MR. MARCHAN:

8  Q    My question is did any person go attend -- and

9    I'll change a little bit.  Did any person go

10    attend to Mr. Escobedo before that same person

11    went to attend or check on you?

12  A    No.

13  Q    Since you couldn't go to where Mr. Escobedo was

14    initially, who went to Mr. Escobedo first?

15  A    When the police arrived, they went with me to

16    try to help me.  I told them to go with him

17    first because I would see that he was in a more

18    difficult situation.  He was unable to talk.

19  Q    Was he able to move?

20  A    No, he couldn't.

21  Q    After learning that the seat belt was cut, did

22    you ever find out why it was cut?

23  A    No.

24  Q    Had that vehicle been in a wreck before to your

25    knowledge?

Ray Marchan, Esq.
July 9, 2004
Page 2

and that he saw Mr. Escobedo immediately after the accident outside the truck. Accordingly, Dr. Burton has no proper foundation (and no admissible facts) to claim that Mr. Escobedo was wearing a seat belt or that the seat belt caused or contributed to his injuries. In sum, because there is no viable stability, roof, seat belt, or glazing claim, this is a case that should be dismissed without the necessity of a summary judgment motion.

I am sure that you would like to avoid spending money for us to depose the remaining experts in this case. I'd like to avoid the cost of travel to the depositions, some of which will occur in the next few weeks. Accordingly, please let me know in the next few days whether you will dismiss this case voluntarily. If not, we will file a motion for summary judgment. We anticipate that this federal judge will grant the summary judgment motion. Even if plaintiff has some fact to with stand summary judgment, the judge will likely apply Mexican law because the accident occurred in Mexico with Mexican citizens. Please call me after you have any opportunity to re-evaluate this case and tell me whether you will dismiss is to that both sides can avoid further expense.

Sincerely,

*jsg*

Jill S. Goldsmith

JSG/slw
cc:     Jaime A. Drabek, Esq.
         Thomas M. Boullion, III, Esq.
         Jaime A. Saenz, Esq.

Page 1
JOSEPH L. BURTON, M.D.                                      June 28, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

FEBRIONA VIERA ESCOBEDO        )
INDIVIDUALLY AND AS            )
REPRESENTATIVE OF THE ESTATE)
OF JOSE ANGEL ESCOBEDO         )
RODRIGUEZ, DECEASED; AND       )
LUIS ALBERTO ESCOBEDO VIERA )
AND JOSE VIERA ESCOBEDO,       )
                               )
                               )
VS.                            ) CIVIL ACTION NO. B-03-135
                               )
FORD MOTOR COMPANY,            )
MICHELIN NORTH AMERICA, INC.)
AND WALMART STORES, INC. DBA)
SAM'S WHOLESALE CLUB           )

*********************************************************
              TELEPHONIC DEPOSITION OF
              JOSEPH L. BURTON, M.D.
                 JUNE 28, 2004



*********************************************************
        TELEPHONIC DEPOSITION of JOSEPH L. BURTON, M.D.,
produced as a witness at the instance of the Defendant, and
duly sworn, was taken in the above-styled and numbered cause
on the 28th day of June, 2004, from 8:01 a.m. to 11:23 p.m.,
via telephone, before Naomi R. Peltier, CSR in and for the
State of Texas, reported by machine shorthand, at the
offices of the Watts Law Firm, 300 Convent, Suite 100, San
Antonio, Texas, pursuant to the Federal Rules of Civil
Procedure.

JOSEPH L. BURTON, M.D.

Q.    Have you asked to do so?

2    A.    No.  I just asked to see if Mr. Marchan's office

3   could find any additional information other than what we

4   have in the limited documents that we have.  And, to date,

5   he's not been able to get any additional information.

6       Q.    Have you received any witness statements,

7   correspondence, or any other information from either the

8   medical examiner or anyone else involved in the postmortem

9   examination of Mr. Escobedo?

10      A.    Specific to that question, no.

11      Q.    Well, how about to any question?

12      A.    Mr. Marchan, at least, implied that they may have

13   taken statements or a deposition of some of the

14   investigating officers, or something like that, but I don't

15   have any depositions or statements from anyone else

16   currently.

17      Q.    Do you know what those statements or information is

18   that they obtained from these investigating officers?

19      A.    Primarily, having to do with the reason the belt on

20   the right front seat occupant position was cut.  It's my

21   understanding from Mr. Marchan that the person he had either

22   spoken to or deposed indicated that the only reason that

23   they would cut a belt like that is to remove someone from

24   the restraint after a crash.  And that's the extent of my

25   knowledge about either a statement or deposition that may be

JOSEPH L. BURTON, M.D.

police officer, a civilian, or someone else?

2      A.    True.

3      Q.    You don't know who that person was; is that

4  correct?

5      A.    I personally don't, no.

6      Q.    He did not -- He did not identify a name; is that

7  right?

8      A.    I don't think he identified a name.

9      Q.    Did he indicate whether this person was actually

10  involved in cutting the seat belt in Mr. Escobedo's truck?

11      A.    Not specifically.  I say "not specifically,"

12  because he didn't relay to me the information that this

13  person he talked to actually cut the belt.  Whether he did

14  or not, I don't have enough information about that to answer

15  the question any further than that.

16      Q.    It's your understanding that the person to whom you

17  spoke simply talked about his general policy about when he

18  cuts belts?

19      A.    Seemed more like that, yes.

20      Q.    Earlier, you said that you've assumed that

21  Mr. Escobedo was wearing his seat belt; is that correct?

22      A.    Yes, I assumed it based on the fact that his belt

23  was cut, and there's some markings on the D-ring that are at

24  least consistent with being belted in a rollover.  But there

25  are no markings on the belt that I could examine because the

JOSEPH L. BURTON, M.D.

belt is retracted back in the retractor that I would say

2   would be diagnostic just from the forensic exam of what I

3   was able to see of someone belted.  But they are certainly

4   consistent with someone who might be belted in a rollover.

5       Q.    There are markings on the belt that would be

6   consistent with that?

7       A.    On the upper shoulder routing loop, the D-ring.

8       Q.    Okay.  We'll go back to that.  Other than the fact

9   that the seat belt is cut today on the passenger's side of

10  the Ford Ranger in which Mr. Escobedo was riding, and there

11  are markings on the D-ring which could be consistent with an

12  occupant wearing a seat belt, are there any other

13  indications or any other facts that support that

14  Mr. Escobedo was wearing his seat belt at the time of this

15  accident?

16      A.    Well, initially, we were told by Letty --

17  Apparently, they had some information, I guess, from the

18  driver, that he had been belted.  But other than that, I

19  personally don't have any information or documented

20  information other than what I've just described to you.

21      Q.    Have you seen witness statements, interview

22  statements, depositions, sworn statements of the driver?

23      A.    No.

24      Q.    Have you spoken to the driver?

25      A.    I have not, no.

JOSEPH L. BURTON, M.D.

Q.    Is it -- Would you agree with me that the shoulder

2    bruise could have occurred when the right shoulder came in

3    contact with the ground or with the window or with the

4    interior of the vehicle?

5    A.    I agree that the bruise on the shoulder could

6    happen from those things, yes.

7    Q.    And you can't determine whether that bruise on the

8    shoulder is from a restraint system or contact with the

9    ground or a window or the interior of the vehicle, correct?

10    A.    I suspect it's not from the window, but I can't

11    tell what it's from.  I don't have enough information.

12    Q.    Amongst your file materials, you've prepared a

13    diagram reflecting injuries --

14    A.    Yes.

15    Q.    -- to Mr. Escobedo; is that right?

16    A.    Yes.

17              (Exhibit No. 7 marked)

18    Q.    (BY MS. GOLDSMITH)  I marked that as Exhibit 7.  Do

19    you want to get your copy so we can go through those?

20    A.    Let me correct something I told you.

21    Q.    Okay.

22    A.    I don't have the latch plate on the number 3 right

23    front belt, and there was nothing on the hard chrome D-ring

24    that I could see.  I was thinking of the driver's belt that

25    had two buff marks on the latch plate.  So, I don't have

JOSEPH L. BURTON, M.D.

anything, other than the cut belt and the history that I

2  gave you for this man being belted, other than potentially

3  the bruise on his right shoulder, which we have discussed.

4      Q.    Okay.  So, you found markings on the D-ring for the

5  driver's seat belt; is that right?

6      A.    The latch plate.

7      Q.    Okay.

8      A.    Both of the D-rings are hard chromed, they're

9  rusted.  I didn't see anything on either one of them.

10     Q.    Okay.  You saw markings on the driver's latch plate

11  consistent with belt use in a rollover?

12     A.    Yes.  And I didn't even find the latch plate for

13  the passenger's side.

14     Q.    So, let's go back to Exhibit 7.

15     A.    Okay.

16     Q.    What I'd like you to do is go through each of the

17  -- Describe all of Mr. Escobedo's injuries, where you found

18  that information in the records that were supplied to you or

19  in any other place, and how each -- how you believe each

20  injury occurred, okay?

21     A.    Well, number one, I've read from the documents

22  exactly what's on these diagrams.

23     Q.    Okay.

24     A.    And they're from the, quote, unquote, "postmortem

25  report" that I've read from.

JOSEPH L. BURTON, M.D.

```
        Q.    What is -- Strike that.
2                It's your opinion that ruptured -- or strike
3  that.
4                The -- It's your opinion that the liver injury
5  occurred when he was either fully or partially ejected from
6  the vehicle?
7        A.    Yes.
8        Q.    You cannot determine whether that liver injury
9  occurred because he was completely ejected or just partially
10 ejected; is that right?
11       A.    We'll have to make an assumption that he's either
12 completely or not completely ejected.  I've made --
13       Q.    Can you tell me which one?
14       A.    I've made the assumption that he's only partially
15 ejected.
16       Q.    And what's that assumption based on?
17       A.    Everything that we've covered so far, and only
18 that.  That Mr. Marchan's office indicates, at least, that
19 they believe that he was partially ejected.  They believe
20 that someone cut his belt to take him out.  The cut belt is
21 consistent, based on my investigation of thousands of
22 crashes, with no other reasonable explanation for why it
23 would be cut with someone who was removed from the vehicle
24 after the crash.  That's it.
25       Q.    You said that Mr. Marchan's office has assumed he
```

Page 37
JOSEPH L. BURTON, M.D.
June 28, 2004

was partially ejected.  What information do you have from

2  Mr. Marchan's office on that topic?

3      A.   Well, I shouldn't have said that.  I told

4  Mr. Marchan, if he had these injuries and he wasn't fully

5  ejected, then he could only get them being partially

6  ejected.  I only assumed, from Mr. Marchan's office, that

7  there was information initially that led them to believe he

8  was belted.

9      Q.   And you haven't been given that information, right?

10     A.   Only to the extent that -- this officer or law

11  enforcement personnel that he spoke to.  Other than that,

12  no.

13     Q.   So, the only basis for your opinion that

14  Mr. Escobedo was wearing his seat belt is a statement from

15  some unknown officer that you heard from Mr. Marchan, that

16  the policy is, you cut the belt if the person is wearing it?

17     A.   Well, no.  That that would be the only reason to

18  cut the belt.

19     Q.   Okay.  And that's the only basis for your

20  understanding that he was wearing his seat belt?

21     A.   No.  His belt was cut.  That's forensic evidence.

22  The belt is not intact.  For some reason, someone cut the

23  belt.  It's not torn; it's cut with a sharp instrument.

24     Q.   Okay.  Specifically, describe how the liver injury

25  occurs with a partial ejection.

JOSEPH L. BURTON, M.D.

A.    Well, it can happen with a belt if enough of the

2   body gets out and the body is moving independent from the

3   vehicle, like being slung around.  Then, if you load up the

4   belt, and it loads up across your right upper quadrant of

5   your abdomen, it's possible to get a liver injury.

6   Otherwise, they're not uncommon when someone's got their

7   upper torso hanging out a window, and the vehicle overrolls

8   and compresses the torso against the ground while it's

9   rolling.  That's about the only other way, except to get

10   thrown some distance from the vehicle.

11       Q.    So, there are three ways to get a liver injury in a

12   rollover accident:  One, you're fully ejected and your

13   impact with the ground causes a liver injury, correct?

14       A.    Or some structure, yes.

15       Q.    Two, the restraint system is -- in a rollover,

16   presses against your liver and causes a liver injury; is

17   that right?

18       A.    That's enough force generated between the body and

19   the belt to injure the liver, yes.

20       Q.    And third, the body is -- the upper torso is

21   ejected out the window, and the liver injury occurs when the

22   door window frame presses against the body; is that the

23   third way?

24       A.    Door panel, yes.

25       Q.    Okay.  You cannot tell me which one of those three

JOSEPH L. BURTON, M.D.

deformation of the A- and B-pillar on the passenger's side?

2    A.    I would suspect there's more than that, but there's

3    not a lot.

4    Q.    You can't tell me whether the -- Strike that.

5            Would it be fair to say that the occupant's

6    face above the -- or the -- at the right front passenger

7    seat has not been compromised?

8    A.    Not significantly compromised.  I will agree with

9    that.

10   Q.    Could you tell me to what degree it's been

11   compromised at all?

12   A.    It looks minimally compromised.  You had talked

13   about a half an inch.  I'm not sure it's a half an inch, but

14   it's surely not severely compromised.

15   Q.    This is an instance where -- Strike that.

16           You would agree with me that the roof did not

17   contribute to Mr. Escobedo's injuries -- Strike that.

18           You would agree with me that the roof

19   deformation did not contribute to Mr. Escobedo's injuries,

20   correct?

21   A.    I agree.

22   Q.    Nothing about the inward or downward deformation of

23   the A-pillar, B-pillar, roof rail, or any other roof

24   component, contributed to Mr. Escobedo's injuries, correct?

25   A.    It doesn't appear that they did -- those structures

JOSEPH L. BURTON, M.D.

you just defined.

2    Q.    Is there any roof or supporting structure that

3  caused or contributed to Mr. Escobedo's injuries?

4    A.    No.

5    Q.    You're not going to come to court and say any

6  defect in the roof or supporting structure caused or

7  contributed to Mr. Escobedo's injuries, correct?

8    A.    That's correct.

9    Q.    You took photographs of your vehicle inspection,

10  correct?

11    A.    I did.

12    Q.    Okay.  Can I mark these photographs as an exhibit?

13    A.    Yes.  They're yours.

14          (Exhibit No. 11 marked)

15    Q.    (BY MS. GOLDSMITH)  Okay.  I've marked--just so

16  that the record is clear--as Exhibit 11 your report dated

17  June 4, 2004, okay?

18    A.    That's fine.

19    Q.    Okay.  Is this an updated report?

20    A.    I don't think so.  It might have been printed out

21  on a different printer or something, but --

22    Q.    Okay.

23    A.    -- I think there's only one report.  If there is

24  another one, I'm not aware of it.

25    Q.    I'm going to mark as Exhibit 12 your photographs of

JOSEPH L. BURTON, M.D.

Q.   So, it's your understanding that the -- Strike
that.

          Is it your opinion that the passenger's window
was completely down during the accident?

     A.   It would appear that way, unless someone rolled it
down at the scene.  I know no reason why anyone would have
done that.  You would have had to get in with it upside down
and roll it down.  So I assume it probably was down.

     Q.   Would you agree with me that -- Strike that.

          You're not going to come to court and say that
a different type of window would have avoided or reduced or
eliminated Mr. Escobedo's injuries, correct?

     A.   Not if it's down, I certainly couldn't say that.

     Q.   You're not going to say that at all, right?  Is
there any evidence anywhere that the window was up?

     A.   That's what I'm saying.

     Q.   There is not?

     A.   I've already told you, I believe the window to have
been down.

     Q.   Okay.  So you're --

     A.   And since I believe it to have been down, I will
not come into court and say some other alternative glazing,
unless it was fixed in the window and you couldn't move it,
would have kept him in the vehicle.

     Q.   You're not going to come to court and say that any

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

FEBRIONA VIERA ESCOBEDO,        ) (
INDIVIDUALLY AND AS             ) (
REPRESENTATIVE OF THE           ) (
ESTATE OF JOSE ANGEL            ) (
ESCOBEDO RODRIGUEZ,             ) (
DECEASED; AND LUIS ALBERTO      ) (
ESCOBEDO VIERA AND JOSE         ) (
VIERA ESCOBEDO,                 ) (
        Plaintiffs              ) (
                                ) (
VS.                             ) (  CIVIL ACTION NO. B-03-135
                                ) (
FORD MOTOR COMPANY,             ) (
MICHELIN NORTH AMERICA,         ) (
INC. AND WAL-MART STORES,       ) (
INC., DBA SAM'S WHOLESALE       ) (
CLUB,                           ) (
        Defendants              ) (

_____

ORAL AND VIDEOTAPED DEPOSITION OF
RUBEN BALDERAS PENA
JUNE 3, 2004

COPY

_____

        ORAL AND VIDEOTAPED DEPOSITION OF RUBEN BALDERAS

PENA, produced as a witness at the instance of the

DEFENDANT MICHELIN NORTH AMERICA, INC., taken in the

above-styled and numbered cause on JUNE 3, 2004,

reported by CORINNA N. GARCIA, Certified Court Reporter

No. 5210, in and for the State of Texas, at the Holiday

Inn Matamoros, Avenida Pedro Cardenas No. 5001,

Matamoros, Tamaulipas, Mexico, pursuant to the Federal

Rules of Civil Procedure and the provisions stated on

the record or attached therein.

17:14:58 1      A.   Correct.

17:15:05 2      Q.   Where do you live, sir?

17:15:11 3      A.   Carretera Empalme Valle Hermoso, Kilometer 63.

17:15:20 4      Q.   Is that where you lived the day of this

17:15:22 5   accident?

17:15:24 6      A.   Exactly.

17:15:35 7      Q.   How old a man are you, sir?

17:15:39 8      A.   63 years old.

17:15:46 9      Q.   This accident took place on July 19th, 2002.  Do

17:15:56 10  you remember the accident?

17:15:59 11     A.   Yes.

17:16:02 12     Q.   What was your first indication that there had

17:16:07 13  been an accident?

17:16:14 14     A.   Well, I was still sleeping when I heard the

17:16:22 15  noise of the crash.  I woke up, I came towards the yard

17:16:33 16  of my house, and I saw a pickup truck with its tires

17:16:44 17  upside down -- no, facing up, sorry, facing up, and two

17:16:51 18  people thrown there on the grass.

17:16:56 19     Q.   How much time between you hearing the noise and

17:17:01 20  waking up and when you were able to look at the vehicle?

17:17:14 21     A.   Minutes, two minutes.

17:17:17 22     Q.   Were you the first person at the scene?

17:17:24 23     A.   Possibly, yes.

17:17:25 24     Q.   You did not see anyone else looking at the scene

17:17:28 25  when you got up and saw it?

17:17:30 1    A.   Some cars -- some cars from the highway had

17:17:43 2  already pulled over to look and to help.

17:17:53 3    Q.   So I understand, when you looked at the pickup

17:17:58 4  truck, it was on its roof, tires facing up?

17:18:09 5    A.   Uh-huh, yes.

17:18:10 6    Q.   You also saw two people who were outside the

17:18:15 7  vehicle lying on the ground?

17:18:22 8    A.   Yes, I saw them.

17:18:25 9    Q.   Did you ever see anybody who claimed to have

17:18:29 10  been in the truck walking around?

17:18:38 11    A.   No.

17:18:39 12    Q.   These two people that you saw lying down, were

17:18:43 13  they both men?

17:18:48 14    A.   Yes, two men.

17:18:50 15    Q.   Did you know either of them personally?

17:18:54 16    A.   No, no.

17:19:00 17    Q.   Did you attempt to help either of these two men?

17:19:10 18    A.   No, only one person asked me where he was and I

17:19:16 19  told him not to move, that the ambulance was going to

17:19:21 20  come and pick him up.

17:19:22 21    Q.   So you walked out to them and could see them and

17:19:26 22  talked to one of the men?

17:19:30 23    A.   Yes, with only one person.

17:19:32 24    Q.   Did you look at the other person?

17:19:36 25    A.   Yes.

# Burton & Associates

### FORENSIC AND ENVIRONMENTAL PATHOLOGY AND MEDICINE

## Joseph L. Burton, M.D.

June 4, 2004


Ray Marchan
Watts Law Firm
Fort Brown Plaza
1926 East Elizabeth Street
Brownsville, Texas 78520

Re: Escobedo
Our case no: 04-32


Dear Mr. Marchan:

You have asked that I evaluate this case in order to determine the mechanism by which the fatal injuries occurred to Jose Escobedo Rodriguez, a 56 year old Hispanic male who was the right front seat occupant of a 1994 Ford pickup truck involved in a rollover crash on July 19, 2002 in Mexico.

In the evaluation of this case I have employed, as I have over the last 30+ years in case investigations, the Scientific Method of Analysis.

The methodology I have employed and the conclusions drawn by my analysis follows the general acceptance within the relevant scientific community as applied to similar investigations. The opinions that I will give are reliable based on the knowledge and experience of the education, background and research in my scientific discipline. The same method of reasoning and methodology is relied on by others in my field as is to any applied science.

The principles and methodology which I have used in my analysis of this incident have been applied to the facts of this case properly. These have been based on the case specific facts as well as the general background information which will be referenced.

Specifically, I have applied not only the same level of intellectual rigor which would characterize the practice of experts in this field but, in general, the level of intellectual rigor exceeds such, since I am aware that all opinions which I will give in this case will be carefully scrutinized by other experts as well as the court.

I was first taught this method of analysis in medical school at which time it was referred to as the "Problem Oriented Patient Evaluation".

---

PAUL R. LEWIS, Jr., Consultant-Biomechanical Engineer • DREW R. OLLEY, Executive Director
BOB TRESSEL, Senior Forensic Investigator • STEVE A. RUSH, Senior Forensic Investigator
13784 Highway 9, Alpharetta, Georgia 30004 • 770.777.0437 • Fax 770.753.4389 • e-mail: dolley@jburtonmd.com

Page 19
04-032
Report

- At the time of my vehicle inspection I did not find the latchplate, and most of the webbing was retracted back onto the retractor making a specific evaluation of the restraint impossible at that time.
- However, should the trim be removed and the belt webbing become available for evaluation or should the latchplate be found then further examination may yield additional forensic evidence to support this opinion.
- Although when some officials observed the body it was out of the vehicle, there is nothing within the Mexican Accident Report to indicate that he was fully ejected from the vehicle, and, in fact, there are no current records indicating his body's position relative to the vehicle when the vehicle was at rest upside down in the field.

**4) It is my opinion that but for the rollover of the vehicle the circumstances would not exist unless some other intervening collision between this vehicle and some other structure or another vehicle occurred that would have reasonably caused life threatening or fatal injury to Jose Escobedo.**

- Support for this opinion can be found simply in the fact that without significant crash forces, without events that place the occupant at harm that there would be no risk for any type of significant injury and especially for death.

**5) It is my opinion that the fatal injuries which occurred to Jose Escobedo were a product of at least his partial ejection of head and potentially portions of the torso from the subject vehicle as it overturned.**

- Support for this opinion can be found in the fact that contained occupants typically and within reasonable scientific probability do not sustain fatal injuries in a laterally rolling vehicle especially in a vehicle where the interior space is preserved for that particular occupant.
- Further support for this can be found in the fact that it is typically testified to by experts looking at lateral rollovers and analyzing vehicle occupant dynamics and injuries to opine that the trailing side of the vehicle sees the greatest force.
- In this case the trailing side is the passenger's side.
- The driver's side has the greatest deformation, however, the driver in this case apparently escaped without life threatening injury and certainly was not killed.
- All of the above is supportive of the opinion that had Mr. Escobedo been contained within the occupant space of the vehicle that he would not have sustained either life threatening or fatal injury.

**6) It is my opinion that since Jose Escobedo received fatal injuries, these injuries due to head, neck and potentially torso injuries, that the restraint system failed to contain him within the subject vehicle's occupant space.**

- The restraint system, assuming it to have been in use, allowed his head and potentially part of his upper torso to extend well out of the plane of the vehicle and make contact with the ground as the vehicle was overturning.

RECEIVED
BOWMAN AND BROOKS
MAY 2 3 2004
TO JSb IRS CLC

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| FEBRIONA VIERA ESCOBEDO | § | |
| INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE ESTATE | § | |
| OF JOSE ANGEL ESCOBEDO | § | |
| RODRIGUEZ, DECEASED; AND | § | CIVIL ACTION |
| LUIS ALBERTO ESCOBEDO VIERA | § | |
| AND JOSE VIERA ESCOBEDO | § | |
| | § | NO. B-03-135 |
| | § | |
| VS. | § | |
| | § | |
| FORD MOTOR COMPANY, | § | |
| MICHELIN NORTH AMERICA, INC. | § | |
| AND WALMART STORES, INC. DBA | § | |
| SAM'S WHOLESALE CLUB | § | |

## PLAINTIFF FEBRIONA VIERA ESCOBEDO, AS REPRESENTATIVE OF THE ESTATE OF JOSE ANGEL ESCOBEDO RODRIGUEZ, DECEASED ANSWERS TO DEFENDANT FORD MOTORS' SECOND SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION

NOW COMES, FEBRIONA VIERA ESCOBEDO, AS REPRESENTATIVE OF THE

ESTATE OF JOSE ANGEL ESCOBEDO RODRIGUEZ, Plaintiff in the above styled and

numbered cause, by and through her attorney of record, WATTS LAW FIRM, L.L.P., at

1926 East Elizabeth Street, Brownsville, Texas 78520, and respectfully submits her

answers and responses to Defendants' Second Set of Interrogatories and Request for

Production, separately, fully, and in writing.

WATTS LAW FIRM, L.L.P.
1926 East Elizabeth Street
Brownsville, Texas 78520
Telephone Number: (956) 544-0500
Facsimile Number: (956) 541-0255

By: _____
Ray R. Marchan
Attorney for Plaintiff
State Bar No.12969050

## CERTIFICATE OF SERVICE

I hereby certify that on this the _____19th_____ day of May, 2004, a copy of the foregoing instrument was forwarded to opposing counsel via fax, by hand-delivery, regular mail, or by certified mail, return receipt requested to:

Jaime A. Saenz
Rodriguez, Colvin & Chaney
P.O. Box 2155
Brownsville, Texas 78522
Attorney for Defendant Ford Motor Company

Jaime A. Drabek
The Law Firm of Rabek & Associates
1720 E. Harrison, Ste. B
Harlingen, Texas 78550
Attorney for Defendant Walmart Stores, Inc. dba Sam's Wholesale Club

Thomas M. Bullion, III
Brown, McCarrol, L.L.P.
111 Congress Avenue, Suite 1400
Austin, Texas 78701
Attorney for Defendant Michelin North America, Inc.

Jill Goldsmith
Bowman & Brooke LLP
2929 North Central Avenue, Suite 1700
Phoenix, Arizona 85012-5761
Co-counsel for Defendant Ford Motor Company

Ray R. Marchan

## INTERROGATORIES

Have you or decedent ever been a party to a civil lawsuit?  If so, state for
each lawsuit:
a.   Were you plaintiff or defendant?
b.   What was the nature of the plaintiff's claim?
c.   When, where and in what court was the action commenced?
d.   State the names of all the parties other than yourself.

ANSWER:  No.


INTERROGATORY NO. 2:
Please state what standards (industry, governmental, corporate, or other) you contend
were violated by Ford Motor Company, and which caused or contributed to the
accident or alleged injuries.

ANSWER:   Plaintiff objects to this interrogatory in that it asks Plaintiff about
information or subjects for which Plaintiff is a non-expert witness.  Plaintiff has no
medical, technical, or other specialized knowledge with which to answer.  Plaintiff
further objects to this interrogatory to the extent that it inquires about the mental
impressions, opinions, conclusions, legal theories and trial strategies of Plaintiff's
attorneys in this case.  Subject to and without waiving the foregoing objection, Plaintiff
answers as follows:  Will supplement.


INTERROGATORY NO. 3:
Please describe specifically, completely, and in detail every addition, alteration, or
modification made to the subject vehicle or any component part by any person, firm,
association, company, or corporation after the original retail sale, if any, and identify
the person, firm, association, company, or corporation that made each addition,
alteration, or modification, state the date or dates on which and the address at which
each addition, alteration, or modification was made, and identify every writing
or other document, if any, evidencing each addition, alteration, or modification.

ANSWER:  I don't know.

**INTERROGATORY NO. 4:**
To the best of your knowledge, please identify every person, firm, association, company or corporation that has performed any repair or maintenance work on the subject vehicle or any component part from the date of its original retail sale to the present, and of each such person, firm, association, company or corporation so identified, please describe specifically, completely, and in detail every instance of said repair or maintenance work, state the date or dates on which and the address at which each instance of repair or maintenance work was performed, and identify every writing or other document evidencing said repair or maintenance work, if any.

**ANSWER:**  I don't know.

**INTERROGATORY NO. 5:**
Identify all documents that support your claim for punitive damages against Ford Motor Company.

**ANSWER:** Ford committed willful acts or omissions, gross neglect, and/or malice, which were a proximate cause of injuries and damages to Plaintiffs, including the death of Jose Angel Escobedo Rodriguez, and for which Plaintiffs are entitled to recover punitive damages, pursuant to §41.003(a)(2) and (3) of the Texas Civil Practice and Remedies Code and Article XVI, §26 of the Texas Constitution.

## REQUEST FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**
Produce all documents that reflect, concern, or relate to alternative designs that you contend that Ford Motor Company should have used for the vehicle at issue in this case.

**RESPONSE:** I have no documents responsive to this request at this time.

**REQUEST FOR PRODUCTION NO. 2:**
Produce all documents that reflect negligent acts or omissions by Ford Motor Company, its employees, or its agents that support your claims in this case.

**RESPONSE:** I have no documents responsive to this request at this time.

**REQUEST FOR PRODUCTION NO. 3:**
Produce all documents that support your claim that the subject vehicle has a manufacturing defect.

RESPONSE: See the following documents previously forwarded to Defendant:

1) Photographs of vehicle bate labeled 205623-000027 to 205623-000043, 205623-000046 to 205623-000050, 205623-000053 and 205623-000087 to 205623-000132;
2) Police report; and
3) Stilson's expert report.

Will supplement as discovery is still ongoing.


**REQUEST FOR PRODUCTION NO. 4:**
Produce all documents that support your claim that there is a fallacy in the warnings or instructions provided on or with the subject vehicle.

RESPONSE: I have no documents responsive to this request at this time.


**REQUEST FOR PRODUCTION NO. 5:**
Produce all documents that support your claim, if any, that Ford Motor Company made a misrepresentation to plaintiffs that caused or contributed to plaintiff's injuries.

RESPONSE: I have no documents responsive to this request at this time.

**REQUEST FOR PRODUCTION NO. 6:**
Please sign the attached releases for medical records.

RESPONSE:  Will supplement.